IN THE UNITED STATES DISTRICT COURT
FOR MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| ATCHAFALAYA BASINKEEPER, LOUISIANA CRAWFISH PRODUCERS ASSOCIATION-WEST, GULF RESTORATION NETWORK, WATERKEEPER ALLIANCE, and SIERRA CLUB and its DELTA CHAPTER, | Case No. COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| Plaintiff, | |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS, | |
| Defendant. | |

INTRODUCTION

1.      This is a complaint for declaratory and injunctive relief.  Plaintiffs Atchafalaya

Basinkeeper, Louisiana Crawfish Producers Association-West, Gulf Restoration Network,

Waterkeeper Alliance, and Sierra Club (collectively "Plaintiffs") bring this action in connection

with federal permits and authorizations relating to the "Bayou Bridge Pipeline," (also "Pipeline")

a 24-inch-wide, 162.5-mile-long crude oil pipeline to run from Lake Charles, Louisiana to St.

James, Louisiana.  Plaintiffs are all organizations dedicated to the protection and preservation of

the Atchafalaya Basin and other resources in Louisiana, and bring this case because defendant

U.S. Army Corps of Engineers ("Corps") has taken actions that authorize the pipeline's

construction and operation in violation of federal statutes.  The construction and operation of the

pipeline, as authorized by the Corps, threatens plaintiffs' health, environmental and economic well-being.

2.      On December 14, 2017, the Corps issued a permit, pursuant to § 404 of the Clean Water Act ("CWA"), authorizing dredge and fill activities needed to construct the Pipeline, substantial portions of which will cross federally protected rivers, streams, lakes, and wetlands, including multiple miles crossing through one of the nation's ecological crown jewels, the Atchafalaya Basin.  Also on December 14, 2017, the Corps issued authorizations pursuant to § 408 of the Rivers and Harbors Act ("RHA") allowing the Pipeline to alter eight Corps projects in the Pipeline's path, several of them in the Atchafalaya Basin.  In issuing these authorizations, the Corps declared that the Pipeline would not have a significant impact on the environment, and did not require a full environmental impact statement ("EIS"), as mandated by the National Environmental Policy Act ("NEPA") for federally permitted projects with significant environmental impacts.  Plaintiffs bring this challenge because the Corps' authorizations for the pipeline were made in violation of the CWA, RHA, NEPA, and their governing regulations.

3.      Plaintiffs seek a declaration that the Corps violated the CWA, RHA, and NEPA when it issued the December 14, 2017 permits and authorizations, and an order vacating those decisions pending full compliance with the law.  Plaintiffs further seek injunctive relief to prevent irreparable harm pending the Corps' compliance with law.

## JURISDICTION AND VENUE

4.      This case states a claim under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*. ("APA"), which authorizes a federal court to find unlawful and set aside any final agency action that is "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id*. § 706.  Jurisdiction arises under 28 U.S.C. § 1331 (federal question jurisdiction); § 2201 (declaratory relief); § 2202 (injunctive relief).

5.      Venue in this district is appropriate under 28 U.S.C. § 1391(e) because it is the district in which several of the Plaintiffs reside and in which "a substantial part of the events or omissions giving rise to the claim occurred."

PARTIES

6.      Atchafalaya Basinkeeper ("ABK"), founded in 2004, is a 501(c)(3) nonprofit organization incorporated under the laws of Louisiana, with its principal place of business in Lafayette, Louisiana, and conducts operations throughout the Basin.  ABK works to preserve and restore the ecosystems of the Atchafalaya Basin for future generations.  ABK is a proud member of Waterkeeper Alliance, an international grassroots advocacy organization of over 300 programs working to protect watersheds across the globe.  Locally, ABK works diligently to protect the long-term health and sustainability of the Atchafalaya Basin.  ABK has over 1,100 members, including members who live, work, hunt, boat and fish in the Atchafalaya Basin, and who recreate and enjoy the diverse ecosystems represented in the Basin.

7.      Louisiana Crawfish Producers Association-West ("LCPA") is a nonprofit organization incorporated under the laws of Louisiana, and operates out of Henderson, Louisiana.  LCPA works to protect the economic, environmental, and cultural interests of the Basin and its residents and to promote a healthy habitat for the crawfish, fish, and other wildlife that the Basin supports.  Additionally, LCPA works to protect and insure public access to the waters of the United States within the Basin. LCPA works to ensure that the state and federal laws and regulations intended to preserve and enhance the Basin's natural resources and wildlife are followed.  LCPA has approximately 500 members, including recreational and commercial fishermen, hunters, and recreationists who live, work, and recreate in and around the Basin. These members regularly use the Basin in pursuit of these interests, including the areas that will be adversely impacted by the Bayou Bridge pipeline.

8.     Gulf Restoration Network ("GRN") is a nonprofit organization headquartered in New Orleans.  GRN is committed to restoring the Gulf of Mexico to an ecologically and biologically sustainable condition.  GRN members and supporters live, work, and recreate, in the five Gulf states of Louisiana, Texas, Mississippi, Alabama, Florida, and nationwide.  GRN's members and supporters include fishers, kayakers, canoers, and others who value the Atchafalaya Basin as part of their cultural heritage, as a natural resource, and, often, as essential for their livelihoods.  The Basin is the nation's largest river swamp and includes approximately 880,000 acres of forested wetlands.  The GRN has long been concerned by what it perceives as the U.S. Army Corps of Engineers' mismanagement of the Basin, as well as other riverine and coastal wetlands.  As a result, GRN has monitored 404 wetlands and other Corps permitting in the Basin, as well as other coastal areas of Louisiana, filed comments and legally challenged Corps permitting of wetlands destruction.  For example, in 2015 the GRN joined other plaintiffs in this case in a challenge to Clean Water Act "general permit" 13 that allowed dredge and fill (i.e., destruction) of wetlands under the jurisdiction of the Corps' New Orleans District for construction of roads, drilling locations, pits, levees, and other facilities.

9.     Waterkeeper Alliance is a not-for-profit incorporated under the law of New York dedicated to protecting and restoring water quality to ensure that the world's waters are drinkable, fishable and swimmable.  Waterkeeper is committed to strengthening and growing a global network of grassroots leaders protecting everyone's right to clean water.  Waterkeeper Alliance comprises 337 Waterkeeper Organizations and Affiliates working in 39 countries on 6 continents, covering over 2.5 million square miles of watersheds.  In the United States, Waterkeeper Alliance represents the interests of its 176 U.S. Waterkeeper Organizations and Affiliates, as well as the collective interests of thousands of individual supporting members that

live, work and recreate in waterways across the country – many of which are severely impaired by pollution.  Waterkeeper Alliance's Clean and Safe Energy campaign focuses on protecting waterways and communities by stopping the polluting effects of fossil fuels, including the construction and operation of pipelines.  Atchafalaya Basinkeeper is a member of Waterkeeper Alliance.

10.     Sierra Club is the nation's oldest grassroots organization dedicated to the protection and preservation of the environment.  Sierra Club has over 830,000 members dedicated to exploring, enjoying, and protecting the wild places of the Earth; practicing and promoting the responsible use of the Earth's ecosystems and resources; educating and enlisting humanity to protect and restore the quality of the natural and human environment; and using all lawful means to carry out these objectives.  The Sierra Club's concerns encompass the protection of wildlands, wildlife and habitat, water resources, air, climate, public health, and the health of its members, all of which stand to be affected by this project.

11.     The Delta Chapter of the Sierra Club has over 3,400 Sierra Club members living in Louisiana, including within the Basin.  Many Sierra Club members recreate, boat, and fish, in the Basin.  The Delta Chapter advances the cause of protecting Louisiana's environment in a variety of ways, including sponsoring a campaign to take mercury out of the environment, identifying and protecting the state's scenic rivers, working to save cypress trees and to protect the Atchafalaya Basin, America's greatest river swamp.  The Delta Chapter conducts outings and informational events so that Club members and supporters can enjoy the unique environment of Louisiana.  The Delta Chapter has worked closely with other plaintiffs to stop illegal logging of cypress-tupelo forest, to protect water in the Basin from pollution and deterioration due to oil and

gas related operations and construction, and to defend the right of public access to state waters in the Atchafalaya Basin.

12.     Plaintiffs stand in the shoes of their members who live, work, and recreate in places threatened by the Bayou Bridge Pipeline and who use, study, and cherish the land, wildlife, and other resources that may be irrevocably damaged by the project, especially in and around the Atchafalaya Basin.  Plaintiffs' members and supporters live in and along the pipeline right of way, and fish and hunt within the Basin for commercial and subsistence purposes.  The Pipeline threatens these individuals' use and enjoyment, and the economic value, of their property and/or livelihoods, which are based on a properly functioning ecosystem.  Others recreate, study, and strive to protect the unique ecology and wildlife that could be affected by the pipeline.  Plaintiffs' members enjoy crawfishing, boating, hunting, fishing, hiking, picnicking, and observing wildlife near the proposed pipeline route, and plan to return to those areas to pursue such activities in the future.

13.     The Corps' approval of the Pipeline, based on a plainly inadequate environmental review and consideration of mandatory factors under the law, injures the health, recreational, economic, professional, scientific, and aesthetic interests of Plaintiffs' and their members.  The relief requested in this lawsuit will redress such injuries.

14.     Defendant U.S. Army Corps of Engineers is a federal regulatory agency that is organized under the U.S. Department of Defense.  It is authorized by federal law to issue permits and authorizations for activities involving dredge and fill of waters of the United States upon satisfaction of certain conditions, and alterations to its water resource projects.  The challenged permits and authorizations were signed by New Orleans District Commander Colonel Michael Clancy.

STATUTORY AND REGULATORY BACKGROUND

I.     THE CLEAN WATER ACT.

15.     Congress enacted the CWA in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  To accomplish this goal, the CWA prohibits the discharge of any pollutant, including dredged spoil or other fill material, into waters of the United States unless authorized by a permit.  *Id*., § 1311(a).  Unless statutorily exempt, all discharges of dredged or fill material into waters of the United States must be authorized under a permit issued by the Corps.  *Id*., §§ 1344(a)–(e).

16.     The Corps is authorized to issue two types of permits under § 404: individual permits and general permits.  *Id*.  The Corps issues individual permits under § 404(a) on a case-by-case basis.  *Id*., § 1344(a).  Such permits are issued after a review involving, among other things, site specific documentation and analysis, public notice and opportunity for a hearing, public interest analysis, and formal determination.  33 C.F.R. § 322.3; Parts 323, 325.

II.    THE RIVERS AND HARBORS ACT.

17.     The Rivers and Harbors Act of 1899 is the nation's oldest environmental law. The statute prohibits a number of activities that impair ports, channels, and other navigable waters.  Unlike the CWA, which applies in all waters of the United States, the RHA applies only in "navigable" waters, defined as waters subject to the ebb and flow of the tides, or waters that are "presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce."  33 C.F.R. § 329.4.

18.     Section 10 of the RHA, 33 U.S.C. § 403, among other things, makes it unlawful "to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of" any navigable water without a permit from the Corps.  Tunneling under a navigable water requires a section 10 permit from the Corps, even without any discharge into navigable

waters.  33 C.F.R. § 322.3(a) ("For purposes of a section 10 permit, a tunnel or other structure or work under or over a navigable water of the United States is considered to have an impact on the navigable capacity of the waterbody.").

19.     A separate provision of the RHA, known as "Section 408," makes it unlawful to "build upon, alter, deface, destroy, move, injure, obstruct by fastening vessels thereto or otherwise, or in any manner whatever impair the usefulness of any sea wall, bulkhead, jetty, dike, levee, wharf, pier, or other work built by the United States" without a permit from the Corps.  33 U.S.C. § 408.  Prior to issuance of a § 408 permit, the Corps must determine whether the use or occupation will be injurious to the public interest or impair the usefulness of the project.

III.     THE NATIONAL ENVIRONMENTAL POLICY ACT.

20.     NEPA, 42 U.S.C. §§ 4321–4370f, is our "basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  It makes environmental protection a part of the mandate of every federal agency.  42 U.S.C. § 4332(1).

21.     NEPA seeks to ensure that federal agencies take a "hard look" at environmental concerns.  One of NEPA's primary purposes is to ensure that an agency, "in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts."  *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349 (1989).  NEPA also "guarantees that the relevant information [concerning environmental impacts] will be made available to the larger audience," including the public, "that may also play a role in the decision-making process and the implementation of the decision."  *Id.*

22.     NEPA requires agencies to fully disclose all of the potential adverse environmental impacts of its decisions before deciding to proceed.  42 U.S.C. § 4332(C).  NEPA

also requires agencies to use high quality, accurate scientific information and to ensure the scientific integrity of the analysis.  40 C.F.R. §§ 1500.1(b), 1502.24.

23.     If an agency action has adverse effects that are "significant," they need to be analyzed in an environmental impact statement ("EIS").  40 C.F.R. § 1501.4.  If it is unclear whether impacts are significant enough to warrant an EIS, it may prepare an "environmental assessment" ("EA") to assist in making that determination.  *Id*.  If the agency determines that no EIS is required, it must document that finding in a "finding of no significant impact" ("FONSI").

24.     NEPA's governing regulations define what "range of actions, alternatives, and impacts [must] be considered in an environmental impact statement."  40 C.F.R. § 1508.25.  This is in part what is known as the "scope" of the EIS.  The EIS must consider direct and indirect effects.  The direct effects of an action are those effects "which are caused by the action and occur at the same time and place."  40 C.F.R. § 1508.8(a).  The indirect effects of an action are those effects "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."  40 C.F.R. § 1508.8(b).

25.     An agency must also analyze and address the cumulative impacts of a proposed project.  40 C.F.R. § 1508.25(c)(3).  Cumulative impacts are the result of any past, present, or future actions that are reasonably certain to occur.  Such effects "can result from individually minor but collectively significant actions taking place over a period of time."  40 C.F.R. § 1508.7.

FACTUAL ALLEGATIONS

I.     THE BAYOU BRIDGE PIPELINE WILL CONNECT WITH THE CROSS-
       CONTINENTAL BAKKEN PIPELINE.

26.     On June 1, 2017, Energy Transfer Partners ("ETP") and several other entities began operating the "Bakken pipeline," an 1,832-mile long pipeline running from the

Bakken/Three Forks oil production region of North Dakota to Nederland, Texas.  The Bakken

pipeline is made up of two components:  the controversial Dakota Access pipeline ("DAPL")

(which runs 1,172 miles from North Dakota to Pakota, Illinois) and the Energy Transfer Crude

Oil Pipeline ("ETCO"), a 700-mile converted natural gas pipeline, which connects the Pakota

terminus of DAPL to Nederland, Texas.  The Bakken pipeline has a maximum capacity of

560,000 barrels (or 23.5 million gallons) of crude oil per day.

27.     Although touted as a critically important piece of infrastructure, the Bakken

pipeline has been operating significantly below capacity since its inception.

28.     The Bayou Bridge Pipeline constitutes yet another segment in this crude oil

transportation network.  Bayou Bridge Pipeline LLC ("Bayou Bridge") is a joint venture between

ETP and Philips 66 Partners LP ("Philips").  Bayou Bridge constructed a 49-mile, 30-inch

pipeline running from the terminus of the Bakken pipeline at Nederland, Texas, to Lake Charles,

Louisiana, that went into service in April 2016.  In 2016, Bayou Bridge applied for permits to

connect this earlier constructed pipeline with the proposed Bayou Bridge pipeline.

29.     The Bayou Bridge pipeline would be a 24-inch pipeline, running 162 miles from

Lake Charles to a terminal near St. James, Louisiana, in proximity to crude oil refineries and

crude export terminals.  The Pipeline is unnecessary because crude oil already moves between

these two locations.  As originally proposed, it would have a capacity of 280,000 barrels (or 11.7

million gallons) of crude oil per day.  However, the permit now says the pipeline has a maximum

capacity of 480,000 barrels of crude a day.  The project would include ancillary above-ground

facilities, including two pump stations.

30.     In essence, the Bayou Bridge pipeline would constitute the final segment of a cross-continental mega-pipeline connecting the Bakken oil fields in North Dakota with refineries and export terminals in eastern Louisiana.

## II.     THE PIPELINE WILL CROSS THE ATCHAFALAYA GREAT RIVER SWAMP.

31.     Construction of the of the Bayou Bridge pipeline will have significant environmental impacts on the human and natural environment of Louisiana.  It will cross hundreds of streams, rivers, lakes, wetlands, and bayous, where both construction and operation of the project presents significant environmental threats.

32.     Most notable is the Pipeline's crossing of the Atchafalaya Basin, one of the nation's ecological crown jewels and a critical component of the nation's flood protection system.  The Basin is America's largest river swamp.

33.     The Atchafalaya River is the largest distributary of the Mississippi River, and forms part of the great Mississippi River Delta.  Louisiana's Comprehensive Master Plan for a Sustainable Coast states that "the Mississippi River Delta provides at least $12 billion to $47 billion in benefits to people each year.  If this natural capital were treated like an economic asset, its total economic benefit to the nation would be $330 billion to $1.3 trillion per year."  State of Louisiana, *Louisiana's Comprehensive Master Plan for a Sustainable Coast*, at ES-10 (Jun. 2, 2017).  Fed by waters from the Red and the Mississippi Rivers, the Atchafalaya flows south for approximately 140 miles, emptying into the Gulf of Mexico at Atchafalaya Bay, approximately 15 miles south of Morgan City, Louisiana.  La. Dep't of Nat'l Res., *FY 2018 Annual Plan: Atchafalaya Basin Program Supplement*, at 5 (2017) ("*2018 Atchafalaya Basin Plan Supplement*").

34.     The Atchafalaya Basin historically encompassed over two million acres, but flood protection levees substantially reduced the Atchafalaya River's floodplain.  Today, the

Atchafalaya Basin encompasses approximately 880,000 acres of forested wetlands. The historical Basin area including and surrounding the floodway boasts the largest contiguous tracts of fresh marsh in Louisiana, and is unique among basins in the state because it is the only growing delta system with nearly stable wetlands. *See 2018 Atchafalaya Basin Plan Supplement* at 5.

35.     The Atchafalaya Basin's bottomland hardwoods, cypress swamps, bayous, and backwater lakes are some of the country's most productive habitats. Louisiana signature wildlife like alligators, roseate spoonbills, and crawfish; plant life like cypress trees and Swamp Iris; and abundant fish and other aquatic life are found there. La. Dep't of Nat'l Res., *FY 2016 Annual Plan: Atchafalaya Basin Program*, at 6 (2016) ("*2016 Atchafalaya Basin Plan*").

36.     Forty-five species of mammals inhabit the Basin, including bobcat, coyote, fox, armadillo, opossum, and beaver. The Basin is home to the largest concentration of Louisiana black bears in South Louisiana. Small game animals like the fox squirrel, gray squirrel, and swamp rabbit live here, as well as white-tailed deer, the principal big-game species. Raccoon, mink and nutria are abundant. *2018 Atchafalaya Basin Plan Supplement* at 6. Several of the wildlife species found in the Basin are listed under federal or state endangered species laws.

37.     The Basin is situated at the mouth of one of North America's most important flyways, and the wetlands of the Atchafalaya Basin provide excellent feeding and resting areas for migratory waterfowl, making the region an important wintering area for mallards and gadwalls. Over 250 species of birds can be found in the Basin, including the bald eagle, Peregrine falcon, and Bachman's warbler. Wood ducks, great blue herons, and great egrets are common inhabitants of the shallow lakes and bayous. *2018 Atchafalaya Basin Plan Supplement* at 6. The Basin is also an important habitat for neo-tropical migratory birds.

38.     Over 40 reptilian species, including the American Alligator, make their home in the Basin, along with 20 species of amphibians.  The Basin also supports over 100 species of fish, crawfish, shrimp, and crabs.  *Id.*

39.     This natural wonderland contributes significantly to the local economy.  Tourism and travel expenditures in the Basin exceed $400 million annually.  *2018 Atchafalaya Basin Plan Supplement* at 10.  During 2016, the Louisiana Department of Wildlife and Fisheries sold over 190,000 recreational hunting, fishing and trapping licenses, and in 2015 sold thousands of commercial licenses.  *Id.* at 6.  The economic impact of travel in the Atchafalaya Basin in 2015 alone contributed over $87 million in payroll, over $18 million in state sales tax receipts, and over $11 million in local sales tax receipts.  *Id.* at 5.

40.     Local commercial fishermen, including members of plaintiffs LPCA and Atchafalaya Basinkeeper, make a living from commercial fishing in the Atchafalaya Basin.  From January to August 2014, fisherman harvested over 11 million pounds of wild crawfish, with a dock side value of $9.7 million.  *2018 Atchafalaya Basin Plan Supplement* at 7.

41.     Additionally, the Atchafalaya Basin also contributes to Louisiana's booming tourism industry.  Between June 2004 to September 2016, 1.4 million visitors came to the Atchafalaya Welcome Center, and over 900,000 tourists visited the Lake Fausse Point State Park. *2018 Atchafalaya Basin Plan Supplement* at 7.

42.     The Atchafalaya Basin also plays an important role of flood protection.  The Basin is the most important spillway in the Lower Mississippi River, and during major floods water is diverted into the Basin to protect communities living in the Mississippi River Delta and coastal Louisiana, including the cities of Baton Rouge, New Orleans, Lafayette and Morgan City.

III.    PIPELINE IMPACTS.

43.    The ecology of the Basin has suffered significant degradation over several decades due to multiple causes, many of them relating to the management of the Basin by the Corps, and Corps permitting private activities which degrade habitat and water quality, including construction of oil and gas pipelines through the Basin.  Oil and gas pipelines, and the spoil banks and canals associated with their construction, have degraded or destroyed extensive portions of the Basin's wetlands and waterways.

44.    The Bayou Bridge pipeline threatens to cause significant environmental harm to an integral part of our national heritage, an ecological treasure that sustains local economic growth and forms an important center of the culture and soul of the State of Louisiana. Construction of the Pipeline will degrade the Basin in multiple direct, indirect, and cumulative ways.

45.    The Pipeline will require a 75-foot-wide right of way through the Basin, permanently converting hundreds of acres of rare forested wetlands into non-forested wetlands, with significant ecological impacts that were not meaningfully assessed or addressed by the Corps in issuing the permit.  Studies have revealed that cypress and tupelo trees cannot regenerate in many areas due to the altered hydrology of the Basin, as extended periods of flood-level flows drown young trees before they can become established.  Consequently, trees that are hundreds of years old and are scheduled for removal in the pipeline right-of-way, are likely gone forever.  Such trees, especially older hollow cypress trees, are critically important to the Basin's ecology.  They provide habitat and refuge for numerous mammal and avian species that is already in short supply.

46.    Another major impact of the project arises from pipeline leaks and spills, which are routine in both new and old pipelines.  For example, a segment of the Keystone pipeline built

in 2010 recorded 35 leaks in its first year of operations.  Major spills from crude oil pipelines have occurred recently on the Kalamazoo and Yellowstone Rivers, with devastating economic and environmental impacts.  Data reveals that spills in Louisiana from existing pipelines are commonplace.  One study revealed 403 major pipeline spills in Louisiana between 1997 and 2017, or over 20 a year.

47.     It is all but certain that the Bayou Bridge pipeline will suffer from numerous leaks and spills during its lifetime.  With a capacity of 480,000 barrels per day, and in light of its location in rare and unique aquatic environments, even a small leak could have major ecological consequences.

48.     Leaks below 2% of pipeline flow are typically "invisible" to remote leak detection technology.  In other words, a pipeline with Bayou Bridge's capacity could be leaking 9,600 barrels a day (2% of maximum pipeline flow) without being discoverable by the remote sensing technology.  That amounts to over 400,000 gallons of crude oil, every day.  Given the remoteness of the Basin, it could take a considerable amount of time before such a leak was discovered and reported.

49.     Bayou Bridge's corporate parent, Energy Transfer Partners, plans to use the pipeline to carry varying types of crude oil, which have different responses when spilled.  While the Pipeline will be connected to ETP's infrastructure carrying "light, sweet" Bakken oil, ETP has also stated that the pipeline could also be used for diluted tar sands bitumen sourced from Canada.  Such "heavy, sour" oil has different environmental impacts when spilled and is even more difficult to clean up than typical crude oil.

50.     An oil spill in the dense swamp, particularly during high water periods when vast areas of the Basin are under water, would be an ecological catastrophe.  Clean up of an oil spill

- 15 –

in the Basin would be extraordinarily difficult, expensive, and would have numerous environmental ramifications of its own.

51.    ETP has an abysmal safety record in the thousands of miles of pipelines it operates.  One analysis of federal reporting data—which is widely known to undercount actual spill incidents—reported that ETP and its subsidiary Sunoco Inc. were responsible for 329 "significant" pipeline incidents in between 2006 and 2017—a rate of over two a month— losing over a million gallons of crude oil and imposing an estimated financial cost of over $67 million.  No data is available on smaller incidents.  In addition to releases of crude oil, ETP's mismanagement has resulted in other catastrophic environmental impacts, such as when ETP released 2.05 million of gallons of drilling fluid into the Tuscarawas wetlands in Ohio in April of 2017.  Later, the State of West Virginia ordered work on the same pipeline shut down due to a pattern of permit violations and environmental harm.

52.    Construction and maintenance of pipelines through the Atchafalaya Basin creates canals and spoil banks that have major ecological ramifications.  Spoil banks and canals inhibit the historical sheeting pattern of water flow, deteriorating water quality within nearly all of the large, interior swamps.  *2016 Atchafalaya Basin Plan* at 15.  Canals disrupt the natural hydrology by transporting and depositing sediments into sensitive wetlands ecosystems, like cypress tupelo river swamps, destroying these highly productive wetlands by filling them with sediment.  Spoil banks, a common result of pipeline construction in the Basin, are linear piles of soil dumped adjacent to canal trenches, which are dug through the Basin's unique wetland soil.  As a result of past pipeline construction, there are thousands of linear miles of spoil banks that cross the Atchafalaya Basin.  Spoil banks disrupt the natural movement of water through the Basin, resulting in hypoxic conditions that have drastically altered the ecology of the Basin.  Today,

major portions of the Basin that once sustained crawfishing families for generations are no longer fishable due to the ecological effects of spoil banks.

53.     Even assuming spoil banks are removed and canals are remediated, construction of these hydrologic barriers creates irreversible impacts.  Spoil banks and canals distribute sediment during high water periods, filling in lakes and bayous bisected by the oil pipeline's path, irreparably changing the hydrology of these waterbodies.  Furthermore, along a portion of the Pipeline route, Bayou Bridge proposes to augment an existing spoil bank and pipeline canal, creating a barrier to future remediation.

54.     In 2017, the Louisiana Legislature passed a Senate Resolution requesting the Department of Natural Resources "study potential solutions that may mitigate spoil banks." 2017 La. Sess., Senate Res. No. 154.  The study group has in two meetings, heard statements from stakeholders and interested persons, the majority of which support the contention that pipeline spoil banks cause significant water quality deterioration in the Atchafalaya Basin.  A final report of the study group will be presented to the Louisiana Senate Committee on Natural Resources no later than February 1, 2018.

55.     Leaving spoil banks in place after completion of pipeline construction is generally a violation of permits issued under the CWA and/or RHA by the Corps.  However, the Corps has failed to enforce such permits, allowing permittees to leave these spoil banks in place for years or decades, to the considerable detriment of the Basin's ecology.  Plaintiffs have advocated for decades to no avail in court, state and federal legislatures, and to the Corps seeking better enforcement of permit conditions for dredge and fill permits when operators of oil and gas pipelines fail to remediate spoil banks.  However, the Corps continues to issue permits for new pipeline activities, even to entities that are out of compliance with other permits.

56.     Canals and spoil banks from crisscrossing oil and gas pipelines have contributed to a "death by a thousand cuts" scenario for Louisiana's wetlands, contributing significantly to wetland destruction, coastal erosion, and loss of flood protection.  Louisiana's Coastal Management Plan expresses concern that:

> Dredging canals for energy exploration and pipelines . . . took a toll on the landscape, altering wetland hydrology and leading to land loss. . . . Land loss reduces shorelines, marshes, and swamps that are a vital barrier and our first line of defense against storm surge and flooding.  Coastal flooding has become an all too common occurrence due to powerful storm surges associated with tropical events made worse over the years by subsidence, sea level rise, and coastal land loss.

La. Coastal Prot. & Restoration Auth., *Louisiana's Comprehensive Master Plan for a Sustainable Coast*, at ES-6 (Jun. 2, 2017) ("*2017 Louisiana Coastal Plan*").

57.     The cutting and dredging of thousands of kilometers of canals by oil, gas, and pipeline companies through Louisiana's wetlands allows boats, drilling rigs, pipelines, and other equipment to get through the marsh, but also permits saltwater flow into the wetlands, weakening and killing the plants that hold the marsh together.  Storms then wash the remaining soil away. John Carey, *Louisiana Wetlands Tattered by Industrial Canals, Not Just River Levees*, Scientific American, Dec. 1, 2013.

58.     The Louisiana Coastal Plan recommends investing $25 billion in wetland restoration, to prevent land loss, create habitat to support ecosystems, and reduce flood risk to communities, paid for in part using settlement funds from the Deepwater Horizon oil spill settlement.  *2017 Louisiana Coastal Plan* at 96, 128.

59.     The State of Louisiana is also expending millions of dollars at the expense of taxpayers on restoration projects in the Atchafalaya Basin many of which remediate environmental destruction wreaked by spoil banks and canals created by oil and gas pipelines.

For example, the Cocodrie Swamp Project seeks to restore freshwater flow and open natural waterways to portions of Bayou LaRose and the surrounding swamp that was cut off from fresh water and silted up by the cutting of oil and gas canals and Corps channel training. *2016 Atchafalaya Basin Plan* at 36. Similarly, the Buffalo Cove Water Management Project proposes to remediate hydrologic impoundments caused by the spoil banks of two oil and gas canals. *Id.* at 41. The Beau Bayou Swamp, "once known as a highly productive fisheries area," has deteriorated from hypoxic conditions due in part to pipeline canal spoil banks. The State of Louisiana proposes to expend $3,701,400 in funds from the Coastal Impact Assistance Program on the Beau Bayou project alone. *Id.* at 42-43.

60.     The Bayou Bridge Pipeline threatens to turn back the clock on these restoration efforts, by creating yet another canal and spoil bank. The Bayou Bridge pipeline will follow the right of way of two other out-of-compliance pipeline projects that cross the Atchafalaya Basin already, the Sorrento pipeline and Wanda pipeline. Construction of the Bayou Bridge pipeline in old spoil banks of these existing pipelines will substantially hinder restoration efforts.

61.     Plaintiffs, and many others, have sought to draw the Corps' attention to the historic lack of compliance and the Corps' longstanding history of non-enforcement of these permit conditions at these and other pipelines. Plaintiffs remain unaware of any effort by the Corps to bring any pipeline into compliance, even as existing spoil banks are creating a cascading collapse of the Basin's ecology and harming crawfishermen and others who rely on the Basin for their livelihoods.

62.     One such project with a lengthy and ongoing history of noncompliance is a pipeline owned by the same corporate parent as the Bayou Bridge pipeline. Together with its joint venture partner Kinder Morgan, ETP owns and operates the Florida Gas Pipeline, a natural

gas pipeline project that connects Texas with Florida, and which crosses the Atchafalaya Basin from west to east.  Like other pipelines, the Florida Gas Pipeline permit issued by the Corps prohibited the erection of permanent spoil banks.  However, at the time the pipeline was built, a spoil bank was created and left behind, and it remains to this day, blocking bayous and countless waterways, affecting acres of wetlands by filling them with sediments, causing hypoxic conditions and degradation of water quality, and restricting the access and use of navigable waterways.  In other words, Bayou Bridge's corporate parent is already out of compliance with permit conditions on a different pipeline in the same Basin.

63.	Like past Corps' permits, the Bayou Bridge permit prohibits leaving behind spoil banks once construction is complete.  It also prohibits placing the pipeline in the spoil bank itself, a technique that has been used elsewhere in the Basin because construction is cheaper and easier than digging new trenches through the Basin.  However, the permit does not address how these permit conditions can be expected to result in compliance when decades of experience reveal that noncompliance is commonplace and Corps' enforcement is nonexistent.

64.	In multiple sets of legal comments addressed to the Corps, Plaintiffs expressed their concerns regarding these and many other issues associated with the CWA and NEPA process.  The comment letters extensively documented the risk of oil spills, the ecological impacts of pipeline construction in and out of the Basin and elsewhere, and the ongoing impacts from historic noncompliance with previous permits, including the noncompliance of the project proponent at the Florida Gas Pipeline.

65.	A key theme of the Plaintiffs' comments, and other public comments, was whether the project was necessary at all.  Currently, Louisiana refineries receive crude oil from multiple sources, including other pipelines as well as vessels.  The application describes the

purpose of the project as "to move an economically, abundant, reliable, and domestic supply of crude oil from Clifton Ridge Marine Terminal in Lake Charles, Louisiana to various crude oil terminals located near St. James, Louisiana." Application at 3. Crude oil already moves between these two locations in the absence of the proposed Pipeline. The only purpose for the Pipeline then, is to advantage a single company offering a different transportation option, presumably to the disadvantage of some other company currently engaged in the same business.

IV.     CORPS PERMITS CONSTRUCTION OF PIPELINE.

66.     Despite an extensive administrative record outlining the significant environmental impacts of the pipeline's construction and significant environmental risks attendant to its operation over the next several decades, on December 14, 2017, the Corps issued the requisite permit and authorizations. The permit authorizes 1.5 million cubic yards of dredge and fill, impacting nearly 500 acres of wetlands and other waters, and permanently destroying 142 acres of rare and valuable forested wetlands, much of it within the Atchafalaya Basin. The permit uses mitigation "banks" to compensate for destruction of forested wetlands, and inappropriately considers some wetlands destruction to be "temporary" when the record reveals that impacts are long lasting if not permanent. Within the Atchafalaya Basin, the permit authorizes the permittee to rely on "out of kind" compensatory mitigation via a mitigation bank project that is physically distant from the pipeline site.

67.     The out-of-kind mitigation does not compensate for the significant environmental harm to cypress-tupelo swamps in the Atchafalaya Basin.

68.     Despite extensive documentation of the risks and impacts of oil spills and leaks, the Corps declined to consider such impacts in reaching its decision, stating that they are the province of other regulatory agencies and "not within the defined purview of the Corps."

Accordingly, the permit and accompanying NEPA evaluation are otherwise silent on the risks and impacts of oil spills and leaks.

69.     However, while defining the scope of the project narrowly to exclude the risks and impacts of operating the project, the Corps' decision unlawfully touts the putative economic benefits of operating the pipeline.  The Corp does not disclose that such benefits are only available if the citizens and waters of Louisiana are exposed to serious risks and impacts.

70.     Throughout the permitting process, the project was described as having a maximum capacity of 280,000 barrels a day.  However, in the final permit, the project is identified as having an "ultimate design capacity" of 480,000 barrels a day.  This dramatic increase in capacity within a fixed pipeline diameter has significant consequences for the risks of spills, and their impacts.  However, these consequences were neither disclosed nor analyzed by the Corps in the permitting process.

71.     Neither the permit, nor the accompanying environmental reviews, address the historic noncompliance with such permit conditions in the Basin.  In issuing the permit, the Corps found that the impacts of the project were so insignificant that no environmental review was required.

CLAIMS FOR RELIEF

I.     FIRST CLAIM FOR RELIEF – VIOLATIONS OF NEPA WITH RESPECT TO § 404 AND § 408 PERMITS.

72.     Plaintiffs hereby allege, incorporate and restate all previous paragraphs of this complaint.

A.     Arbitrary and Capricious Conclusion Regarding "Significance"

73.     Under NEPA, federal agencies are required to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).

74.     CEQ regulations further define whether impacts are "significant" enough to warrant a full EIS, requiring consideration of both "context" (i.e., the various scales, regions, and interests affected by the action) and "intensity" (i.e., the "severity of the impact").  40 C.F.R. § 1508.27.  With respect to the latter, the regulations lay out ten factors that are to be considered. Examples of these criteria include:  "the degree to which the proposed action affects public health or safety"; "unique characteristics of the geographic area such as proximity to historic or cultural resources…"; the degree to which the effects on the environment "are likely to be highly controversial," are "highly uncertain" or "involve unique or unknown risks"; "whether the action is related to other actions with individually insignificant but cumulatively significant impacts"; "the degree to which the action may … cause loss or destruction of significant scientific, cultural, or historical resources"; and other criteria.

75.     The Corps issued a "memorandum" that appears to constitute its EA and FONSI, which suffers from numerous factual errors and legal flaws.  Based on this flawed analysis, the Corps concluded that impacts would not be significant and that there was no need for a full EIS.

76.     Such conclusion is erroneous.  The Corps § 404 permit and § 408 authorizations authorizing the pipeline have significant impacts, requiring preparation of a full EIS.  The Corps failed to account for the unique significance of the Atchafalaya Basin; failed to evaluate the risks and impacts of various-sized leaks and spills, particularly in light of the operator's exceedingly poor safety record when it comes to spills and leaks; failed to evaluate the potential impacts on flooding in a critical flood zone; and failed to evaluate the impacts to federally supported restoration projects, among other factors.  The Corps further failed to assess the climate impacts of "locking in" future reliance on fossil fuels with a massive infrastructure investment, and failed to assess the unique risks that could arise from use of the pipeline for other kinds of crude oil,

notably tar sands crude.  All of these factors were documented in the administrative record before the Corps, but the Corps did not address them.

77.     The Corps' conclusion that it has no obligation to consider the environmental impact of spills or leaks is particularly notable.  In other permitting decisions for crude oil pipelines, the Corps gives scrutiny to such risks and incorporates them in its NEPA findings. Indeed, the "overall purpose" of the project, as defined by the Corps, is to both build *and operate* the crude oil pipeline.  As ETP's abysmal safety record demonstrates, spills and leaks are all-but-certain impacts of operating a crude oil pipeline.  Such information was amply documented in the record before the Corps.

78.     The Corps' significance finding also inappropriately dismissed the long history of noncompliance with permit conditions in the Basin from other pipelines, which have contributed to devastating ecological and economic impacts.  In light of this well-documented pattern, the Corps' inclusion of permit conditions preventing disruption of water flows is insufficient. Moreover, the Corps failed to consider the temporary impacts of spoil bank creation in light of the extensive harm to the hydrology of the Basin that already exists.

79.     Additionally, the Corps dismissed the impacts of hundreds of acres of loss to forested wetlands in the Atchafalaya Basin and elsewhere.  Although creation of linear channels through the Basin has had a number of gravely adverse impacts to the Basin's water quality and general ecology, none of these impacts are discussed in the permit or accompanying NEPA documentation.

80.     Finally, the Corps' significance finding relies upon and incorporates the proposed mitigation for permanent conversion of forested wetlands in the Atchafalaya Basin and elsewhere.  However, other than characterizing the mitigation bank credits, which involve "out

of kind" mitigation for loss of forested wetlands, the EA does not analyze or discuss the impacts to the Basin from the project and how the proposed mitigation will offset it.

81.    The Corps acted arbitrarily, capriciously, contrary to the evidence before it, and in violation of NEPA and the CEQ regulations and contrary to the APA, in finding that the Bayou Bridge pipeline would have no significant environmental impact and in failing to prepare a full EIS.

        B.    <u>Failure to Adequately Consider Reasonable Alternatives</u>

82.    At the heart of NEPA is the duty to consider all reasonable alternatives to the proposed action.  This duty extends to both EAs as well as EISs.  40 C.F.R. § 1508.9(b).

83.    The range of alternatives is governed by the description of the project purpose and need.  It is a violation of NEPA to define the project's purpose in a way that limits consideration of reasonable alternatives.

84.    In issuing the permits, however, the Corps did not consider all reasonable alternatives to the proposed action.  To the extent that it did consider any such alternative, such consideration was unlawfully truncated, arbitrary, and one-sided.  Moreover, it accepted a narrow definition of the project purpose and need that defined the "purpose" for the project as the project itself, i.e., a crude oil pipeline between two fixed points.  *See* 33 C.F.R. Pt. 325 App B(b)(4).  Such a narrow definition precluded meaningful consideration of viable alternatives.

85.    NEPA regulations further require the Corps to undertake an "independent evaluation" of information submitted by the proponent.  40 C.F.R. § 1506.5(a).  While the Corps need not redo work submitted by the proponent, it is obligated to verify its accuracy.

86.    For example, the EA did not consider an alternative of requiring horizontal directional drilling ("HDD") at all water crossings, which would have significantly reduced impacts to waters of the United States.  It did not consider an alternative and significantly shorter

pipeline alignment that would have connected the terminus at St. James with a different location on the ETCO pipeline, avoiding the need to cross the Atchafalaya Basin altogether. It did not give meaningful consideration, or even fairly present, the no action alternative of continuing to ship oil via vessel from either the Nederland, Texas, or Lake Charles, Louisiana pipeline terminals to existing refineries, circumventing the need for the pipeline crossing altogether. Nor did it consider an alternative site for the terminus of the pipeline other than St. James Parish, a minority community already overburdened by industrial facilities.

87.     Finally, the Corps failed to meaningfully consider a "restoration alternative" under which authorization to build the pipeline would be conditioned on restoring the right of way by removing legacy spoil banks. Such alternative is well within Corps' authority.

88.     Instead, the Corps simply accepted the truncated and misleading analysis provided by the applicant with no independent verification.

89.     The Corps failure to consider all reasonable alternatives in the EA renders the document arbitrary and capricious and not in accordance with law in violation of the APA and NEPA.

C.     <u>Failure to Consider Cumulative Effects.</u>

90.     In evaluating the significance of a proposed federal action, either in an EA or in an EIS, an agency must pay particular attention to the cumulative impacts of its decision. 40 C.F.R. § 1508/25(a)(2). Cumulative impacts are defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.* § 1508.7.

91.     Cumulative impacts are of particular consequence when it comes to oil development in the Atchafalaya Basin and elsewhere in Louisiana, where oil development has caused innumerable environmental and human health problems over time.  Specifically, a history of careless development in the Atchafalaya Basin, and noncompliance with past permits coupled with historic non-enforcement by the Corps, has decimated habitat conditions in the Basin. Moreover, the cumulative risk of spills and leaks grows with each new pipeline, particularly as legacy pipelines reach or exceed the end of their useful lives and risks of spills increases.

92.     Even if the addition of yet another pipeline across the Basin was not by itself significant—which it is—the cumulative impacts to the Basin via habitat degradation and increased spill risk are significant enough to warrant close discussion.   However, the Corps provided no such close analysis, instead providing only a cursory and limited discussion of cumulative effects.

93.     The Corps failure to adequately consider cumulative impacts in the EA renders the document arbitrary and capricious and not in accordance with law in violation of the APA and NEPA.

D.     Arbitrary Economic Analysis

94.     NEPA and its implementing regulations require the Corps to produce environmental review documents that are factually accurate, well supported, and that fully discloses the impacts of an action to the public.  40 C.F.R. § 1502.

95.     These standards apply equally to an agency's treatment of economic data.  40 C.F.R. §§ 1502.23 (cost benefit analysis), 1508.8 (EIS must evaluate economic effects).  An agency's failure to include and analyze information that is important, significant, or essential renders an EA and FONSI inadequate.  40 C.F.R. § 1500.1.  These fundamental NEPA principles

apply to both economic and environmental analyses in an EIS.  40 C.F.R. §§ 1502.24, 1508.8 ("effects" in an EIS must evaluate include economic impacts.).

96.     The Corps permitting decision violates these principles.  As noted above, the Corps refused to disclose or consider the impacts and risks of crude oil leaks and spills, finding that such impacts are outside of its regulatory "purview."  However, it expressly weighed and considered the economic benefits of operating the pipeline, even though those benefits cannot arise without exposing the Basin to significant environmental risks.  The result is an apples-to-oranges comparison which deprives decision-makers and the public of a fair assessment of the pros and cons of the project.  Such a lopsided comparison is expressly prohibited by the Corps' implementing NEPA regulations.  33 C.F.R. Pt. 325 App. B § 7(b)(3).

97.     Moreover, the final EA cites as a justification for the project the goal of achieving "American energy independence."  However, the document fails to acknowledge that America is a net exporter of petroleum products, and that a key purpose of the project is to facilitate the export of crude oil.  This is a failure to disclose a material fact about the project that was documented in the record.

98.     The Corps' decision to balance the economic benefits of building and operating the entire pipeline without a full consideration of the environmental harms, and corresponding economic risks is arbitrary and capricious and not in accordance with law, in violation of NEPA and the APA.

V.      SECOND CLAIM FOR RELIEF:  VIOLATIONS OF THE CLEAN WATER ACT AND RIVERS AND HARBORS ACT WITH RESPECT TO § 404 PERMITS AND § 408 AUTHORIZATIONS.

99.     Plaintiffs incorporate by reference all preceding paragraphs.

100.    Construction of the Bayou Bridge pipeline will involve dredge and/or fill in waters of the United States in hundreds if not thousands of locations.  Construction of the

Pipeline will also involve obstructions to the capacity of navigable waters of the United States and impacts to eight Corps projects.

101.     The CWA prohibits discharges of pollutants unless allowed by permit.  *See* 33 U.S.C. § 1311(a).  With regard to construction in the Atchafalaya Basin, depositing dredged material from this wetland into spoil piles adjacent to the pipeline constitutes the discharge of a pollutant under the Clean Water Act.

102.     The purpose and policy of the Section 404 permit program "is to restore and maintain the chemical, physical, and biological integrity of waters of the United States through the control of discharges of dredged or fill material."   40 C.F.R. § 230.1(a).

103.     The Corps is prohibited from approving a dredge and fill permit application "unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern."  40 C.F.R. § 230.1(c).  The unnecessary alteration or destruction of wetlands is discouraged as contrary to the public interest because wetlands constitute a productive and valuable public resource.  33 C.F.R. § 320.4(b).  The Corps' regulations further provide that:

> From a national perspective, the degradation or destruction of special aquatic sites, such as filling operations in wetlands, is considered to be among the most severe environmental impacts covered by these Guidelines. The guiding principle should be that degradation or destruction of special sites may represent an irreversible loss of valuable aquatic resources.

*Id*. § 230.1(d).  The Atchafalaya Basin is a "special aquatic site," the degradation or destruction of which is a matter of utmost concern under the CWA.  40 C.F.R. § 230.4(m).  The permit decision acknowledges both that the pipeline impacts "special aquatic sites" and that it does not need to be located in such a site "to fulfill its basic purpose."

- 29 –

A.       Arbitrary and Inadequate Public Interest Review

104.    Prior to issuance of any CWA or RHA permit, the Corps is required to conduct a "public interest" review consistent with its governing regulations.  33 C.F.R. § 320.4(a).  In conducting a public interest review, the Corps must consider the probable impacts of the proposed action, its putative benefits, and weigh "all those factors which become relevant."  *Id*. The Corps must balance the benefits "which reasonably may be expected to accrue" from the action against the "reasonably foreseeable detriments."  *Id*.  The Corps public interest review for the pipeline is inconsistent with the regulations for several reasons.

1.       *Failure to Consider Aquatic Impacts of Crude Oil Spills and Leaks*

105.    The EPA guidelines direct the Corps to closely analyze the impacts of a proposed discharge on a number of water quality and other parameters.  40 C.F.R. § 230.11.  This includes close consideration of secondary effects, defined as "effects on an aquatic ecosystem that are associated with a discharge of dredged or fill materials, but do not result from the actual placement of the dredged or fill material."  *Id*. §230.11(h).

106.    Such information informs the substantive decision as to whether or not the permit is to be issued.  For example, the regulations expressly prohibit issuance of the permit where it would cause or contribute to violations of water quality standard, violate a toxic effluent standard, jeopardize the survival of any federally protected species, among other things.  40 C.F.R. § 230.10(b).  Permits cannot be issued if they will result in significant adverse effects to water quality.  *Id*. § 230.10(c)(3). Similarly, permits must be denied if the Corps finds that such permit is not in the public interest.  33 C.F.R. § 320(a).  Such determination is to be made only after consideration of "all factors that may be relevant" to the proposal.  *Id*.

107.    However, the Corps did not consider "all factors" relevant to the proposal, nor did it closely analyze the potential impacts of the project on water quality and other parameters.

Instead, it performed a narrow and truncated analysis under which the single most salient threat from the project—oil spills and leaks—was simply disregarded as not within the Corps' "purview." Having failed to consider this critical issue, the substantive decision that the project was in the public interest and otherwise the requirements of law was fundamentally flawed.

### 2. *Failure to Adequately Consider Need for Project*

108.   The Corps must consider as part of its public interest review "[t]he relative extent of the public and private need for the proposed structure or work." 33 C.F.R. § 320.4(a)(2)(i). The District Engineer is authorized to make an "independent review of the need for the project from the perspective of the overall public interest." *Id.* § 320.4(q). Moreover, regulations explicitly prohibit impacts to valuable wetlands like the Atchafalaya Basin unless the Corps makes an explicit finding that "the benefits of the proposed alteration outweigh the damage to the wetlands resource." *Id.* § 320.4(b) 4).

109.   The Corps failed to consider the "relative extent of the public and private need" for the Bayou Bridge pipeline, and failed to adequately balance all of the benefits and damages of the project.

110.   First, the Corps failed to consider credible record evidence that the project is not needed at all. Instead, the project simply offers one corporate entity an opportunity to profit from the transportation of crude oil, presumably to the detriment of other entities who currently profit from such transportation, as well as the public and Plaintiffs, who rely on the ecological health of the Atchafalaya Basin.

111.   Oil is currently transported from the terminus of the proponent's existing pipeline to refineries in Louisiana via vessel and other methods. There is no evidence in the record that refineries in Louisiana lack access to crude oil. Failure to build the pipeline would not have an adverse effect on the public or third parties involved in the refining or other uses of crude oil.

112.    Moreover, where, as here, there are "unresolved conflicts as to resource use," the Corps' public interest regulations require the Corps to consider "the practicability of using reasonable alternative locations and methods to accomplish the objective of the proposed structure or work."  33 C.F.R. § 320.4(a)(2)(ii).

113.    However, the Corps failed to consider alternative project configurations— including alternative "locations" and "methods" that would avoid the need for significant impacts to waters of the United States.  *Id*.  As discussed above, these include continued use of marine transportation and alternative pipeline configurations with significantly less impacts to waters, particularly unique and special waters like the Atchafalaya Basin.

114.    Against this lack of need for the project, the Corps failed to analyze the significant costs to the public from pursuing the project, including potential lost revenues from impacts to the tourism, recreational fishing, and commercial fishing industries, as well as costs to the public from reduction in flood protection that may result from the anticipated permanent wetland destruction, and the risk of wetland destruction from unremediated spoil banks.  *See* 33 C.F.R. § 320.4(a)(1); *Hough v. Marsh*, 557 F. Supp. 74, 86 (D. Mass. 1982) ("[Army Corps] sidestepped any consideration of adverse economic effects" by failing to analyze economic losses incurred by local industries, and thus "ignore[d] the directive in the Corps regulations to consider all economic factors.")

> 3.    *Failure to Consider History of Noncompliance with § 404 Permit Conditions.*

115.    As discussed above, the Atchafalaya Basin suffers from an extensive history of pipelines being built in violation of § 404 permits and other standards issued by the Corps, coupled with decades of non-enforcement by the Corps.  This history of violations and

accompanying inaction by the Corps has resulted in major degradation of the aquatic health of the Atchafalaya Basin.

116.    These impacts are matters of public record, and were extensively documented to the Corps by Plaintiffs and others in comments on the proposed permit.

117.    Public interest regulations require consideration of "all factors" attendant to the issuance of a § 404 permit, and specifically calls out unique factors that may "become relevant in each particular case."  33 C.F.R. § 320.4(a)(1).  The history of noncompliance in the Basin is just such a unique and relevant factor.

118.    However, the Corps failed to adequately consider this history and the possibility that, yet again, a § 404 permittee would violate permit conditions by either creating, or building in, permanent spoil banks.  Instead, it dismissed these concerns out of hand, incorrectly relegating the issue to pre-CWA permitting and ignoring continued efforts to force compliance with Corps permits.  Nor did the Corps consider a "restoration alternative" under which spoil banks along the existing right of way would be removed as a condition of building another pipeline through the Basin.  40 C.F.R. § 230.75(d) (authorizing Corps to restore habitat to compensate for degradation); 33 C.F.R. § 325.4(a) (authorizing conditions to protect the public interest).  Nor did the Corps consider using a "bond" in the event that Bayou Bridge fails to meet its obligation to restore the construction right of way to pre-project conditions.  *Id*. § 325.4(d).

### 4.    Failure to Adequately Consider Cumulative Effects

119.    The public interest regulations highlight the risk of cumulative impacts to wetlands and other water resources in several places.  Under the EPA guidelines, cumulative impacts

> are the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges of dredged or fill material.  Although the impact of a particular discharge may constitute a minor change in itself, the

cumulative effect of numerous such piecemeal changes can result in a major impairment of the water resources and interfere with the productivity and water quality of existing aquatic ecosystems.

40 C.F.R. § 230.11(g).

120.    "Although a particular alteration of a wetland may constitute a minor change, the cumulative impact of numerous piecemeal changes can result in major impairment of wetland resources." 33 C.F.R. § 320.4(b)(3).  Accordingly, as with NEPA, consideration of the cumulative effects of a proposal is a crucial component of the Corps public interest analysis.  40 C.F.R. § 230.11(g).

121.    The Corps failed to provide an adequate assessment of the cumulative effects of the Bayou Bridge pipeline on the Atchafalaya Basin.  Local cuts and nicks, one acre at a time, from cutting and dredging for oil and gas pipelines is a major cumulative cause of wetland loss in Louisiana.  Over the decades, pipeline construction has created permanent channels through the Basin, altering water flows and impacting habitat.  The Bayou Bridge project will convert hundreds of acres more of this valuable and increasingly imperiled form of wetlands to nonforested wetlands.  Moreover, any mitigation is likely to occur outside of the Basin, resulting in both a net loss of a valuable and unique wetland habitat, as well as cumulative impacts caused by multiple similar activities over time.

122.    Another cumulative effect is the increased risk of oil leaks and spills in the Atchafalaya Basin from multiple pipelines, some of increasing age.  *See also* 40 C.F.R. § 230.11(g) (requiring consideration of effects of an aquatic ecosystem "that are associated with a discharge of dredged or fill materials, but do not result from the actual placement of the dredged or fill materials.")  The Corps was obligated to consider the effect of adding yet another source of spill risk.  However, it failed to do so.

123.    Finally, the Corps failed to consider the possibility that yet again a permittee would violate conditions in its permit that prohibit the permanent creation of spoil banks and other structures that impede flow of water and navigation.  Collectively, the existence of such banks from developers of crude oil pipelines has created a catastrophic environmental impact on the Basin.  However, the potential for ETP (an entity already in violation of a permit) to violate its permit (in a right of way that is, in turn, already in violation of *its* permits) was not addressed in the Corps' decision.  Prior non-compliance by ETP, and the Corps' historical failure to enforce dredge and fill permit violations, creates a significant risk that "temporary" wetland impacts of creating a spoil bank and canal will become permanent wetland loss and significant, irreversible damage to the Basin.

### 5.    Failure to Adequately Consider Floodplain and Coastal Loss Impacts

124.    The Atchafalaya River is an important flood channel for the Mississippi River.

125.    Flooding prevention is of the highest importance in Louisiana.  *See Bd. of Comm'rs of the S. E. La. Flood Prot. Auth. v. Tennessee Gas Pipeline Co*., LLC, 29 F. Supp. 3d 808, 816 (E.D. La. 2014) (lawsuit by Board of Commissioners "seek[ing] damages and injunctive relief against ninety-two oil and gas companies" for dredging a network of canals to access oil and gas wells and transport oil and gas products, altering the hydrology of wetlands and leading to coastal land loss, thereby leaving south Louisiana increasingly exposed to tropical storms and hurricanes).  Louisiana's Comprehensive Master Plan for a Sustainable Coast proposes to expend billions of dollars on wetland restoration and flooding risk reduction.

126.    Dredging canals for energy exploration and pipelines through bayous and swamps on the coast has altered wetland hydrology, leading to land loss in marshes and swamps that are a vital barrier and the first line of defense against storm surge and flooding.  In the Atchafalaya

Basin, spoil banks from oil and gas pipeline construction are exacerbating sedimentation in this critical floodplain that was naturally designed to disperse floodwaters.

127.     Adverse impacts to floodplains require a heightened level of scrutiny, and an even higher bar for permitting, because of the important function floodplains provide in mitigating flood damage and storm surges.  Floodplains possess natural functions important to the public interest, and even a minor change could have cumulative impacts that significantly degrade the floodplain values and functions.  33 C.F.R. § 320.4 (l)(2).  The Corps must "avoid to the extent practicable, long and short term significant adverse impacts" from occupancy and modifying the floodplains.  *Id.*  Development in the flood plain must be in accordance with Executive Order 11988, Floodplain Management.  33 C.F.R. § 320.4 (l)(3).   An agency "shall consider alternatives to avoid adverse effects and incompatible development in the floodplains." Executive Order 11988, Sec. 2(a)(2).

128.     Development may occur in the floodplain only if the Army Corps finds that the project is "the *only* practicable alternative consistent with the law and with the policy[.]" Executive Order 11988, Sec. 2(a)(2) (emphasis added).  If the Army Corps makes such a finding, "the agency shall, prior to taking action, . . . design or modify its action in order to minimize potential harm to or within the floodplain[.]" Id.

129.     The Corps failed to analyze the impacts to floodplain functioning that may result due to the proposed Pipeline and its associated risks.  Indeed, it failed to so much as mention the floodplain executive order in its decision, nor did it make any finding that the pipeline is the "only" practicable alternative.  To the contrary, as discussed above, other practicable alternatives exist that avoid or minimize impacts to this flood zone, thus the Corps acted arbitrarily and capriciously in refusing to adopt these less impactful practicable alternatives.

130.     For all of the foregoing reasons, the Corps did not conduct a valid public interest review of the authorizations for the pipeline.  By failing to undertake a lawful and adequate public interest review, the Corps has acted in a manner that is arbitrary, capricious, and not in accordance with law, in violation of the CWA and the APA.

B.     Arbitrary and Incomplete Assessment of Project Alternatives

131.     The Corps may not issue a permit for the discharge of dredged or fill material into navigable waters "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences."  40 CFR § 230.10(a).  An alternative is practicable if "it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of the overall project purposes."  40 C.F.R. § 230.10(a)(2); *see also id*. § 230.5(c) (mandating that the Corps "examine practicable alternatives to the proposed discharges, that is, not discharging into the waters of the U.S. or discharging into an alternative aquatic site with potentially less damaging alternatives")

132.     Where (as here) the discharge is proposed for a special aquatic site and is not water dependent, "practicable alternatives that do not involve special aquatic sites are presumed to be available, unless *clearly demonstrated otherwise*."  40 C.F.R. § 230.10(a)(3) (emphasis added).

133.     Moreover, "all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise."  *Id*.; *see Sierra Club v. Van Antwerp*, 709 F. Supp. 2d 1254, 1267 (S.D. Fla. 2009) (holding the Army Corps acted arbitrarily and capriciously by failing to require applicant clearly demonstrate that environmentally preferable and practicable alternatives were unavailable in a non-water-dependent project).

- 37 –

134.    Practicable alternatives are those that are "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes.  If it is otherwise a practicable alternative, an area not presently owned by the applicant which could reasonably be obtained, utilized, expanded, or managed in order to fulfill the basic purpose of the proposed activity may be considered."  40 C.F.R. § 230.10(a)(2).

135.    The regulations place a particularly high bar on permit issuance for special aquatic sites, and for projects that are not water dependent.  Under these standards, the Corps must presume that practicable alternatives exist that do not involve significant impacts to federally protected waters, unless "clearly demonstrated" otherwise.

136.    The high bar was triggered in this instance.  The Corps properly concluded that the project was not water dependent.  It further concluded that the project impacted a special aquatic site, and that it did not need to be in such a site to fulfill its basic project purpose.  Under the circumstances, the law created a strong presumption that practicable alternatives were available.

137.    Bayou Bridge failed to present sufficient evidence to rebut the presumption enshrined in the Corps' regulations.  However, the Corps granted the permit anyway, in violation of law.  The assessment ignored viable alternatives like an alternative configuration using ETP infrastructure that avoided the Atchafalaya Basin, or continued use of existing transportation infrastructure between the existing terminals and Louisiana refineries.

138.    For example, the permit dismissed the option of modifying existing infrastructure to meet oil transportation needs, with the observation that ETP doesn't currently own any such pipelines, and that it cannot "speculate on available capacity."  Army Corps of Eng'rs, *Memorandum for Record*, Appl. No. MVN-2015-02295-WII at 42.  Rather than provide the

independent analysis called for by the regulations, the Corps simply "cut and pasted" the proponent's statements into the body of its permit.

139.     Furthermore, the Corps avoided meaningful consideration of alternatives by defining the purpose of the project narrowly to be identical to the project itself—construction of a pipeline between two fixed points.  The Corps' regulations state that "the Corps, will in all cases, exercise independent judgment in defining the purpose and need for the project from both the applicant's and the public's perspective." 33 C.F.R. § 325 app. B § 9(c)(4).  It is a violation of the law to define the project purpose in a way that renders practicable alternatives impracticable.

140.     The purpose of this pipeline is not to build a pipeline between two fixed points, as claimed by the applicant and accepted by the Corps.  Instead, the purpose is to transport crude oil from places that it is available to places where it is needed.  Transporting crude via existing pipelines, marine vessels, or other means is an alternative "available and capable of being done" because it is the method of transportation currently used and does not involve construction of a pipeline through the Basin.  The "no action" alternative is a practicable alternative that will avoid adverse impacts to the aquatic environment associated with the Pipeline.  Similarly, as discussed above, other alternatives that would have avoided or minimized impacts to the Atchafalaya Basin were either ignored or summarily dismissed without analysis.

141.     By failing to undertake a lawful and adequate analysis of practicable alternatives, the Corps acted in a manner that is arbitrary, capricious, and not in accordance with law, in violation of the CWA and the APA.

     C.     <u>Arbitrary and Incomplete Mitigation Plan</u>

          *1.     Inadequate Mitigation for Permanent Conversion of Unique Forested Wetlands*

142.     The permit authorizes Bayou Bridge to permanently convert 142 acres of unique

forested wetlands, much of it within the Atchafalaya Basin. Construction of the pipeline would require clearing a right of way through the Basin, including cutting existing vegetation like old-growth cypress and tupelo trees. The forests would not be allowed to regenerate even if they could, as Bayou Bridge will maintain a permanent cleared right of way above the pipeline.

143.    Applicants for a dredge and fill permit have the responsibility to propose "an appropriate compensatory mitigation option to offset unavoidable impacts." 40 C.F.R. § 230.93(a)(1). "[C]ompensatory mitigation requirements must be commensurate with the *amount* and *type* of impact that is associated with a particular [dredge and fill] permit." 40 C.F.R. §230.93 (emphasis added); 33 C.F.R. § 332.3(a)(1) (same). "[R]equired compensatory mitigation should be located within the same watershed as the impact site, and should be located where it is most likely to successfully replace lost functions and services, taking into account such watershed scale features as aquatic habitat diversity, habitat connectivity, relationships to hydrologic sources . . ., trends in land use, ecological benefits, and compatibility with adjacent land uses." 33 C.F.R. § 332.3(b)(1).

144.    The Corps' regulations set an exceedingly high bar for out-of-kind mitigation, observing that in-kind mitigation is "preferable." 33 C.F.R. § 332.3(c)(1). Under the regulations, out of kind mitigation can only be authorized where the district engineer determines, using a specific "watershed approach," that out of kind mitigation will best serve the needs of the watershed. *Id*. § 332.3(c)(2). Such finding must be documented in the administrative record for the action. Moreover, the regulations set the bar even higher for "difficult to replace" aquatic resources, a characterization that fits the forested swamps of the Atchafalaya. However, no such analysis ever took place before the Corps signed off on out-of-kind mitigation that was physically distant from the impact site.

145.     The Corps allowed Bayou Bridge to mitigate the permanent conversion of unique and imperiled Atchafalaya Basin forests by purchasing wetland mitigation credits from a local mitigation bank.  However, the proposed mitigation does not replace the lost functions and services of the destroyed forested wetlands.  Indeed, the permit gives very little information about the allowable mitigation except to characterize the mitigation as "out of kind" but otherwise in the Basin.

146.     The permit identified the mitigation credits to be purchased to offset permanent loss of forest wetlands as coming from a specific mitigation bank, the Bayou Fisher mitigation bank.  However, mitigation credits from this bank are physically distant from the impacts, lack hydrologic connectivity to the impact site, and otherwise fail to mitigate for the ecological impacts of the permanent wetlands impacts authorized by the permit.  40 C.F.R. § 230.93 (requiring Corps to consider "location of the compensation site relative to the impact site and their significance within the watershed").  The Bayou Fisher mitigation bank will create new bottomland hardwoods, not cypress-tupelo swamp.  The abundance of bottomland hardwoods in Louisiana does not adequately mitigate for the shrinking cypress-tupelo swamps that protect southern Louisiana from severe weather events and provide important wildlife habitat and other important ecological values.

147.     The Corps acted arbitrarily and capriciously because it failed to demonstrate that that proposed mitigation will compensate for the loss of the valuable ecosystem services provided by the Atchafalaya Basin.

148.     The Corps also failed to demonstrate whether the amount of wetland restoration proposed for mitigation is equal to the amount of wetland lost.  *See Wyo. Outdoor Council v. U.S. Army Corps of Eng'rs*, 351 F. Supp. 2d 1232, 1252 (D. Wyo. 2005) ("A grand

generalization that a 1:1 replacement ratio will be 90% effective is not supported by any, let alone substantial, evidence in the record.  As such, the Corps was arbitrary and capricious in relying on mitigation to conclude that there would be no significant impact to wetlands.").

149.    The Corps failed to demonstrate through data and analysis or monitoring and verification that the proposed wetland restoration would successfully mitigate identified wetland losses.  *See Ohio Valley Envt'l Coal. v. Hurst*, 604 F. Supp. 2d 860, 890–91 (S.D. W.Va. 2009); *Kentucky Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 413 (6th Cir. 2013) (holding that the Corps may rely on post-issuance mitigation procedures, but to find the project will not cause a significant adverse impact, the Corps must provide documented evidence in support thereof) (citing 40 C.F.R. §§ 230.7(a)-(b), 230.11(g)).

> 2.    *Insufficient mitigation in light of history of noncompliance with Corps permits.*

150.    In addition to authorizing hundreds of acres of permanent wetlands impacts with inadequate mitigation, the permit also authorizes 500 acres of "temporary" impacts to wetlands and other waters, including many acres in the Atchafalaya Basin.  Mitigation requirements for such "temporary" impacts are substantially reduced.

151.    However, the permit assumes that the impacts of pipeline construction will in fact be temporary and the right of way restored to pre-project conditions once installation of the pipeline is complete.

152.    The Corps ignored credible record evidence that "temporary" impacts are much more consequential than it assumed, and may in fact be permanent.  Due to hydrologic modification of the Basin, cypress-tupelo forests in many instances cannot naturally regenerate.  Accordingly, cutting hundreds of acres of these forests may in fact be a permanent impact.

153.    Moreover, as discussed above, the extensive history of noncompliance with Corps

§404 permits by crude oil pipeline proponents was a key issue before the Corps at the time it made its decision.  However, the Corps imposes no requirements for monitoring and enforcement to ensure that Bayou Bridge LLC will backfill excavated areas, and returned disturbed areas to pre-construction conditions.  To the contrary, the permit—like many other permits issued by the Corps for pipelines—simply relies on what appear to be unenforceable promises of the proponent to ensure that the site is returned to pre-project conditions, despite abundant evidence that this approach has failed in the past.

154.    The Corps' failure to require appropriate mitigation for impacts erroneously deemed temporary, and the failure to include any requirement for monitoring, reporting, or oversight in light of this history was arbitrary and capricious.

### 3.    Failure to consider onsite mitigation of noncompliant right of way.

155.    Corps regulations provide for alternative kinds of mitigation where insufficient in-basin and in-kind mitigation is available.  "Permittee-responsible mitigation means an aquatic resource restoration, establishment, enhancement, and/or preservation activity undertaken by the permittee (or an authorized agent or contractor) to provide compensatory mitigation for which the permittee retains full responsibility."  33 C.F.R. § 332.2.  The Corps' regulations specifically call for "restoration" to be the "first option considered."  *Id*. § 332.3(a)(1).

156.    The Corps has extensive authority to impose a mitigation plan in light of the facts of each case.  *See*, *e.g.*, 40 C.F.R. § 230.73(a), (b) ("The effects of a discharge can be minimized by the manner in which it is dispersed, such as . . . distributing the dredged material widely in a thin layer at the disposal site to maintain natural substrate contours and elevation; . . . Orienting a dredged or fill material mound to minimize undesirable obstruction to the water current or circulation pattern, and utilizing natural bottom contours to minimize the size of the mound[.]");  40 C.F.R. § 230.74(d) ("Designing . . . channel spanning structures using culverts, open

channels, and diversions that will pass both low and high water flows, accommodate fluctuating water levels, and maintain circulation and faunal movement[.]”); 40 C.F.R. § 230.75 (requiring planning and construction practices that would minimize adverse effects on plants and animals).

157.    Plaintiffs and others repeatedly asked the Corps to consider a permitting and mitigation approach under which the proponent would be required to restore the currently noncompliant right of way as a condition of being authorized to build in such right of way. Such mitigation would provide significant benefits to the Atchafalaya Basin and the people who rely on it.  Moreover, given that Bayou Bridge’s parent company, ETP, owns a noncompliant pipeline with its own spoil bank, such mitigation is entirely reasonable.

4.    *Inadequate public notice regarding mitigation.*

158.    The public notice issued by the Corps must include “sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful comment.”  33 C.F.R. § 325.3(a).  The public notice is required to include “any other available information which may assist interested parties in evaluating the likely impact of the proposed activity, if any, on factors affecting the public interest.”  33 C.F.R. § 325.3(a)(13).

159.    The regulations are particularly prescriptive with respect to notice regarding mitigation.  33 C.F.R. § 332.4.  A public notice for a proposal must describe the “amount, type, and location of any proposed compensatory mitigation, including any out of kind compensation, or indicate an intention to use an approved mitigation bank or in lieu fee program.”

160.    The public notice issued by the Corps was inconsistent with these standards.  The information contained in the public notice regarding proposed mitigation was vague, and speculative.  The application for the proposed Bayou Bridge pipeline in summary terms states that mitigation credits somewhere “within the New Orleans district” will be purchased, with no detail whatsoever regarding their location and nature.

- 44 –

161.    The Army Corps deprived Plaintiffs of their "procedural right . . . to comment intelligently" because it failed to provide substantive information in the public notice regarding proposed mitigation. *See Ohio Valley Envt'l Coal. V. U.S. Army Corps of Eng'rs*, 674 F.Supp.2d 783, 802-807.

162.    The Corps failed to disclose in the public notice the quantity and type of wetlands proposed to be mitigated, where mitigation activities will occur, whether proposed mitigation will mitigate the loss of ecosystem functions from wetland destruction in the Atchafalaya Basin, or how it will enforce the proposed mitigation. This information is necessary for the Corps' determination that the project adequately mitigated significant adverse impacts. *See O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 232-235 (5th Cir. 2007) (holding that the Corps "bare assertion" that mitigation will remove or reduce expected impacts is insufficient to explain how mitigation requirements ameliorate anticipated damage to wetlands).

163.    By failing to disclose this substantive information, crucial to the Corps determination that the project adequately mitigated significant adverse impacts, the Corps failed to provide sufficient information to allow for meaningful public comment. A meaningful opportunity to comment requires that the agency disclose sufficient information to enable the public to identify the material issues relating to the justification for agency action. *Id.* (citing *Appalachian Power Co. v. EPA*, 579 F.2d 846, 852-853 (4th Cir. 1978)).

164.    For all of the above reasons, the Corps authorization of permanent and temporary impacts to wetlands, as mitigated by out-of-kind and inappropriate credits, is arbitrary, capricious and contrary to law.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

1.     Declare that the permits and authorizations issued by defendant Army Corps for the Bayou Bridge pipeline violate NEPA, CWA and RHA, and their implementing regulations;

2.     Vacate such permits and authorizations, and the underlying NEPA review, pending full compliance with law;

3.     Issue any necessary injunctive relief against the Corps or other parties to this litigation necessary to prevent irreparable harm pending full compliance with the law;

4.     Retain jurisdiction over this matter to ensure that the Corps complies with the law;

5.     Award Plaintiffs reasonable fees, costs, expenses, and disbursements, including attorneys' fees, associated with this litigation; and

6.     Grant Plaintiffs such further and additional relief as the Court may deem just and proper.

Respectfully submitted this 11th day of January, 2018.

_____
Jan E. Hasselman
WSBA #29107
*(Pro Hac Vice Application Pending)*
Earthjustice
705 2nd Avenue, Suite 203
Seattle, WA 98104
Ph: (206) 343-7340
Fax: (206) 343-1526
jhasselman@earthjustice.cor
*Lead Attorney for Plaintiffs*

_____
Alisa Coe
LSBA #27999
Earthjustice
111 S. Martin Luther King Jr. Blvd
Tallahassee, FL 32301
Ph: (850) 681-0031
Fax: (850) 681-0020
acoe@earthjustice.org
*Local Counsel for Plaintiffs*

Adrienne Bloch
CABA #215471
*(Pro Hac Vice Application Pending)*
50 California St. Suite 500
San Francisco, CA 94111
Ph: (415) 217-2000
Fax: (415) 217-2040
abloch@earthjustice.org
*Attorneys for Plaintiffs*

Misha L. Mitchell
LSBA #37506
Atchafalaya Basinkeeper
47 Mt Laurel Ave
Birmingham, AL 35242
Phone: (225) 692-1133
Fax: (225) 692-4114
basinkeeperlegal@gmail.com
*Attorney for Atchafalaya Basinkeeper*