# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

ATCHAFALAYA BASINKEEPER,
LOUISIANA CRAWFISH PRODUCERS
ASSOCIATION-WEST, GULF RESTORATION          CIVIL ACTION
NETWORK, WATERKEEPER ALLIANCE, AND
SIERRA CLUB AND ITS DELTA CHAPTER


VERSUS                                                            18-23-SDD-EWD


U.S. ARMY CORPS OF ENGINEERS


## RULING

    This matter is before the Court on the *Motion for Preliminary Injunction*[1] filed by

Plaintiffs, Atchafalaya Basinkeeper, Louisiana Crawfish Producers Association-West,

Gulf Restoration Network, Waterkeeper Alliance, and Sierra Club and its Delta Chapter

("Plaintiffs").  Defendant, U.S. Army Corps of Engineers ("Corps") filed an *Opposition* to

this motion,[2] as did Intervenor Bayou Bridge Pipeline, LLC ("BBP")[3] and Intervenor Stupp

Bros, Inc. d/b/a Stuff Corporation ("Stupp").[4]  Plaintiffs filed a *Reply* in support of their

motion.[5]  The Court held a preliminary injunction hearing on February 8 and February 9,

2018 where the Court took evidence and heard argument on Plaintiffs' motion.  All parties

---

[1] Rec. Doc. No. 15.  Plaintiffs initially filed a *Motion for a Temporary Restraining Order* (Rec. Doc. No. 16), which the Court denied (Rec. Doc. No. 24).
[2] Rec. Doc. No. 37-2.
[3] Rec. Doc. No. 36.
[4] Rec. Doc. No. 51.
[5] Rec. Doc. No. 65.
44142

Finance

were granted leave to file Post-Hearing Briefs on the motion,[6] which the Court has reviewed in considering this motion.  For the following reasons, the Court finds that the motion should be GRANTED.

## I.   BACKGROUND

This matter arises out of the Corps issuance of permits to Bayou Bridge pipeline, to construct and maintain a pipeline across the Atchafalaya Basin capable of carrying nearly half a million barrels a day of crude oil  The Corps performed two Environmental Assessments ("EAs"), one pursuant to Section 408 of the Rivers and Harbors Act ("RHA"),[7] and one pursuant to Section 404 of the Clean Water Act ("CWA")[8]  Based on these EAs, the Corps ultimately concluded that no Environmental Impact Statement ("EIS") was necessary; however, Plaintiffs maintain that the Corps' review failed to assess critical environmental impacts arising from project construction and operations and a long history of alleged noncompliance of prior Corps pipeline permits in violation of the National Environmental Policy Act ("NEPA").[9]  Plaintiffs also contend the Corps' failed to consider oil spill risks in violation of the CWA.  Further, Plaintiffs argue that the Corps has violated both NEPA and CWA by relying on inadequate mitigation.  Alleged violations of both NEPA and the CWA are reviewed under the Administrative Procedure Act ("APA").[10]

---

[6] Rec. Doc. Nos. 73, 74, 75, & 76.
[7] Rec. Doc. No. 37-7.
[8] Rec. Doc. No. 15-31.
[9] 42 U.S.C. §§ 4321-4370f.
[10] 5 U.S.C. § 706.
44142

## II. FEDERAL AGENCY REVIEW

Under § 706 of the APA, a reviewing court must uphold the agency's action unless it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[11] The reviewing court must hold unlawful and set aside agency action that is contrary to constitutional right, in excess of statutory authority, or without observance of procedure required by law.[12] The ultimate standard of review is a narrow one.[13] "The court is not empowered to substitute its judgment for that of the agency."[14] In applying this standard, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."[15] Nevertheless, although the arbitrary and capricious standard of review is highly deferential, "it is by no means a rubber stamp."[16]

### A. NEPA

The National Environmental Policy Act of 1969 ("NEPA"),[17] mandates that federal agencies evaluate the environmental impacts of proposed agency action before taking action.[18] NEPA is a procedural statute intended "to ensure that federal agencies 'carefully consider detailed information concerning significant environmental impacts,' and at the

---

[11] 5 U.S.C. § 706(2)(A).
[12] *Id.* § 706(2)(B)-(D).
[13] *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).
[14] *Id.*
[15] *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).
[16] *U.S. v. Garner*, 767 F.2d 104, 116 (5th Cir. 1985).
[17] 42 U.S.C. §§ 4321-4370d.
[18] 42 U.S.C. § 4332(1*); Baltimore Gas and Elec. Co. v. Natural Resources Defense Council*, 462 U.S. 87, 97 (1983).
44142

same time 'guarantee that the relevant information will be made available to the larger audience that may also play a role in both the decision making process and the implementation of that decision.'"[19]

NEPA requires federal agencies to prepare a detailed EIS for all "major federal actions significantly [affecting] the quality of the human environment."[20] The threshold determination of whether the effect of the proposed action is sufficiently "significant" to necessitate the production of an EIS is made by the preparation of an Environmental Assessment ("EA").[21] The EA is a more "concise" environmental review that "briefly" discusses the relevant issues and either reaches a conclusion that preparation of an EIS is necessary or concludes with a "Finding of No Significant Impact" ("FONSI").[22]  An EA is conducted to "provide sufficient evidence and analysis for determining whether to prepare an [EIS]."[23]

In making this determination, agencies are to consider both direct and indirect effects of its decision "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."[24]  An impact is reasonably foreseeable if a "person of ordinary prudence would take it into account in reaching a

---

[19] *Sabine River Authority v. U.S. Dept. of Interior*, 951 F.2d 669, 676 (5th Cir.1993) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989)).
[20] 42 U.S.C. § 4332(C).
[21] *Sabine River*, 951 F.2d at 677.
[22] *Id.*
[23] 40 C.F.R. § 1508.9(a)(1).
[24] 40 C.F.R. §1508.8(b); *O'Reilly v. U.S. Army Corps of Engineers*, 477 F.3d 225, 228 (5th Cir. 2007)
44142

decision."[25]   The Corps must consider even relatively unlikely events with significant impacts, like accidents.[26]

 "The EA is a rough-cut, low-budget environmental impact statement designed to show whether a full-fledged environmental impact statement-which is very costly and time-consuming to prepare and has been the kiss of death to many a federal project-is necessary."[27]   Thus, the ultimate purpose of the EA is to lead to one of two findings: "either that the project requires the preparation of an EIS to detail its environmental impact, or that the project will have no significant impact ... necessitating no further study of the environmental consequences which would ordinarily be explored through an EIS."[28] If the former is found, then the agency must proceed with a full blown EIS; if the latter is found, the agency issues a FONSI and has no further obligations under NEPA.[29]

Notably, the NEPA statutory framework provides no substantive guarantees; it prescribes adherence to a particular process, not the production of a particular result.[30] NEPA "is a procedural statute that demands that the decision to go forward with a federal project which significantly affects the environment be an environmentally conscious one."[31]   The statute "does not command the agency to favor an environmentally preferable course of action, only that it make its decision to proceed with the action after

---

[25] *City of Shoreacres v. Waterworth*, 420 F.3d 440, 453 (5th Cir. 2005).
[26] 40 C.F.R. § 1502.22(b)(4).
[27] *Sabine River*, 951 F.2d at 677 (internal quotations and citations removed).
[28] *Id.*
[29] *Id.*
[30] *Robertson*, 490 U.S. at 350, 109 S.Ct. 1835.
[31] *Sabine River*, 951 F.2d at 676 (quoting *Robertson*, 490 U.S. at 350).
44142

taking a 'hard look at environmental consequences.'"[32]  Indeed, "NEPA does not prohibit the undertaking of federal projects patently destructive of the environment; it simply mandates that the agency gather, study, and disseminate information concerning the projects' environmental consequences."[33]  Thus, while "[o]ther statutes may impose substantive environmental obligations on federal agencies . . . NEPA merely prohibits uninformed-rather than unwise-agency action."[34]  "Agency actions with adverse environmental effects can thus be NEPA compliant where 'the agency has considered those effects and determined that competing policy values outweigh those costs.'"[35]

Further, the Fifth Circuit has found that the fact that plaintiffs or their experts take great issue with the factual findings and ultimate conclusions of the agency does not render those findings and conclusions "arbitrary and capricious."[36] As the court noted, government agencies-and not the federal courts-are the entities NEPA entrusts with weighing evidence and reaching factual conclusions:

> Where conflicting evidence is before the agency, the agency and not the reviewing court has the discretion to accept or reject from the several sources of evidence. The agency may even rely on the opinions of its own experts, so long as the experts are qualified and express a reasonable opinion.[37]

Moreover, even if a court was convinced that the plaintiffs' experts were more

---

[32] *Id.* (quoting *Robertson*, 490 U.S. at 350, 109 S.Ct. 1835).
[33] *Id.*
[34] *Robertson*, 490 U.S. at 351.
[35]  *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 255 F.Supp.3d 101, 113 (D.D.C. 2017)(quoting *Ohio Valley Envtl. Coal v. Aracoma Coal Co.*, 556 F.3d 177, 191 (4th Cir. 2009)).
[36] *Spiller v. White*, 352 F.3d 235 (5th Cir. 2003).
[37] *Id.* at 243, quoting *Sabine River*, 951 F.2d at 678.
44142

persuasive than those relied upon by the agency, the court would still be compelled to uphold the agency's finding so long as their experts were qualified and their opinions reasonable.[38]

### B. CWA

The Clean Water Act is a pollution control statute that establishes a comprehensive program designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."[39] To achieve this goal, the CWA prohibits the discharge of pollutants, including dredged or fill material, into navigable waters unless authorized by a CWA permit.[40] The CWA defines "navigable waters" as "waters of the United States," which, in turn, is defined by regulation to include certain wetlands.[41]

Section 404 of the CWA authorizes the Corps to regulate discharges of dredged and fill material into wetlands through permitting procedures.[42] In addition to passing a public interest review which balances reasonably expected benefits against reasonably foreseeable detriments, all CWA section 404 permits must meet guidelines issued by the Environmental Protection Agency and the Corps under CWA section 404(b)(1).[43] These "404(b)(1) Guidelines" specify that the Corps must ensure that the proposed fill will not cause significantly adverse effects on human health or welfare, aquatic life, and aquatic

---

[38] *Id.* (citing *Sabine River*, 951 F.2d at 678; *Marsh*, 490 U.S. at 378, 109 S.Ct. 1851 ("[w]hen specialists express conflicting views, an agency must have the discretion to rely on the reasonable opinions of its own qualified experts, even if, as an original matter, a court might find contrary views more persuasive.")).
[39] 33 U.S.C. § 1251(a).
[40] 33 U.S.C. § 1311(a).
[41] 33 U.S.C. § 1362(7); 33 C.F.R. § 328.3(a)-(b).
[42] 33 U.S.C. § 1344.
[43] See 33 U.S.C. § 1344(b)(1), 1344(e)(1); 33 C.F.R. § 320.4.
44142

ecosystems.[44] To comply with this requirement, the Corps must make a written determination of the effects of a proposed activity "on the physical, chemical, and biological components of the aquatic environment ...."[45]

The 404(b)(1) Guidelines also provide that "no discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem."[46] Under the Guidelines, a project may generally not be permitted where there is "a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences."[47]

### C. RHA[48]

The principal purpose in enacting the Rivers and Harbors Act[49] was to facilitate the federal government's ability to ensure that navigable waterways, like any other routes of commerce over which it has assumed control, remain free of obstruction.[50] "The coverage of the Rivers and Harbors Act is broad, and its principal beneficiary is the United

---

[44] 40 C.F.R. § 230.10(c)(1)-(3).

[45] *Id.* § 230.11.

[46] 40 C.F.R. § 230.10(d).

[47] 40 C.F.R. § 230.10(a); *see generally City of Shoreacres v. Waterworth*, 332 F.Supp.2d 992, 1015–16 (S.D.Tex. 2004).

[48] Plaintiffs have not brought a challenge under the RHA; however, the Section 408 EA upon which the Corps relied in the Section 404 EA was conducted pursuant to the RHA, thus it is summarily explained.

[49] 33 U.S.C. § 408.

[50] *Board of Com'rs of Southeast Louisiana Flood Protection v. Tennessee Gas Pipeline Co., LLC*, 88 F.Supp.3d 615, 632 (E.D. La. 2015)(citing *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967)).

44142

States government."[51] Section 408 of the Rivers and Harbors Act makes it illegal for any person to damage or impair a public work built by the United States to prevent floods.[52] However, the Corps may "grant permission for the alteration or permanent occupation or use of any of the aforementioned public works when ... such occupation or use will not be injurious to the public interest and will not impair the usefulness of such work."[53]

## III.    STANDARD FOR A PRELIMINARY INJUNCTION

Plaintiffs "seek a limited preliminary injunction preventing construction of the pipeline through the Atchafalaya Basin" pending a merits challenge to the permit.[54] A preliminary injunction is an "extraordinary and drastic remedy" that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.[55]   A plaintiff seeking a preliminary injunction must establish (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) that their substantial injury outweighs the threatened harm to the party whom they seek to enjoin; and (4) that granting the preliminary injunction will not disserve the public interest.[56]

None of the four requirements has a fixed quantitative value.[57] Therefore, in applying the four-part test, "a sliding scale is utilized, which takes into account the intensity

---

[51] *Id.* at 632-33 (citing *In re S. Scrap Material Co., L.L.C.,* 713 F.Supp.2d 568, 575 (E.D.La. 2010) (Feldman, J.) (citing *Wyandotte Transp. Co. v. United States,* 389 U.S. 191, 201, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967))).
[52] *Id.* at 633 (citing 33 U.S.C.A. § 408).
[53] *Id.,* n. 160 (quoting 33 U.S.C. § 408).
[54] Rec. Doc. 15-1.
[55] *Munaf v. Geren,* 553 U.S. 674, 689, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008).
[56] *Planned Parenthood Ass'n of Hidalgo Cty. Tex., Inc. v. Suehs,* 692 F.3d 343, 348 (5th Cir. 2012); *accord Canal Auth. of Fla. v. Callaway,* 489 F.2d 567, 572 (5th Cir. 1974).
[57] *Monumental Task Committee, Inc. v. Foxx,* 157 F.Supp.3d 573, 582 (E.D. La. 2016)(citing *Texas v. Seatrain Int'l, S.A.,* 518 F.2d 175, 180 (5th Cir. 1975)).
44142

of each in a given calculus."[58]  This requires "a delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury that possibly could flow from the denial of preliminary relief."[59]

The decision to grant or deny a preliminary injunction is discretionary with the district court.[60] However, because a preliminary injunction is an extraordinary remedy, it "should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements."[61]  Consequently, the decision to grant a preliminary injunction "is the exception rather than the rule."[62]

The purpose of a preliminary injunction is limited to preserving the relative positions of the parties until a trial on the merits can be held.[63]  "Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."[64]  For this reason, the findings of fact and conclusions of law made by a court deciding whether to grant a preliminary injunction are not binding at trial on the merits.[65]

---

[58] *Id.*
[59] *Klitzman, Klitzman & Gallagher v. Krut*, 744 F.2d 955, 958 (3d Cir. 1984).
[60] *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).
[61] *Planned Parenthood v. Suehs*, 692 F.3d at 348.
[62] *Miss. Power & Light Co.*, 760 F.2d at 621.
[63] *Monumental Task Committee, Inc. v. Foxx,* 157 F.Supp.3d at 582 (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981)).
[64] *Id.* (quoting *Camenisch*, 451 U.S. at 395)(internal quotation marks omitted).
[65] *Id.*
44142

## A. Threat of Irreparable Harm

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered."[66]  The focus of this inquiry is not so much the magnitude but the irreparability of the threatened harm.[67]  The Fifth Circuit has defined irreparable harm to mean "harm for which there is no adequate remedy at law," such as monetary damages.[68]

Plaintiffs must show that "irreparable injury is likely in the absence of an injunction."[69]  "[A] preliminary injunction will not be issued simply to prevent the possibility of some remote future injury."[70]  There must be more than "an unfounded fear on the part of the applicant."[71]  Accordingly, the party seeking a preliminary injunction must show that the threatened harm is "more than mere speculation."[72]  Therefore, "[a] presently existing actual threat must be shown."[73]

---

[66] 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (3d ed. 2013) [hereinafter Wright & Miller].

[67] *See Callaway*, 489 F.2d at 575.

[68] *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.,* 710 F.3d 579, 585 (5th Cir. 2013); *accord Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011).

[69] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).

[70] *Id.* (alteration in original) (quoting Wright & Miller, supra, § 2948.1); *Morrell v. City of Shreveport*, 536 Fed.Appx. 433, 435 (5th Cir. 2013).

[71] *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985).

[72] *Janvey*, 647 F.3d at 601; *see also Connecticut v. Massachusetts*, 282 U.S. 660, 674, 51 S.Ct. 286, 75 L.Ed. 602 (1931) ("[An injunction] will not be granted against something merely feared as liable to occur at some indefinite time in the future."); *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.Cir. 1985) ("[T]he injury must be both certain and great; it must be actual and not theoretical.").

[73] *Morrell*, 536 Fed.Appx. at 435 (alteration in original) (quoting *United States v. Emerson*, 270 F.3d 203, 262 (5th Cir. 2001)).

44142

In sum, even if a plaintiff demonstrates a strong likelihood of success on the merits, a preliminary injunction may not be granted unless the plaintiff has shown a likelihood— not just a possibility—of irreparable harm.[74]  In *Winter*, the district court and Ninth Circuit had held that when a plaintiff demonstrates a strong likelihood of prevailing on the merits, a preliminary injunction may be entered based merely on a "possibility" of irreparable harm.[75]  The Supreme Court rejected the Ninth Circuit's "possibility" standard as too lenient.[76]  Accordingly, a court must deny a motion for a preliminary injunction unless the plaintiffs demonstrate, at a minimum, that irreparable harm is likely in the absence of an injunction.

Plaintiffs content that numerous courts have found that the loss of trees constitutes irreparable injury, even where they constitute a relatively small part of a larger ecosystem.[77]  The Fifth Circuit found that the loss of trees along a river, impacting the river's ecology, could constitute irreparable harm even though the total acreage affected was relatively small.[78]

Plaintiffs also claim that construction of the project has commenced and will start with clearing a 75-foot wide path through the unique and valuable cypress forest swamp, including countless trees over a century old.  Trees in the path provide valuable habitat

---

[74] *See Winter*, 555 U.S. at 22–23, 129 S.Ct. 365.
[75] *Id.* at 21, 129 S.Ct. 365.
[76] *Id.* at 22, 129 S.Ct. 365 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").
[77] Rec. Doc. No. 15-1 at 44 (citations omitted).
[78] *Id.* at 45.
44142

for wildlife and a variety of other ecological benefits.[79]   There are also many individual "heritage" trees in the right of way that were already ancient at the time of the Louisiana Purchase. It is also highly unlikely that any cypress forests will regenerate.[80]   Plaintiffs state: "It is hard to imagine a more compelling example of 'irreparable' harm than that."[81]

Plaintiffs also contend that construction will also alter the Basin's hydrology and siltation rates, leading to the loss of yet more cypress-tupelo swamp due to sediment accretion.[82] Further, spoil banks will aggravate hypoxic condition in the Basin by inhibiting the natural north-south flow of water, degrading aquatic habitat and further suffocating fish and crawfish.[83]

Plaintiffs posit that these impacts are not just irreparable to the environment but have real consequences for Plaintiffs and their members. For example, hundreds of members of Louisiana Crawfish Producers Association-West will struggle to make a living in the Basin harvesting crawfish, a profession that once sustained Basin communities for generations.[84]

In opposition, the Corps contends that Plaintiffs' delay in bringing their lawsuit and filing their motion for relief belies any harm that is immediate or irreparable.  Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the Plaintiff's rights, and a plaintiff's delay in bringing suit thus undercuts

---

[79] *Id.* at 45-46.
[80] *Id.* at 46 (citing Wilson Decl., Conner Decl.).
[81] *Id.*
[82] *Id.* (citing Van Heerden Decl., Exhibit 2, Eustis Decl.).
[83] *Id.* at 46-47 (citing Exhibit 1 at 19-20; Eustis Decl.; Meche Decl.).
[84] *Id.* at 47.
44142

allegations of irreparable harm.[85]  The Corps argues that, here, rather than filing promptly, Plaintiffs waited nearly a month to file their complaint and then waited over two weeks to move for a TRO and file their preliminary injunction motion although Plaintiff Atchafalaya Basinkeeper has been aware of the proposed route since January 5.  Thus, Plaintiffs' delay in seeking an order to enjoin the tree-clearing that allegedly causes irreparable harm is "inexplicable and unexplained."[86]  The Corps further contends that Plaintiffs' proffered Declarations fail to show that the injury to their aesthetic and recreational interests are irreparable in light of the mitigation required under the permits.  That mitigation has been deemed sufficient to compensate for losses to the natural environment, and Plaintiffs have failed to establish the threat of irreparable harm in this motion.

BBP offers a more substantive opposition to Plaintiffs' suggestion of irreparable harm.  BBP contends Plaintiffs have provided no evidence to support the suggestion that there are a great number of heritage trees that will be cut.  For instance, one of Plaintiffs' declarants claims that there are many "old growth" trees in the surrounding "forest," but does not establish that there are "many" in the narrow right-of-way.[87]  Indeed, of the two declarants relied on by Plaintiffs, each provides only a single photograph of a single tree.[88]

---

[85] Rec. Doc. No. 37-2 (citing *Mylan Pharmaceuticals v. Shalala*, 81 F.Supp.2d 30, 44 (D.D.C. 2000)).
[86] *Id.* at 42.
[87] Rec. Doc. No. 36 at 36 (citing Rec. Doc. No. 15-43 ¶ 15 (Conner Decl.)).
[88] *Id.* (citing Rec. Doc. No. 15-43 at Fig. 2; Rec. Doc. No. 15-44 Ex. E (Wilson Decl.)).
44142

BBP claims that, during the tree survey conducted by BBP, the survey identified only five cypress trees with a 36 inches or greater dbh[89] in either the permanent or temporary right of way.  Even if all five trees are cut down, BBP contends this is a *de minimus* number, representing less than 0.08% of the remaining cypress relic trees in the Basin.[90]  Further, BBP maintains that the Corps reasonably concluded that much of the cleared area "would be allowed to revegetate"[91]  While Plaintiffs disagree with this conclusion, BBP contends their language reveals their uncertainty – the trees will "probably" not grow back.  Not only are these assertions speculative, but they rely on expert say-so, which is insufficient when the Corps has applied its own expertise to reach a contrary conclusion.

BBP also contends Plaintiffs have conceded that mitigation is available to remedy past harm – the very antithesis of irreparable harm.[92] Thus, whatever impact may have occurred from earlier developments, BBP maintains that all Plaintiffs show is that many of the harms alleged have already occurred.  Because these past harms cannot be prevented by a preliminary injunction, they cannot form the basis of preliminary injunctive relief.[93]

In reply, Plaintiffs argue that Defendants' claim that harm was not imminent based on Plaintiffs' alleged "delay" is without merit.  Plaintiffs repeatedly visited the project site

---

[89] Diameter at breast height, meaning at four and a half feet above ground.
[90] Rec. Doc. No. 36 at 37.
[91] *See* Section 408 EA at 56; Section 404 EA at 45.
[92] Rec. Doc. No. 36 at 38 (citing Rec. Doc. 15-1 at 27-32).
[93] *Id.* at 39(citing *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009)).
44142

to look for signs that construction was imminent and saw none. Further, Plaintiffs reasonably anticipated construction would not begin until later in the year. As soon as Plaintiffs saw indications that construction was imminent, they filed the injunction motion within days. Further, in their post-hearing brief, Plaintiffs rely on the testimony of their fact and expert witnesses, which Plaintiffs contend was "virtually uncontested," in arguing they have established the threat of irreparable harm. Plaintiffs contend they presented testimony that the loss of forests would have grave ecological impacts, such as the loss of habitat and the destruction of legacy trees that could be thousands of years old. Dr. Conner explained how the claimed "temporary" impacts were not temporary in light of the fact that cypress forests can no longer regenerate themselves due to changed conditions of the Basin. Additionally, Plaintiffs contend they explained how the carving of yet another channel from one side of the Basin to the other would alter the Basin's hydrology and result in changes in sediment dynamics that would cause two kinds of irreparable harm: robbing the delta of the sediment necessary to sustain it and putting that sediment instead into the Basin where it would threaten cypress swamps.

The Court finds that Plaintiffs have established a threat of irreparable harm. First, the Court finds no unjustified delay in the timing of Plaintiff's motion. Further, the Court agrees that the impact of the loss of legacy trees cannot be mitigated against or restored to the same condition. The Court also finds that the project potentially threatens the hydrology of the Basin and poses the threat of destruction of already diminishing

44142

wetlands.  The Court adopts by reference the comments and findings made during the preliminary injunction hearing in support of this ruling on this issue.

### B. Likelihood of Success on the Merits[94]

Plaintiffs must also demonstrate a substantial likelihood that they will prevail on the merits of their claims. Courts use "a bewildering variety of formulations of the need for showing some likelihood of success."[95]  Some courts require the movant to show that the likelihood of success on the merits is greater than fifty percent.[96]  However, the Fifth Circuit recognizes that a finding of substantial likelihood does not require a finding of a fixed quantitative value.[97] Rather, "a sliding scale can be employed, balancing the hardships associated with the issuance or denial of a preliminary injunction with the degree of likelihood of success on the merits."[98]

When the other factors weigh strongly in favor of an injunction, "a showing of some likelihood of success on the merits will justify temporary injunctive relief."[99]  However, no matter how severe and irreparable the threatened harm and irrespective of the hardships which a preliminary injunction or lack of one might cause the parties, "the injunction should never issue if there is no chance that the movant will eventually prevail on the merits."[100]

---

[94] Courts within the Fifth Circuit and the Fifth Circuit use both the "substantial likelihood" and the "sliding scale" standard for success on the merits.  The Court notes that it would reach the same conclusion under application of either standard.

[95] Wright & Miller, *supra*, § 2948.3.

[96] *See, e.g., Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985).

[97] *Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ. & Welfare*, 601 F.2d 199, 203 n. 2 (5th Cir. 1979).

[98] *Id.*

[99] *Productos Carnic, S.A. v. Cent. Am. Beef & Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980).

[100] *Seatrain Int'l*, 518 F.2d at 180.

44142

To show a likelihood of success, plaintiffs must at least present a prima facie case, but need not prove that they are entitled to summary judgment.[101]  To assess the likelihood of success on the merits, the court looks to standards provided by the substantive law.[102]

        1.   The Environmental Impact of Oil Spills and Incorporation of the RHA 408 EA analysis to support a FONSI relative to the CWA 404 Permit

A major dispute between the Parties is whether the Corps performed sufficient analysis of the environmental impact on the Basin of possible oil spills. It is undisputed that NEPA requires an assessment of direct and indirect effects which are reasonably foreseeable.  The Corps must analyze even relatively unlikely events with significant impacts, like accidents.[103]  Plaintiffs argue that the permit issuance was arbitrary and capricious for failure to analyze the environmental impact of oil spills in connection with the 404 EA.  Plaintiffs advance three arguments.  First, Plaintiffs contend that the Corps impermissibly relied on the RHA 408 analysis, which is limited in scope and purpose, to buttress or support a FONSI determination under the broader regulatory requirements of the CWA.  Second, Plaintiffs contend that the public received insufficient notice that the RHA 408 EA would inform the Corps' spill analysis in the Section 404 EA.  Finally, the Plaintiffs contend that the spill modeling relied upon by the Corps was arbitrary and capricious.

---

[101] *Daniels Health Scis.*, 710 F.3d at 582.
[102] *Sepulvado v. Jindal*, 729 F.3d 413, 418 (5th Cir. 2013).
[103] *Supra*, n. 26. ???
44142

> a. *Reliance on the testing, analysis, and findings in the Section 408 EA in coordination with the Section 404 EA to support its FONSI conclusion.*

A careful reading of the Section 404 EA reveals that the environmental impacts of possible oil spills were not analyzed except in connection with the Environmental Justice review required by Executive Order 12989.[104]  In fact, as part of the "Corps Analysis of Applicant's Responses to Comments from the General Public" in the Section 404 EA, the Corps states that:

> comments such as those pertaining to potential impacts to surface and ground water resources through leakage or rupture, [i.e. oil spills] while clearly important factors, are specifically regulated under the Pipeline and Hazardous Material Safety Administration, Office of Pipeline, and LDEQ, and *not within the purview of the Corps.*[105]

However, the Section 404 EA FONSI incorporates the "environmental assessment prepared as part of Section 408 review" by reference as part of its conclusory findings in the Section 404 EA.  The Corps District Commander states:

> Finding of No Significant Impact (FONSI).  Having reviewed the information provided by the applicant, the comments received from the public in writing and at the public hearing, the environmental assessment prepared as part of the Section 408 review and this assessment of the environmental impacts, I find that this permit action will not have a significant impact on the quality of the human environment.  Therefore, and Environment Impact Statement will not be required.[106]

Plaintiffs argue that this amounts to impermissible stacking.  Plaintiffs argue that the Section 408 EA expressly states that it did not look at impacts to wetlands in the

---

[104] Rec Doc. 15-31, pp 75 – 92.
[105] Rec. Doc. 15-31, p. 31 (emphasis added).
[106] Section 404 EA at 91.
44142

Basin.   Plaintiffs are concerned about the risk of a spill in the Basin, but by its own terms, the Section 408 EA doesn't address this. Plaintiffs acknowledge that NEPA allows an agency to rely on, or "tier," to one NEPA document in another, but contend that this tiering is permissible only in specific circumstances.  Further, Plaintiffs contend the segmentation of a single project into two separate environmental analyses under NEPA is strictly prohibited:  "Proposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statements."[107]   Plaintiffs maintain that the Corps should have done a single environmental review of the project informing both permits, not separate, isolated reviews that both inform its NEPA analysis.

At the hearing, the Corps explained the process of conducting the Section 408 EA in conjunction with the Section 404 EA.  The New Orleans District Commander reviewed all of the environmental documentation, including the Section 408 EA, in reaching the NEPA FONSI as to the RHA permit and the CWA permit, and a single administrative record supports both determinations and is properly before the Court for consideration. The Corps cites the Supreme Court's decision in *National Association of Home Builders v. Defenders of Wildlife*,[108] holding that, under the APA, a court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  The Corps contends that the District Commander's path is made clear in the conclusory findings on

---

[107] 40 C.F.R. § 1502.4(a).
[108] 551 U.S. 644, 658 (2007).
44142

page 91 of the Section 404 EA where the Commander references the Section 408 EA and other supporting documents.

The Corps and BBP also addressed Plaintiffs' complaint that the Section 408 EA analyzed a very limited portion of the project such that it was insufficient to support the much broader Section 404 permit. The Corps and BBP explained at the hearing that both the Section 404 EA and the Section 408 EA relied on a spill model and analysis that considered the risk of oil spills every 200 feet along the entire pipeline route.[109] Both EAs reference the spill model prepared in accordance with PHMSA regulations. Further, the Corps argues it demonstrated that the preparation of separate EAs is consistent with the Corps' procedures under the Engineering Circular and not an attempt to avoid compliance with NEPA.[110]

The Section 408 EA explained that "[t]he model shows how far an unabated plume could propagate in 6 hours from a release located generally every 200 feet along the pipeline route in accordance with PHMSA modeling protocols."[111] While the Section 408 EA applied the spill model results to the specific federal easements and projects to determine the risks and impacts at those locations, the PHMSA model itself clearly covered the entire pipeline. Further, the Section 408 EA compared alternative routes to the preferred route, including with respect to the risks of an oil spill: these "alternatives

---

[109] Section 404 EA at 75-76; Section 408 EA at 17-19.
[110] Government Exhibit 34.
[111] Section 408 EA at 18.
44142

were evaluated for the pipeline route as a whole."[112]  On these grounds, the Corps and BBP maintain that this is not a case wherein a broader EA incorrectly rested its conclusions on the results of a narrower EA.  The analysis used by the Corps in both EAs was co-extensive, and the spill model used to support both assessed oil spills every 200 feet along the entire 162-mile route.  Moreover, Plaintiffs offered no evidence or testimony to suggest that this spill analysis was improper or inadequate.

Considering both EAs and the explanations by the Corps and BBP at the hearing, the Court finds that it was not improper for the Corps to rely upon the Section 408 EA in reaching its FONSI determination in the Section 404 EA.  Plaintiffs' claim that reliance on the Section 408 EA in support of the Section 404 EA is a post-hoc litigation tactic unsupported by the record is demonstrably unsupported by page 91 of the Section 404 EA, which clearly and explicitly references and incorporates the finding of the Section 408 EA.[113]  The Court is also satisfied that the spill analysis included in the Section 408 EA was not too narrow in scope to support the FONSI.

### b. Public Notice

Although the 408 EA was finalized in October 2017, Plaintiffs claim the Corps maintained its existence as a "highly guarded secret," and it was never released – notwithstanding Plaintiffs' vigorous efforts to gather the information.  Also, the Section

---

[112] *Id.* at 9-10.
[113] There was no independent analysis in the Section 404 EA regarding the risk of oil spills, but the Court is satisfied that the scope of the spill analysis conducted for the Section 408 satisfies the Section 404 requirement.
44142

408 EA was allegedly never released in draft form for public comment, and the final document was never posted on the website that the Corps maintains regarding the pipeline.

Regarding public notice, the Corps notes that the Section 408 EA was expressly referenced in the Section 404 FONSI,[114] and Plaintiffs actually briefed this provision in earlier pleadings.  Section 1.4 of the Section 408 EA entitled "PUBLIC CONCERNS" states that "[t]he Atchafalaya Basinkeeper responded to the Section 408 Public Notice by letter dated March 9, 2017 with several comments.  Most of the comments involved the interaction between the District's Section 408 process and the Section 10 and Section 404 processes being conducted by the District's Regulatory Branch."[115]  This is concrete evidence that the Plaintiffs were aware of the Section 408 EA and had the opportunity to express their concerns.

### c. Challenge to the Spill Analysis as pertaining to the Basin

Plaintiffs argue that, to the extent the Section 408 EA addresses oil spills, it doesn't say a word about the risk of a leak or spill in a pipeline buried a few feet below the surface of a unique aquatic ecosystem; it doesn't say a word about Energy Transfer Partner's ("ETP")[116] dismal safety and compliance record or the varying risks of different kinds of crude.  Thus, the Section 408 EA does not solve the Corps' failure to look at spills in its 404 decision.

---

[114] Section 404 EA at 91.
[115] Section 408 EA at 6.
[116] ETP is Bayou Bridge's parent company.
44142

Plaintiffs contend that, because the scope of the RHA Section 408 EA was limited only to the federal projects and easements along the right of way, it lacks an analysis of the risk of spills specific to the unique ecosystems found in the Basin and is thus incompetent analysis under CWA Section 404. According to Plaintiffs, the Basin area of the right of way comprises only 10 percent of the total length of the right of way. Thus, Plaintiffs contend, if the Section 408 EA only covers 10 percent of the Basin, then the real risk of an oil spill incident is ten times as large as acknowledged in just the Basin – and likely more since the deep underground portions will have additional protections unavailable elsewhere. Plaintiffs maintain that the Section 408 EA's conclusion that an oil spill is unlikely is not supported and speculative for the pipeline as a whole and that much of the documentation upon which BBP relies is not in the record. Thus, the Corps' failure to address the full risks and impacts of oil spills renders its decision arbitrary and capricious.

In defense of its permit, the Corps contends that the Section 408 EA analyzed oil spill impacts based on a "worst case" spill scenario.[117] This spill model assumes a "guillotine cut" to an above-ground pipeline that evacuates all of the oil in a particular segment of the pipeline.[118] The Section 408 EA explains that this model is conservative in that it greatly overstates the potential volume and impacts of a spill.[119] The Corps also examined the probability that a spill of any significant volume could occur and determined

---

[117] Section 408 EA at 52-103.
[118] *Id.* at 17-19.
[119] *Id.*
44142

that it was low.[120]   The Corps notes that courts have consistently upheld the use of

conservative modeling and risk-based analysis under NEPA.[121]

At the preliminary injunction hearing, the Corps responded to Plaintiffs' criticisms

of the Section 408 EA oil spill analysis.   The Corps maintains that Plaintiffs failed to

understand the extent of the Corps' analysis because, even though the scope of Section

408 is focused upon federal easement along the right of way, the pipeline spill data that

was reviewed was far broader in scope.   Specifically, in analyzing the BBP pipeline, the

Corps reviewed a model that examined oil spill risks every 200 feet for the length of the

162-mile pipeline.[122]  The Corps also reviewed data on oil spill impacts in connection with

its Environmental Justice analysis for each census block in the Basin and each

environmental feature for the entire pipeline length.[123]

Plaintiffs also took issue with the Section 408 EA for not adequately considering

the "unique characteristics" of non-federal portions of pipeline route pursuant to 40 C.F.R.

§ 1508.27(b)(3).   However, the Corps argues that Plaintiffs have not identified any

characteristics "unique" to these sections of the route that were not already considered

by the Corps' discussion of impacts in the federal areas.   Although Plaintiffs incorrectly

assert that the Section 408 EA focused on only "a handful of deeply buried pipeline

---

[120] *Id.* at 107.
[121] Rec. Doc. No. 76 at 8-9 (citing *Standing Rock*, 255 F.Supp.3d at 132; *Defs. of Wildlife v. BOEM*, 684 F.3d 1242, 1250 (11th Cir. 2012); *Balt. Gas & Elec. Co. v. Nat. Res. Def. Counc., Inc.*, 462 U.S. 87 (1983)).
[122] Section 408 EA at 18-19:  "The model shows how far an unabated plume could propagate in 6 hours from a release located generally every 200 feet along the proposed pipeline route in accordance with PHMSA modeling protocols for determining the relative impact from a hypothetical release."
[123] *See* Government Exhibit 19; Section 404 EA at 75.
44142

segments,"[124] the Corps cites to the portions of the EA that repeatedly address and distinguish the impacts of pipeline segments installed by "open-cut" trench techniques, *i.e.*, above grade pipeline construction.[125] Further, the Tables in the Section 408 EA show that the federal easements include wetlands, floodplains, and water bodies that are representative of the land types on other sections of the route.[126] The Corps explained that the spill model "assumes that the pipeline is placed on top of the ground or is floating on top of the waterbodies,"[127] and these conservative assumptions overstate the potential impact of a spill, making the model results applicable along the entire route.[128] The Section 408 EA also included analysis of crossings that did not involve HDD drilling, meaning the Section 408 assessed risks from the same closer-to-the-surface pipeline segments relevant to the Section 404 EA.[129]

BBP explained at the hearing that the federal projects and easements to which the PHMSA model analysis was applied in the Section 408 EA are representative of the Basin as a whole. Further, the factors that bear on a spill – pipe corrosion, manufacturing and construction defects, operational errors, equipment failures, etc.[130] – are not unique to the federal projects and easements analyzed in the Section 408 EA. There is sufficient information in the Section 408 EA to demonstrate that the spill prevention, lead detection,

---

[124] Rec. Doc. No. 43-8 at 9.
[125] Section 408 EA at 54, 60-61, 64, & 77.
[126] *Id.* at 23, 25, 29, 69-70.
[127] *Id.* at 17.
[128] *Id.*
[129] *Id.* at 1-3.
[130] *Id.* at 109-110.
44142

and spill response measures the Corps relied on in the Section 408 EA apply across the entire pipeline.[131]

Plaintiffs expressed particular concern with the Corps' statement that it would defer issues "pertaining to potential impacts to surface and ground water resources through leakage or rupture," to the PHMSA as those issues "are specifically regulated by programs administered under the [PHMSA]."[132]  Plaintiffs argue that this demonstrates the Corps' dismissiveness to an extremely serious risk.  The Court cannot agree with Plaintiffs' characterization, and the administrative record establishes the contrary.

The Court has considered the evidence presented and the arguments of all Parties on this issue, and the Court finds that, in connection with its Section 408 environmental analysis, the Corps gave extensive and appropriate consideration to the risk of oil spills along the entire route of the pipeline, which includes the Basin. Although the Corps' statement in the Section 404 EA that spill risks were "not within the purview of the Corps[133] created ambiguity, the Court must nonetheless uphold the agency's determination if its decision making "path may reasonably be discerned."[134]  Any suggestion that the Corps simply dismissed the risk and referred the matter to the PHMSA is meritless in light of the substantial attention given to this issue as set forth above in both EAs.  Indeed, it is appropriate for the Corps to rely on the expertise of the PHMSA

---

[131] *Id.* at 111-115.
[132] Section 404 EA at 30.
[133] Rec. Doc. 15-31, p. 31
[134] Note 107 supra.
44142

in this regard.  In *OVEC v. Army Corps of Engineers*,[135] the court noted that the concerns

raised by the plaintiffs and the EPA primarily related to water quality.[136]   In that case, the

court noted that, "[u]nder the Clean Water Act, that responsibility lies with WVDEP and

the NPDES permit, not the § 404 permit."[137]   Further, the court stated that it was not

unreasonable "for the Corps to rely on the expertise of the WVDEP, the agency with

primary responsibility for water quality, in determining that impacts on water quality will

be insignificant."[138]   The Corps' reliance and deference to the PHMSA in this case is no

different and is not improper.

Further, Plaintiffs have provided the Court with no scientific or technical challenge

to the PHMSA spill risk model utilized by the Corps.   While the Court acknowledges

Plaintiffs have not had access to the specific model, the Court agrees that the record in

this matter is overwhelmingly sufficient for Plaintiffs to understand the analysis performed

and provide the Court with any scientific or technical challenge to the model and analysis

employed.  Plaintiffs have failed to do so, and the Court finds that Plaintiffs are unable to

demonstrate a likelihood of success on the merits as to the claims pertaining to the risk

of oil spills.  The Court finds that, on the record presently before the Court, the record is

replete with evidence that the Corps did indeed take a "hard look" at the risk of oil spills;

thus, the Court finds that the Plaintiffs have failed to demonstrate that they are likely to

---

[135] 883 F.Supp.2d 627 (S.D. W.V. 2012).
[136] *Id.* at 645.
[137] *Id.*
[138] *Id.*
44142

succeed on the merits of the claim that the Corps was arbitrary or capricious in its assessment of the risk of oil spills for this project.

      2. <u>Mitigation</u>

          *a. Public Notice & Comment*

Plaintiffs contend the opportunities for public input on the mitigation plan were insufficient under both NEPA and the CWA. Section 404 of the Clean Water Act authorizes the Secretary of the Army, acting through the Corps, to issue a permit for the discharge of dredged or fill material into navigable waters "after notice and opportunity for public hearings."[139] Likewise, NEPA requires a process for public comment and debate. The Corps must publish notice soliciting public comment within fifteen days after receipt of a complete application.[140] If the application is incomplete, the Corps must request from the applicant any additional information necessary for a complete application.[141] Generally, an application "must include a complete description of the proposed activity including necessary drawings, sketches, or plans sufficient for public notice."[142] Detailed engineering plans and specifications are not required; however, the application must describe "the location, purpose and need for the proposed activity; scheduling of the activity; the names and addresses of adjoining property owners; the location and dimensions of adjacent structures; and a list of authorizations required by other federal,

---

[139] 33 U.S.C. § 1344(a).
[140] 33 C.F.R. § 325.2(a)(2); 33 U.S.C. § 1344(a).
[141] 33 C.F.R. § 325.2(a)(1).
[142] *Id.* § 325.1(d)(1).
44142

interstate, state, or local agencies ... including all approvals received or denials already made."[143]  In short, a complete application is defined in terms of the sufficiency of the submitted materials to issue public notice.[144]

Because completion is defined by the sufficiency of the submitted materials to warrant public notice, it is controlled by the Corps' regulation that governs the content of a public notice.[145]  Public notice serves as "the primary method of advising all interested parties of the proposed activity for which a permit is sought and of soliciting comments and information necessary to evaluate the probable impact on the public interest."[146]  Therefore, "[t]he notice must ... include sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful comment."[147]  Further, the regulation lists items of information that should be incorporated into the notice, including, in relevant part, "[a]ny other available information which may assist interested parties in evaluating the likely impact of the proposed activity, if any, on factors affecting the public interest."[148]  However, "[t]he issuance of a public notice will not be delayed to obtain information necessary to evaluate an application."[149]

Plaintiffs state that, under the CWA, the notice issued by the Corps must include "sufficient information to give a clear understanding of the nature and magnitude of the

---

[143] *Id.*
[144] *Id.* 325.1(d)(10) ("An application will be determined to be complete when sufficient information is received to issue public notice.").
[145] *See id.* § 325.3(a).
[146] *Id.*
[147] *Id.*
[148] *Id.* § 325.3(a)(13).
[149] *Id.* § 325.1(d)(10).
44142

activity to generate meaningful comment."[150]   Plaintiffs posit that "compensatory mitigation is the single most important material issue related to the justification of a § 404 permit."[151]   Plaintiffs rely on the decision by the Virginia District Court in *OVEC*, which held that a public notice that contains no substantive information on mitigation violates NEPA as well as the CWA.[152]   Plaintiffs claim that the Corps' notice for the Bayou Bridge project fell far short of notice requirements.  Even after a supplemental application, the notice failed to include any detail regarding mitigation.  Further, the details of the mitigation plan – using "out of kind" credits far from the project site – were not revealed until the permit was issued.  Plaintiffs argue these are profound problems that the public and other agencies never had an opportunity to address.[153]   Plaintiffs claim there is no dispute that the only notice provided regarding mitigation was comprised of a single sentence:  "The applicant proposes to offset unavoidable wetland impacts by purchasing credits from Corps-approved mitigation banks within the New Orleans District."[154]   The Plaintiffs claim they were not able to meaningfully comment on the actual mitigation plan – out-of-kind mitigation credits for a different type of wetland far from the project site – which wasn't revealed until the decision was finalized.  Defendants' argument that the one sentence description of the mitigation plan meets these standards falls short.

The Corps maintains that the public received sufficient notice regarding proposed

---

[150] *Id.* quoting 33 C.F.R. § 325.3(a); §325.3(a)(13).
[151] *Id.* (quoting *Ohio Valley Envtl. Coal v. U.S. Army Corps of Engineers*, 674 F.Supp.2d 783, 804 (S.D.W. Va. 2009)).
[152] *Id.* (citing *OVEC*, 674 F.Supp.2d at 809).
[153] *Id.* at 37.
[154] *Id.* at 36 (citing Exhibit 9 at 2).
44142

mitigation as it provided notice that BBP would be purchasing acreage credits from Corps-approved mitigation banks in the six watersheds that would be impacted by the project as required by 33 C.F.R. § 332.3(b)(2).  For purposes of the CWA, the Corps contends it issued public notice providing "sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful comment," including "any information which may assist interested parties in evaluating the likely impact of the proposed activity ... on the public interest."[155]  If it is determined that no alternative would have a lesser impact on the aquatic ecosystem, the Corps conducts a public interest review to evaluate probable impacts of the project balancing the reasonably foreseeable benefits and detriments to determine whether to authorize the proposed project.  An intrinsic part of this review is formulating special permit conditions that mitigate temporary and permanent project impacts by avoiding, minimizing, and reducing wetland impacts to the extent possible and providing on or off-site compensatory mitigation for unavoidable impacts.[156]

The record reflects that, following the public notice and comment period, the Corps conducted a joint public hearing with the LDEQ on January 12, 2017 and a second public hearing on February 8, 2017 in Baton Rouge, Louisiana, and officially fielded additional comments until January 30, 2017.  Plaintiff Atchafalaya Basinkeeper submitted comments making the very arguments raised in this lawsuit:  criticizing the use of mitigation bank

---

[155] 33 C.F. R. § 325.3(a), (a)(13).
[156] 33 C.F. R. §§ 320.4(r), 325.4(a), (c), 332.3(a); 40 C.F.R. §§ 230.92, 230.93(a).
44142

credits and urging the Corps to instead require BBP to remediate historic spoil banks created by different companies. Indeed, in the same paragraph where Plaintiffs now allege they received insufficient notice, they also admit that they nonetheless were able to submit comments "highlight[ing] the inappropriateness of using either out-of-basin or out-of-kind mitigation."[157] By Plaintiffs' own admission, the Corps did provide adequate notice to the public.

The Corps attempts to distinguish the *OVEC*[158] opinion, arguing that it provides no support for Plaintiffs' position. In *OVEC*, the notices failed entirely to discuss compensatory mitigation because, at the time the notices were published, the applicants had yet to develop a compensatory mitigation plan. In contrast, the Corps claims that the notice Plaintiffs challenge here is "robust,"[159] containing details about the project's temporary and permanent impacts and accurately describing the permittee's planned mitigation for unavoidable wetland impacts as purchasing mitigation credits from Corps-approved mitigation banks within the New Orleans District. The Corps argues this notice satisfies both CWA regulations and NEPA's aim of fostering meaningful public participation.

The Court finds that the Corps provided sufficient public notice and opportunity to comment under both NEPA and the CWA. That Plaintiffs' complaints at that time are the same as the complaints raised in this lawsuit is telling. Further, the Court finds that the

---

[157] Rec. Doc. No. 15-1 at 26-27.
[158] 674 F.Supp.2d 783 (S.D.W.V. 2009).
[159] Rec. Doc. No. 37-2 at 34.
44142

Section 404 EA contains 26 pages of public comments and the Corps' detailed responses thereto.[160]  The Court finds that the substance and detail of the public comments are evidence that the public notice was sufficient to provoke robust public debate about the type and location of the proposed mitigation.

### b. "Preferred Hierarchy" of Mitigation

The Fifth Circuit has "consistently accepted the proposition that reliance on mitigation measures may reduce a project's impacts below the level of significance."[161] The Fifth Circuit also recognized that the Supreme Court "has held that proposed mitigation measures need not be laid out to the finest detail, even within the more labor-intensive context of an environmental impact statement."[162]  The court continued:

> Mindful of that distinction, we have still required that an EIS involving mitigation must include "a serious and thorough evaluation of environmental mitigation options for [a] Project to allow its analysis to fulfill NEPA's process-oriented requirements [.]"  We have, moreover, noted that "mere perfunctory or conclusory language will not be deemed to constitute an adequate record and cannot serve to support the agency's decision not to prepare an EIS."  With these principles in mind, we examine the Corps' EA

---

[160] *See* Section 404 EA at 5-31.

[161] *O'Reilly*, 477 F.3d at 231 ("In *Spiller*, 352 F.3d at 241, we explicitly approved that principle, while noting that "we have implicitly endorsed [such] use[.]" *Id.* (citing *Sierra Club v. Espy*, 38 F.3d 792, 803 (5th Cir.1994) (holding that EAs satisfied NEPA where they considered appropriate alternatives, including mitigation measures) and *Louisiana v. Lee*, 758 F.2d 1081, 1083 (5th Cir.1985) (holding that it was proper to consider restrictions placed on dredging permits in reviewing the agency's decision not to file an EIS)). Other circuits agree. *See, e.g., Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 682 (D.C.Cir.1982); *C.A.R.E. Now, Inc. v. Fed. Aviation Admin.*, 844 F.2d 1569 (11th Cir.1988); *Greenpeace Action v. Franklin*, 14 F.3d 1324 (9th Cir.1992); *Roanoke River Basin Ass'n v. Hudson*, 940 F.2d 58 (4th Cir.1991); *Audubon Soc'y of Cent. Ark. v. Dailey*, 977 F.2d 428 (8th Cir.1992)).

[162] *Id.* (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989) ( "There is a fundamental distinction ... between a requirement that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated ... and a substantive requirement that a complete mitigation plan be actually formulated and adopted."); *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 176–77 (5th Cir.2000) (quoting *Robertson*, 490 U.S. at 352, 109 S.Ct. 1835)).

44142

and the reasons set forth there for its conclusion that each significant environmental impact it had identified would be reduced to insignificance by its prescribed mitigation measure.[163]

With respect to compensatory mitigation under the CWA, the Code of Federal Regulations ("CFR") provides that:

> The fundamental objective of compensatory mitigation is to offset environmental losses resulting from unavoidable impacts to waters of the United States authorized by DA permits. The district engineer must determine the compensatory mitigation to be required in a DA permit, based on what is practicable **and capable of compensating for the aquatic resource functions that will be lost as a result of the permitted activity**. When evaluating compensatory mitigation options, the district engineer will consider what would be environmentally preferable.
>
> * * *
>
> the environmentally preferable compensatory mitigation **may be** provided through mitigation banks
>
> * * *
>
> **Compensatory mitigation requirements must be commensurate** with the amount and type of impact that is associated with a particular DA permit.[164]

Plaintiffs argue that the Corps incorrectly describes controlling regulations as imposing a mechanical and rigid hierarchy under which the outcome here – mitigation credits miles away from the pipeline site that bear zero ecological or hydrologic relationship to the impacts of the project – was the only permissible one. Citing 33 C.F.R. 332.3(a), the Plaintiffs contend the regulations direct precisely the opposite: a careful and balanced analysis to arrive at the "environmentally preferable" approach that actually

---

[163] *Id.* at 231-32 (internal citations omitted).
[164] 33 C.F.R. § 332.3(1) (emphasis added).

44142

offsets the environmental impacts which result from permit issuance. Plaintiffs aver no such careful analysis ever took place, in violation of the CWA and NEPA.

Rather than working through the hierarchy as the regulations direct, Plaintiffs claim the Corps simply selected a mitigation banking approach under which off-site and out-of-kind mitigation credits would be used, without any consideration or analysis of whether other alternatives would be feasible. Plaintiffs submit that there appears to have been zero consideration given to the core question of whether the off-site credits would "successfully replace lost functions and services" in light of aquatic habitat, connectivity, and hydrology.[165]

In opposition, the Corps argues that it must choose from a "limited menu" of compensatory mitigation options in a "strict priority" order.[166] Because wetland mitigation bank credits appear first in this hierarchy, the Corps contends wetland mitigation bank credits should be used for impacts within the service area of an approved bank that has an appropriate number and type of resource credits.[167] The Corps claims this priority may only be overridden in favor of permittee-responsible projects that "will restore an outstanding resource based on rigorous scientific and technical analysis."[168] Further, while in-kind mitigation is ordinarily preferable, the Corps contends it may authorize out-of-kind mitigation if it determines, based on a watershed approach, that it "will serve the

---

[165] 33 C.F. R. § 332.3(b)(1).
[166] Rec. Doc. No. 76 at 15.
[167] 33 C.F. R. § 332.3(b)(2).
[168] Rec. Doc. No. 76 at 15-16, quoting 33 C.F. R. § 332.3(b)(2).
44142

aquatic resource needs of the watershed."[169]

The Court starts with the plain words of the regulation.  33 C.F.R. § 332.3(b)(1) provides:

> (b) Type and location of compensatory mitigation
>
> (1) When considering options for successfully providing the required compensatory mitigation, the district engineer shall consider the type and location options in the order presented in paragraphs (b)(2) through (b)(6) of this section.

The regulation does not use the word "hierarchy," nor does the regulation specify a "strict priority" as argued by the Corps. A plain reading of the regulation proscribes the order of considering the "type and location of compensatory mitigation," but this is not the same as a "strict priority" as to the type of mitigation selected as the Corps suggests.

Section 332.3(b)(1) further provides:

> In general, the required compensatory mitigation should be located within the same watershed as the impact site, *and should be located where it is most likely to successfully replace lost functions and services.*[170]

In terms of considering the "type and location of compensatory mitigation,"[171] mitigation bank credits are to be considered first.[172]  Accordingly, the Court takes no issue with the Corps proceeding through specified order of consideration; however, rote reliance on what the Corps calls a "strict priority" without any rational explanation as to

---

[169] 33 C.F. R. § 332.3(e)(1)-(2).
[170] Emphasis added.
[171] 33 C.F.R. 332.3(b)(1).
[172] 33 C.F.R. 332.3(b)(2).
44142

how the mitigation choices serves the stated goal of "replac[ing] lost functions and services"[173] is arbitrary and capricious as will be discussed below.

33 C.F.R 332.3(b)(2) specifies that "the district engineer should give preference to the use of mitigation bank credits *when* [stated] considerations are applicable. However, these same considerations may also be used to override this preference, where appropriate."[174] Thus, while there is a stated preference for the use of mitigation bank credits when considerations exist,[175] the same considerations "may also be used to override this preference, where appropriate, as, for example, where . . . a permittee-responsible project will restore an outstanding resource based on rigorous scientific and technical analysis."[176] There was no analysis or consideration in the Section 404 EA of whether a "preference" for mitigation bank credits was appropriate or whether the particular mitigation bank credits to be acquired are "located where it is most likely to successfully replace lost functions and services."[177]

---

[173] 33 C.F.R. 332.3(b)(1).
[174] Emphasis added.
[175] "Since an approved instrument (including an approved mitigation plan and appropriate real estate and financial assurances) for a mitigation bank is required to be in place before its credits can begin to be used to compensate for authorized impacts, use of a mitigation bank can help reduce risk and uncertainty, as well as temporal loss of resource functions and services. Mitigation bank credits are not released for debiting until specific milestones associated with the mitigation bank site's protection and development are achieved, thus use of mitigation bank credits can also help reduce risk that mitigation will not be fully successful. Mitigation banks typically involve larger, more ecologically valuable parcels, and more rigorous scientific and technical analysis, planning and implementation than permittee-responsible mitigation. Also, development of a mitigation bank requires site identification in advance, project-specific planning, and significant investment of financial resources that is often not practicable for many in-lieu fee programs. For these reasons, the district engineer should give preference to the use of mitigation bank credits when these considerations are applicable." 33 C.F.R. 332.3(b)(2).
[176] *Id.*
[177] 33 C.F.R. 332.3(b)(1).
44142

c. *The Lack of Mitigation Analysis and Explanation is Arbitrary and Capricious*

The Section 404 EA defines the proposed work as follows:

Clear rights-of-way, conduct trenching operations, temporarily stockpile approximately 1,525,897 cubic yards of native earthen material, dredge flotation ditches, dredge barge landings, install above-ground facilities and components, and perform horizontal directional drilling operations, all as necessary to install 163 miles of 24-inch crude oil pipeline. Project implementation would temporarily impact approximately 455.5 acres of jurisdictional wetlands and approximately 41.8 acres of other waters of the U.S. through temporary construction rights-of-way (ROWs) and workspaces. Approximately 142 acres of jurisdictional wetlands would be permanently converted from forested to herbaceous wetlands within the permanent right-of-way.[178]

It is undisputed that the construction and continued maintenance of the pipeline ROW will have unavoidable environmental impacts in the Atchafalaya Basin.[179] According to the Corps, "[p]roject implementation [will] temporarily impact approximately 455.5 acres of jurisdictional wetlands . . . [and] [a]pproximately 142 acres of jurisdictional wetlands [will] be permanently converted from forested to herbaceous wetlands within the permanent right-of-way."[180]  The Section 404 EA states that "[t]he proposed project will change and/or reduce wetland functional quality along the route of the proposed ROW by conversion of forested habitat types."[181]  The EA identifies "[a] key issue(s) of concern in this watershed is the loss of wetland function and value."[182]

---

[178] Section 404 EA at 2.
[179] The applicant, Intervenor BBP, concedes that there will be "unavoidable impacts" in the Section 404 EA at 22-30. The Corp notes in the EA "there will be permanent conversion and green impacts associated with construction and maintenance of the pipeline ROW." Section 404 EA at 46-50.
[180] Section 404 EA at 2.
[181] *Id.* at 50-51.
[182] *Id.* at 58.
44142

According to the Section 404 EA, the U.S. Fish and Wildlife Services ("USFWS") objected to the proposed clearing and maintenance of a 30 foot ROW "within forested wetlands due to their high ecological value."[183] "[T]o avoid current and future forested wetland loss form this precedent-setting proposal, the USFWS strongly opposes the clearing of forested wetlands."[184] The Louisiana Department of Wildlife and Fisheries ("LDWF") objected on the same grounds.[185]

The Louisiana Department of Natural Resources ("LDNR") complained about placing the pipeline in a location that "would add to the cumulative effect of ecologically detrimental hydrologic alteration, and the pipeline would obstruct planned efforts to restore hydrologic function."[186] LDNR requested that the pipeline be installed "at a depth at or below that of the adjacent natural swamp."[187] The Corps responded that "[i]t was determined to be impracticable to place the pipeline" any deeper; however, no analysis or explanation was given for this determination.[188]

In its discussion of the wetland impacts, the Corps notes that, in the permanent pipeline ROW, "existing forested wetlands will be cleared of all tree stratum and hence be converted and maintained as predominately a cleared herbaceous habitat."[189] Thus,

---

[183] *Id.* at 6-8.
[184] *Id.*
[185] *Id.* at 9-11.
[186] *Id.* at 12.
[187] *Id.*
[188] *Id.*
[189] *Id.* at 46-50. According to the Corp, "it is expected that a typical ROW corridor will exist as more of a scrub shrub habitat during its life span." *Id.*
44142

"typical habitats" will be affected "throughout the Atchafalaya Basin."[190] The Corps

recognizes that these "are important natural communities for the maintenance of water

quality, provid[e] a very productive habitat for a variety of fish and wildlife species and,

and are important in regulating flooding and stream recharge."[191]

The Section 404 EA describes the functionality and value of the wetlands which

will be lost as a result of this project, as follows:

> They are important natural communities for maintenance of water quality,
> providing a very productive habitat for a variety of fish and wildlife species,
> and are important in regulating flooding and stream recharge.
>
> [F]reshwater wetlands act as filters to remove excess nutrients and toxic
> pollutants form the water. They are tremendous filters for human sewage,
> toxic metals, and other types of pollutants … Wetlands also buffer coastal
> areas against wind and waves, and hold excess floodwater to help protect
> cities and towns during hurricanes and heavy rains … Wetlands provid[e] a
> very productive habitat for a variety of fish and wildlife species.[192]

It is this value and functionality that is determinative of the nature and type of

compensatory mitigation required. There is no analysis explaining how out-of-kind

mitigation addresses these important functions.[193]

The objective and purpose of compensatory mitigation for environmental harms is

to "successfully replace lost functions and services."[194] "The district engineer must

determine the compensatory mitigation to be required in a DA permit, based on what is

practicable and capable of compensating for the aquatic resource functions that will be

---

[190] *Id.*
[191] *Id.*
[192] *Id.* at 48.
[193] *Id.* at 68 (see discussion).
[194] 33 C.F.R. § 332.3(b)(1).
44142

lost as a result of the permitted activity."[195]   To that end, the regulations require that compensatory mitigation "be commensurate with the amount and type of impact that is associated with a particular DA permit."[196]

The Corp concluded that 597.48 acres of wetlands will be impacted by the project, of which, 142.03 acres will be permanently impacted.[197]   The Corp identifies the temporary conversion of wetlands as the "most prevalent"[198] and proceeds to provide a "breakdown of the temporary impacts by workspace for the proposed ROW."[199]   The Section 404 EA is, however, devoid of similar data for the 142 acres of wetlands which will be permanently impacted, *i.e.*, irretrievably lost.   Labeling the temporary wetlands impacts as the "most prevalent" does not dispense with the obligation to analyze the permanent, albeit less "prevalent" losses.   The Section 404 EA is lacking in any discussion or analysis of the effects of these permanent conversions.

In support of its FONSI determination, the Corps concluded that "[a]ppropriate compensatory mitigation was purchased at [mitigation] banks to offset unavoidable impacts to wetlands that [will] result from permit issuance."[200]   BBP purchased 65 acres in-kind/in-basin and 163.8 acres out-of-kind/in basin[201] from the Bayou Fisher Mitigation Bank.   In total, BBP proposed to purchase 2019.2 mitigation bank credits for

---

[195] *Id.*
[196] 33 C.F.R. § 332.3.
[197] Section 404 EA at 63-64.
[198] *Id.* at 63.
[199] *Id.* at 63-64.
[200] *Id.* at 65.
[201] *Id.* at 68.  Plaintiffs dispute that the mitigation bank is actually in-basin, but for the purposes of these proceedings the Court accepts the Corps' determination that the mitigation bank is "in-basin."
44142

environmental impacts in the Atchafalaya Basin.[202]  According to the Corps, 519.7 credits were required to mitigate for impacts to Bottomland Hardwoods (BLH), and 1499 credits were required to mitigate for impacts to Cypress/Tupelo swamp.   Yet, only 434.5 Cypress/Tupelo swamp credits were actually purchased (1064.5 less than the number of credits required) and 1584.7 of BLH credits were purchased.  In a footnote, the Corps discloses that "1064.7 BLH credits were purchased as out-of-kind/in-basin credits to offset impacts to bald cypress/tupelo swamp."[203]   Based on the compensatory mitigation imposed,[204] the Corp concluded that the "effect" on the wetlands was "neutral as a result of mitigative action."[205]   Despite this conclusion, there is not an iota of discussion, analysis, or explanation how BLH credits mitigate the loss of function and value of the cypress/tupelo swamp impact.  As to temporary or construction-related impacts, BBP proposes that it will implement "Best Management Practices" to offset certain environmental impacts.[206]   However, there is precious little analysis of what "best practices" will offset temporary impacts.  The Court finds the Fifth Circuit's decision in *O'Reilly* particularly applicable to this case as the *O'Reilly* also held that no detail was provided to demonstrate how "best practices" would work to mitigate lost function and value.

---

[202] *Id.* at 63-64, Chart 2.
[203] *Id.* at 68.
[204] Mitigation bank credits
[205] *Id.* at 52 (see chart).
[206] Section 404 EA at 26, 28.
44142

For the reasons set forth above, the Court finds that the Section 404 EA fails to demonstrate that the chosen mitigation measures effectively address and remediate the adverse impacts such that a FONSI was proper.  As stated by the *O'Reilly* court, "the EA provides only cursory detail as to what those measures are and how they serve to reduce those impacts to a less-than-significant level. Because the feasibility of the mitigation measures is not self-evident … the EA does not provide a rational basis for determining that the Corps has adequately complied with NEPA."[207]   The Court further finds the following language from the holding in *O'Reilly* perfectly applicable here:

> We recognize that an EA is meant to be a "'rough-cut, low-budget', preliminary look at the environmental impact of a proposed project." *Spiller*, 352 F.3d at 240. The record before us, however, is simply not sufficient to determine whether the mitigated FONSI relies on "'... mitigation measures which ... compensate for any adverse environmental impacts stemming from the original proposal'" that, unmitigated, would be significant. *Id.* at 241 (quoting *Cabinet Mountains Wilderness*, 685 F.2d at 682). In other words, the EA fails to tell us "why the proposed agency action will not have a significant impact on the human environment." *Coliseum Square*, 465 F.3d at 224 (citing 40 C.F.R. §§ 1501.4(e), 1508.13). We therefore agree with the district court's determination that, the Corps acted arbitrarily in relying only on the information in the current EA to support the issuance of its mitigated FONSI.  In so holding, we pause to note that "[w]e have never said that deficiencies in an EA can only be cured by preparing an EIS, and that is not the law." *Fritiofson v. Alexander*, 772 F.2d 1225, 1248 (5th Cir.1985) (*overruled on unrelated grounds by Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 677 (5th Cir.1992)). Our review of the record today indicates only that we lack the information that would allow us to defer to the Corps's determination that mitigation will reduce the project's effects below the level of significance.[208]

---

[207] *O'Reilly*, 477 F.3d at 234.
[208] *Id.* at 234.
44142

For the reasons set forth above, the Court finds that the Corps failed to sufficiently justify its reliance on mitigation in reaching the FONSI. There is simply no assurance in the EAs that the mitigation plan will be successful in accomplishing the restorative goals of the CWA. Plaintiffs have demonstrated a likelihood of success on the merits regarding mitigation.

### 3. Failure to Consider Cumulative Effects/History of Noncompliance

Plaintiffs contend the Corps improperly ignored the long history of noncompliance with Corps permit conditions for other pipelines that have resulted in irreparable ecological damage to the Basin.[209] Equally problematic, according to Plaintiffs, is that the Corps ignored the oil and gas industry's extensive record of noncompliance with Corps' pipeline permits. Plaintiffs contend that the past pipeline construction has left spoil banks across much of the Basin which have been devastating to its ecology and hydrology.[210]

Further, virtually every commenter who participated in the permit process raised this history of noncompliance as a reason either to deny the permit or to conduct a full EIS. The Corps can only forgo such an analysis if compliance with the permit conditions is assured to occur. Being "hopeful" that compliance will occur is insufficient grounds to excuse the preparation of an EIS.[211] "[S]uch hope does not provide a sufficient basis on which to rest a § 404 permit and FONSI."[212] Because the Corps illegally dismissed

_____

[209] Rec. Doc. No. 15-1 at 25.
[210] *Id.* at 31 (citing Exh. 3 at 3-6; Meche Decl. ¶¶14-17; *see also Bd. of Comm'rs of the S.E. La. Flood Prot. Auth. V. Tenn. Gas Pipeline Co., LLC*, 29 F.Supp.3d 808, 816 (E.D. La. 2014)).
[211] *See Friends of Back Bay v. U.S. Army Corps of Engineers*, 681 F.3d 581 (4th Cir. 2012).
[212] Rec. Doc. No. 15-1 at 32 (citing *Friends of Back Bay*, 681 F.3d at 588).
44142

historic noncompliance as irrelevant to the current permit, Plaintiffs argue this is a failure to consider "all factors" which bear on the public interest determination. Plaintiffs also maintain that Energy Transfer Partners ("ETP"), Bayou Bridge's parent company, is out of compliance on another pipeline in the very same Basin and has an egregious history of violating environmental standards.[213] In sum, Plaintiffs claim it is undisputed that the Corps has granted many pipeline permits that prohibit spoil banks in the Basin; however, these terms have been routinely violated, and the Corps has failed to enforce those permit conditions. The Corps' NEPA and CWA analysis doesn't say a single word about noncompliance, nor does the permit propose anything different than what the Corps has always done in the past.

The Corps rejects Plaintiffs' arguments and claims it properly relied on mandatory permit conditions and project design features in assessing impacts. The Corps did not need to consider the possibility of non-compliance because the conditions are mandatory, and the Corps has regulatory power to enforce them. The Corps reasonably relied on those conditions and its regulatory power to enforce them in reaching its finding of no significant impact. Further, Plaintiffs' argument is contrary to Fifth Circuit case law and is speculative. Here, the permit issued by the Corps contains several mandatory conditions that, if not followed, allow the Corps to invoke suspension, modification, and revocation procedures contained in 33 C.F.R. § 325.7 or enforcement procedures like those contained in 33 C.F.R. 326.4 and 326.5.

---

[213] *Id.* at 34 (citing Exhibit 22; Eustis Decl. at ¶¶ 22, 26, 55; Wilson Decl. ¶¶ 31-34; Exhibit 33 at 2).
44142

The Corps maintains that both EAs respond to Plaintiffs' comments regarding possible spoil bank impacts. In light of the permit's extensive conditions, the permittees' repeated assurance of compliance with those terms and industry best practices, as well as the Corps' own regulatory authority to enforce the permit's conditions, it was reasonable for the Corps to consider the permits mitigation requirements in reaching a FONSI. Unlike the *Friends of Back Bay* case, the Corps is not merely "hopeful" that the permittee will adhere to the conditions in the permit – the Corps enjoys the regulatory authority to enforce those conditions should the permittee fail to uphold them, through actions up to and including revocation of the permit and recommending civil enforcement.

The Corps cites to the Fifth Circuit's decision in *State of Louisiana v. Lee*:

> This is not an instance where the proposed mitigating conditions consist of vague statements of good intentions by third parties not within the control of the agency. … Rather, here the conditions are legally enforceable by the Corps. The dredging must be conducted in accordance with these restrictions. Therefore, the only realistic course of action is to consider the conditions in reviewing the Corps' decision not to file the impact statement.[214]

The Corps addressed Plaintiffs' claims that it failed to consider the cumulative impacts of permitting an additional pipeline crossing in an area impacted by historical unremediated spoil banks, including potential impacts from noncompliance by BBP. The Corps cites to both EAs where the Corps referenced historical spoil banks from past projects in analyzing cumulative impacts.[215] The Corps contends nothing more was

---

[214] 758 F.2d 1081, 1083 (5th Cir. 1985).
[215] *See* Section 404 EA at 50; Section 408 EA at 119.
44142

required under NEPA.  Further, the Corps contends the law is clear that Plaintiffs cannot support a cause of action on a speculative factual hypothetical that presumes future violations by a permit holder.

BBP contends under both NEPA and the CWA, the Corps' analysis is limited to the impacts of **this** pipeline.[216]  Thus, the Corps addressed and rejected Plaintiffs' concern regarding the alleged noncompliance of other pipelines.  In the Section 404 EA, the Corps noted these complaints and BBP's response to these concerns that the right of way must be restored to "pre-construction contours" by BBP following construction.[217]  Also noted in the Section 404 EA is the fact that several pipelines about which Plaintiffs complain pre-date the CWA and Section 404 permitting; thus, they are not out of compliance.[218]  BBP contends the Corps resolved this dispute, explaining that it "has considered comments received from the public in response to the Public Notice and Public Hearing. In reviewing the applicant's responses to the comments and supporting documentation, [the Corps] has determined that the concerns presented and falling within the Corps statutory authority … may be addressed through modifications in project design and special permit conditions."[219]  Thus, rather than ignoring Plaintiffs' concerns, the record

---

[216] NEPA is concerned with the environmental impact of the "proposed action."  42 U.S.C. § 4332 (C).  The relevant factors under the CWA concern the impacts at "specified disposal cites."  33 U.S.C. § 1344(a).
[217] Section 404 EA at 23, 25, 28, 29, 36, 38, 40, 45, 51, 53, 55, 57, & 63.  Likewise, the Section 408 EA mentions BBP's obligation to restore the right-of-way to "pre-construction contours" at least nine times. Section 408 EA at 56, 57, 63, 65, 81, 98, 119, 122.
[218] Section 404 EA at 23.
[219] *Id.* at 30.
44142

reflects that the Corps addressed Plaintiffs' concerns and explained that they could be addressed through permit conditions which were included in the permit.[220]

In *O'Reilly*, the Fifth Circuit also addressed NEPA's specific requirements regarding cumulative impact analysis:

> The CEQ's regulations define a project's cumulative impacts as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7; *see also* 40 C.F.R. § 1508.25 (requiring that agencies take cumulative impacts into consideration during NEPA review). The regulation states that "[c]umulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7. In that vein, we have held that a consideration of cumulative impacts must also consider "[c]losely related and proposed or reasonably foreseeable actions that are related by timing or geography." *Vieux Carre Prop. Owners, Residents, & Assocs., Inc. v. Pierce*, 719 F.2d 1272, 1277 (5th Cir.1983).[221]

Having thoroughly read and considered the EAs and the Section 404 permit conditions placed on BBP, the Court finds that the Corps failed to sufficiently consider and address past noncompliance and cumulative effects in relation to this proposed project. The EA acknowledges that, "in the past, many actions were taken with little consideration [of] project related impacts on wetlands."[222] The Corps concedes that "[s]imilar CEMVN permits for the period 1970-present has authorized impacts to

---

[220] BBP also argues that Plaintiffs failed to provide any evidence that BBP will not abide by these permit conditions. Plaintiffs' argument is entirely based on the behavior of other companies. Further, the Fifth Circuit's opinion in *In re Louisiana Crawfish Producers*, 852 F.3d 456, 463-65 (5th Cir. 2017) confirms that ETP had not created the allegedly out-of-compliance spoil banks, and Plaintiffs' non-compliance argument is unsupported.

[221] *O'Reilly*, 477 F.3d at 234-235.

[222] Section 404 EA at 50-51.

44142

numerous acres of wetlands."[223]  The Section 404 EA categorizes this project as "very large" when "compared to other pipeline activities within the watersheds"[224] and describes "this project [as] larger in function and size when compared to the extent of other wetlands directly and/or secondarily affected by previous development activities, [and will] contribute cumulatively to wetland alteration and loss."[225] The Corps further anticipates that "future activities will further contribute to cumulative degradation of wetlands resource."[226] Considering past environmental impacts, the size and significance of the proposed project, and projections that "authorizations will continue to increase," the Corps identified the "permanent loss of wetlands" as a "[n]atural resource issue of particular concern.[227]

In short, the Corps concedes in the Section 404 EA that this project will "contribute cumulatively to wetland alteration and loss."[228]  Despite this finding, the EA provides utterly no analysis of permit conditions or mitigation that address this admitted cumulative effect. The EA merely concludes, without any analysis, that "[i]t is anticipated that through the efforts taken to avoid and minimize effects on the project site wetlands and the mandatory implementation of a mitigation plan that functionally compensates[229]

---

[223] *Id.* at 58.
[224] *Id.*
[225] *Id.* at 50-51.
[226] *Id.*
[227] *Id.* at 58.
[228] *Id.* at 50-51.
[229] For the reasons stated, the Court finds that the Corp failed to meaningfully analyze how the proposed mitigation "functionally compensates" for the impacts.
44142

unavoidable remaining impacts, permit issuance will not result in substantial direct, secondary or cumulative impact on the aquatic environment."[230]

The Court finds that the Section 404 EA provides insufficient information to conclude that the Corps took a "hard look" at past, present, and future cumulative environmental impacts to permit a reasonable conclusion that its proposed mitigation measures would significantly reduce these effects. Thus, Plaintiffs have demonstrated a likelihood of success on the merits regarding the Corps' failure to adequately consider and address the cumulative impacts of the project. The Corps' and BBP's myopic view that they are only required to consider the impacts of this singular project is not consistent with the regulations or applicable jurisprudence.

### C. Balance of Harms and Service of the Public Interest

Finally, in order to obtain a preliminary injunction, Plaintiffs must also establish that their substantial injury outweighs the threatened harm to the party whom they seek to enjoin and that granting the preliminary injunction will not disserve the public interest. This requires a balancing of harms to the parties, which involves an evaluation of the severity of the impact on the defendant should the temporary injunction be granted and the hardship that would occur to the plaintiff if the injunction should be denied. In addition, the court must consider whether an injunction would injure the public interest. However, there is no need to weigh relative hardships which a preliminary injunction or the lack of one

---

[230] Section 404 EA at 51.
44142

might cause the parties unless the plaintiff can show some likelihood of ultimate success.[231]

Plaintiffs contend the Corps relied on an arbitrary and unlawful balancing in which the benefits of operating the crude oil pipeline were expressly weighed, while the risks of such operations were ignored.[232] Although the Corps repeatedly touts the benefits of operating the pipeline, the Corps explicitly weighed the benefits of operating a crude oil pipeline while explicitly refusing to consider the risks. Such a one-sided comparison violates NEPA.[233] In *Sierra Club v. Sigler*, the Fifth Circuit invalidated a Corps EIS for a port project that "painted a rosy picture" of the economic benefits but totally ignored the risk of oil spills associated with the benefits.[234] Plaintiffs argue that, here, the Corps ignored the considerable economic benefits put at risk by this project such as impacts on tourism and travel revenues, impacts to ecosystems such as flood control, and the cultural and heritage values of "a centuries-old way of life in the Basin under siege."[235] Without considering these impacts, the Corps "tipped the scales" in favor of project approval, in violation of NEPA.[236] Plaintiffs posit that this "sham" analysis also violates the CWA which prohibits impacts to wetlands unless the Corps finds that "the benefits of the proposed alteration outweigh the damage to the wetlands resource."[237] The Corps cannot properly

---

[231] *Seatrain Int'l*, 518 F.2d at 180.
[232] Rec. Doc. No. 15-1 at 25.
[233] *Id.* at 42.
[234] *Id.* at 43 (quoting *Sigler*, 695 F.2d at 976).
[235] *Id.* (citing Meche Decl.)
[236] *Id.*
[237] *Id.* at 44 (quoting 33 C.F.R. § 320.4(b)(4)).
44142

weigh the benefits against the harm when it refuses to consider the harm.

Thus, Plaintiffs contend that the balance of harms weighs in favor of an injunction. Further, there is no harm at all to the Corps from an injunction vacating a permit while this case proceeds.[238]  While an injunction could delay the schedule for this project, it is well-established that temporary economic harm does not outweigh permanent environmental degradation such as loss of forests – especially ancient trees – or damage to wetlands.[239] Further, Plaintiffs ask this Court to temporarily enjoin the Corps to withdraw the Permit within the Atchafalaya Basin only – construction outside the Basin could proceed within the limits of the law.[240]

As to the public interest, Plaintiffs state that, "[t]he public interest is always served by requiring compliance with Congressional statutes."[241]  The public interest is best served by granting the preliminary injunction and having the Corps address "the public's expressed environmental concerns" and comply with the requirements of NEPA and the CWA prior to the construction of the project.  Further, federal and state legislatures have prioritized the protection and restoration of the Atchafalaya Basin through multiple projects, reflecting the strong public interest in protecting and recovering this special place.  It is also in the public interest to preserve the unique cypress swamps of the

---

[238] Rec. Doc. No. 15-1 at 47.
[239] *Id.* (see string cite)
[240] *Id.* at 48.
[241] *Id.* at 49 (quoting *ADT v. Capital Connect, Inc.*, 145 F.Supp.3d 671, 700 (N.D. Tex. 2015).
44142

Atchafalaya, especially where the evidence before the Court is such that forests are unlikely to ever regenerate.[242]

Contrary to Plaintiffs' allegations, the Corps contends it properly considered the likelihood and impact of oil spills, the beneficial effects of project design limitations and compensatory mitigation, and potential floodplain impacts.  The Corps also properly declined, in the absence of credible supporting evidence, to base its review on the presumptions that BBP would violate the requirements of its Section 404 permit and that the Corps would entirely decline to enforce the CWA with respect to the project.

Further, the Corps claims it devoted a significant amount of time and attention to evaluating detailed assessments of the risk, potential scope and consequences of petroleum releases from the proposed project.[243]  While the Corps did refer to the expertise of the PHMSA in the area of pipeline regulation, safety and operation, the Corps did so by looking to the databases of pipeline safety and release information that PHMSA compiles, and closely examining the pipeline modeling and Risk Assessment that were conducted pursuant to PMSHA requirements.

The Corps maintains that it did consider potential temporary and permanent impacts on the floodplain and current resource-dependent activities such as commercial and recreational hunting and fishing.  With respect to the flood plain, the Corps found that the project design parameters would minimize impacts such that they would be minor and

---

[242] *Id.* at 49-50.
[243] *See* Section 404 EA , Part 1.A.
44142

during construction.[244]  For the same reason, the Corps also found that impacts to commercial and recreational fishing and hunting would be temporary during actual construction activity, and then only within the construction foot print.[245] Once construction is completed, those activities are expected to resume.

Contrary to Plaintiffs' assertions, the Corps argues that it did consider their comments regarding alleged permit noncompliance; however, the Corps did not choose to base its public interest review on a worst case scenario in which BBP ignores the Permit requirements and the Corps subsequently refuses to enforce them.  The particular Permit at issue serves an important public interest in development of domestic energy resources, and there is a strong public interest in the certainty and reliability of permits granted by the Corps.  The ability of the Corps to fulfill those policies depends to some extent on the certainty that its permits represent.  Thus, the Corps contends that a preliminary injunction clouding the permits issued to BBP could set precedent harmful to the public interest.

BBP contends it will suffer certain harm from a delay of the project at a cost of more than $950,000 per day, or $25 million per month.  Cessation of all construction activities is alleged to cost more than $1.675 million per day, or $44 million per month. Cessation would also force BBP's contractors to lay off or furlough hundreds of workers.

---

[244] Section 408 EA at 63.
[245] *Id.* at 128.
44142

The work of suppliers, subcontractors, and vendors would also be brought to a halt, causing significant adverse impacts on the local economy and tax base.[246]

The Court has considered the Parties' arguments and finds that the balance of harms and public interest considerations support a preliminary injunction in this case. The Court is mindful of the importance of local employment and the economic benefits this project may yield. However, the Court finds Intervenors' evidence of the monetary losses not supported by underlying data. The claimed financial losses are not supported by specific details or analysis justifying the vast amounts presented. Moreover, this injunction would only apply to the construction in the Basin, leaving a substantial area subject to continued work.

The Supreme Court has stated that, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment."[247] The *OVEC* court opined: "Damage to the environment is a strong consideration in balancing the harms for an injunction. In fact, because damage to the environment is often irreversible, this harm is frequently justification for a restraining order or an injunction."[248] The Court finds the temporary delay in reaping economic benefits does

---

[246] The position of Intervenor Stupp also focuses on the alleged economic harm to its business, employees, and the local economy if the Court granted a preliminary injunction.
[247] *Amoco Production Co. v. Village of Gambell, AK*, 480 U.S. 531, 545 (1987).
[248] *OVEC*, 528 F.Supp.2d at 631.
44142

not outweigh the permanent harm to the environment that has been established as a result of the pipeline construction. The Court also notes that economic harm to BBP as a result of temporary cessation of work in the confines of the Basin can be ameliorated with construction scheduling and diversion of efforts to construction efforts along the other 90 percent of the ROW not affected by the Court's injunction. Accordingly, the Court finds that the balance of harms and the public interest in the environment weighs in favor of an injunction.

## IV.   BOND

Plaintiffs have asked the Court to waive the bond requirement in this case given their non-profit status as public interest plaintiffs. The Corps does not appear to oppose this request; however, BBP maintains that there is no reason in this case to excuse the bond requirement. BBP contends Plaintiffs have significant resources, more than enough to pay a bond, and BBP will suffer financial harm if the project is delayed. BBP cites the Seventh Circuit's holding that "nonprofit entities should pay their way, reimbursing the losses incurred by entities who operations the nonprofits impeded by obtaining preliminary injunctions later dissolved."[249]   BBP claims that Plaintiff Sierra Club Foundation announced net assets of $125,286,788 in 2016, and Plaintiff LA Crawfish Producers Association-West is a commercial organization whose members could contribute to a bond. BBP argues that the years required to litigate this matter are likely to result in damages of over $550 million.

---

[249] *Habitat Educ. Ctr. V. U.S. Forest Serv.*, 607 F.3d 453, 460 (7th Cir. 2010).
44142

In response, Plaintiffs contend that, in the event the Court should impose a bond, it should be nominal because the public interest plaintiffs in this case do not have the funds to pay a substantial bond and would be forced to withdraw their request for a preliminary injunction – effectively denying them the relief to which they are entitled. Plaintiffs claim that three of them are small, local non-profit organizations with one to thirteen staff members and mostly restricted funds that are not available for anything other than the specific work for which they were raised. For example, for its crude oil-related work, Sierra Club has to apply to a separate entity, Sierra Club Foundation, for restricted grants. Its total budget 2017 was $140,000, and all that money is currently devoted to the Club's advocacy work and therefore unavailable. Plaintiff also challenges BBP's "grossly inflat[ed]" potential injuries and argues that any economic loss to BBP would be BBP's fault.[250] Further, Plaintiffs' injunction request extends only through the Basin, not to other areas where the pipeline would operate. As such, the Court should either dispense with the bond or require only a nominal bond consistent with governing law.

Fed.R.Civ.Proc. 65(c) provides that a bond must be posted before a federal court may issue an interlocutory injunction and that the enjoined defendant may recover on the bond if a court later determines that it was "wrongfully enjoined." This bond requirement serves two functions: "(1) it assures the enjoined party that it may readily collect damages from the funds posted or the surety provided in the event that it was wrongfully enjoined,

---

[250] Rec. Doc. No. 65 at 34.
44142

without further litigation and without regard to the possible insolvency of the assured,[251] and (2) it provides the plaintiff with notice of the maximum extent of its potential liability, since the amount of the bond 'is the limit of the damages the defendant can obtain for a wrongful injunction, ... provided the plaintiff was acting in good faith.'"[252]

The Fifth Circuit has held that, "[w]hile a district court's failure to require the posting of a bond or other security constitutes grounds for reversal of the injunction,[253] some courts have waived the security requirement when they have found that the plaintiff was financially responsible[254] or was very likely to succeed on the merits.[255] Indeed, the Fifth Circuit has also stated: "In holding that the amount of security required pursuant to Rule 65(c) 'is a matter for the discretion of the trial court,'[256] we have ruled that the court "may elect to require no security at all."[257]

The Court has considered the arguments of all Parties. The Court hereby Orders that Plaintiffs shall, in accordance with Rule 65(c) of the Federal Rules of Civil Procedure, provide security in the amount of $10,000.00. The Court finds that security in the amount of $10,000.00 is reasonable considering that the Plaintiffs are mostly non-profit agencies

---

[251] *Continuum Co., Inc. v. Incepts, Inc.*, 873 F.2d 801, 803 (5th Cir. 1989)(citing *Coyne–Delany v. Capital Development Bd.*, 717 F.2d 385, 391 (7th Cir.1983)).
[252] *Id.* (quoting *Coyne–Delany*, 717 F.2d at 391).
[253] *Id.* (citing 11 Wright & Miller Federal Practice & Procedure § 2954, p. 524).
[254] *Id.* (citing *Monroe Div. Litton Business Sys. Inc. v. De Bari*, 562 F.2d 30, 32 (10th Cir.1977); *Continental Co. v. Frontier Refining Co.*, 338 F.2d 780, 782–83 (10th Cir.1964)).
[255] *Id.* (citing *Scherr v. Volpe*, 466 F.2d 1027, 1035 (7th Cir.1972)).
[256] *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996)(quoting *Corrigan Dispatch Company v. Casa Guzman*, 569 F.2d 300, 303 (5th Cir.1978); *see also City of Atlanta v. Metropolitan Atlanta Rapid Transit Authority*, 636 F.2d 1084, 1094 (5th Cir. Unit B Feb. 1981). *But see Continuum Company, Inc. v. Incepts, Inc.*, 873 F.2d 801, 803 (5th Cir.), *reconsidered on other grounds*, 883 F.2d 333 (5th Cir.1989).
[257] *Id.* (quoting *Corrigan Dispatch*, 569 F.2d at 303).
44142

with limited resources, and the injunctive relief ordered is confined to construction activities in the Atchafalaya Basin, which is a small portion of the right of way permitted. Hence, the Court finds that the permittee can ameliorate the costs of the preliminary injunctive relief ordered through construction sequencing and management practices.

## V.    CONCLUSION

For the oral and written reasons assigned, the Court hereby GRANTS Plaintiffs' *Motion for Preliminary Injunction*[258] relative to the construction of the permitted Right of Way within the Atchafalaya Basin, and Defendant and Intervenors are hereby ENJOINED from taking any further action on the project within the Atchafalaya Basin, in order to prevent further irreparable harm until this matter can be tried on the merits.  It is further ORDERED that the Plaintiffs shall post a bond of $10,000.00 forthwith; and it is further ORDERED that this *Order* shall be valid until final disposition of this case on the merits. BBP's *Motion to Stay Preliminary Injunction Pending Appeal*[259] is DENIED as moot.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana on <u>February 27, 2018.</u>

_____
**JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[258] Rec. Doc. No. 15.
[259] Rec. Doc. No. 83.
44142