# IN THE UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| ATCHAFALAYA BASINKEEPER, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 3:18-cv-00023-SDD-EWD |
| U.S. ARMY CORPS OF ENGINEERS | ) ) | |
| Defendant. | ) ) | |

**FEDERAL DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS ................................................................................................... 2

STATUTORY BACKGROUND........................................................................................... 5

    I.     The Administrative Procedure Act (APA)............................................................ 5

    II.    The National Environmental Policy Act (NEPA)................................................. 7

    III.   The Clean Water Act .......................................................................................... 9

    IV.   The Rivers and Harbors Act [Section 408]......................................................... 10

ARGUMENT ....................................................................................................................... 10

    I.     The Corps' Spill Analysis Fully Complied with NEPA ....................................... 10

          A.    The Corps thoroughly analyzed the risk of an oil release......................... 11

          B.    The Corps took a hard look at the possibility of an oil spill in the
                Basin. ................................................................................................. 13

          C.    The Corps thoroughly analyzed the potential environmental impact
                of a release. ......................................................................................... 16

          D.    The Corps did not delegate its NEPA responsibilities to the Project
                proponent or to another agency............................................................. 19

    II.    The Corps' Public Interest Analysis is Valid........................................................ 25

    III.   The Corps Adequately Considered the Construction Impacts of the Bayou
           Bridge Pipeline................................................................................................. 27

          A.    The Corps properly considered the secondary impacts of the
                authorized discharge. ........................................................................... 28

          B.    The Corps properly assessed the amount of mitigation necessary
                under the Clean Water Act..................................................................... 30

CONCLUSION..................................................................................................................... 33

**TABLE OF AUTHORITIES**

## CASES

*Alaska Airlines, Inc. v. Transp. Sec. Admin.*,
  588 F.3d 1116 (D.C. Cir. 2009) ............................................................ 15

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ....................................................... 32, 33

*Am. Bioscience, Inc. v. Thompson*,
  269 F.3d 1077 (D.C. Cir. 2001) ............................................................ 5

*Andrus v. Sierra Club*,
  442 U.S. 347 (1979) ............................................................................. 8

*Atchafalaya Basinkeeper v. United States Army Corps of Eng'rs*,
  894 F.3d 692 (5th Cir. 2018) ......................................................... 30, 31

*Avoyelles Sportsmen's League, Inc. v. Marsh*,
  715 F.2d 897 (5th Cir. 1983) ................................................................ 7

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
  462 U.S. 87 (1983) ........................................................................... 6, 7

*Bluewater Network v. Salazar*,
  721 F. Supp. 2d 7 (D.D.C. 2010) ........................................................ 18

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
  419 U.S. 281 (1974) ........................................................................... 27

*City of Dallas v. Hall*,
  562 F.3d 712 (5th Cir. 2009) .......................................................... 7, 19

*Club v. Clinton*,
  746 F. Supp. 2d 1025 (D. Minn. 2010) ............................................... 23

*Coastal Conservation Ass'n. v. U.S. Dept. of Commerce*,
  846 F.3d 99 (5th Cir. 2017) .................................................................. 6

*Coliseum Square Ass'n v. Jackson*,
  465 F.3d 215 (5th Cir. 2006) ............................................................ 6, 7

*Colo. River Cutthroat Trout v. Salazar*,
  898 F. Supp. 2d 191 (D.D.C. 2012) .................................................... 16

*Conservation Law Found. v. Mineta*,
  131 F. Supp. 2d 19 (D.D.C. 2001) ........................................................ 16

*Defs. of Wildlife v. Bureau of Ocean Energy Mgmt.*,
  684 F.3d 1242 (11th Cir. 2012) ...................................................... 11, 15

*Delaware Riverkeeper Network v. Federal Energy Regulatory Commission*,
  753 F.3d 1304 (D.C. Cir. 2014) ........................................................ 18

*EarthReports, Inc. v. FERC*,
  828 F.3d 949 (D.C. Cir. 2016) ...................................................... 23, 24

*Exxon Corp. v. Dep't of Energy*,
  91 F.R.D. 26 (N.D. Tex. 1981) ........................................................... 5

*Grand Canyon Trust v. Federal Aviation Administration*,
  290 F.3d 339 (D.C. Cir. 2002) ......................................................... 18

*Gulf Restoration Network v. U.S. Dep't of Transp.*,
  452 F.3d 362 (5th Cir. 2006) ............................................................ 7

*In re Katrina Canal Breaches Litig.*,
  696 F. 3d 436 (5th Cir. 2012) ........................................................... 8

*Kleppe v. Sierra Club*,
  427 U.S. 390 (1976) .................................................................... 18

*La. Crawfish Prods. Ass'n-W. Mallard Basin, Inc.*,
  Nos. 6:10-cv-1085, 6:11-cv-0461, 2019 WL 171693 (W.D. La. Jan. 10, 2019) ...................... 16

*La. Crawfish Prods. Ass'n-W. v. Rowan*,
  463 F.3d 352 (5th Cir. 2006) .......................................................... 17

*Limerick Ecology Action, Inc. v. Nuclear Regulatory Comm'n*,
  869 F.2d 719 (3d Cir. 1989) ........................................................... 15

*Marsh v. Or. Nat. Res.*,
  *Res.*, 490 U.S. 360 (1989) .............................................................. 6

*Md.-Nat'l Capital Park & Planning Comm'n v. U.S. Postal Serv.*,
  487 F.2d 1029 (D.C. Cir. 1973) ........................................................ 17

*Metro Edison Co v. People Against Nuclear Energy*,
  460 U.S. 766 (1983) .................................................................... 24

*Milk Train, Inc. v. Veneman,*
   310 F.3d 747 (D.C. Cir. 2002) ............................................................... 32

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ............................................................................... 6

*Nat'l Parks Conservation Ass'n v. Semonite,*
   916 F.3d 1075 (D.C. Cir. 2019) ............................................................ 17

*O'Reilly v. U.S. Army Corps of Eng'rs,*
   477 F.3d  (5th Cir. 2007).................................................................... 18

*OVEC v. Army Corps of Eng'rs,*
   883 F. Supp. 2d 627 (S.D. W.Va. 2012) .......................................... 12, 26

*Redeemed Christian Church of God v. U.S. Citizenship and Immigration Servs.,*
   331 F. Supp. 3d 684 (S.D. Tex. 2018) .................................................. 6

*Robertson v. Methow Valley Citizens Council,*
   490 U.S. 332 (1989) ..................................................................... 7, 8, 15, 19

*Sabine River Auth. v. U.S. Dept. of Interior,*
   951 F.2d 669 (5th Cir. 1992)........................................................ 6, 17, 19, 30

*Save Our Wetlands, Inc. v. Sands,*
   711 F.2d 634 (5th Cir. 1983)........................................................... 22, 23

*Sierra Club v. Espy,*
   38 F.3d 792 (5th Cir. 1994)................................................................ 8

*Sierra Club v. Sigler,*
   695 F.2d 957 (5th Cir. 1983)............................................................. 21

*Sierra Club v. U.S. Army Corps of Eng'rs,*
   803 F.3d 31 (D.D.C. 2015) ............................................................... 3, 24

*Sierra Club v. Van Antwerp,*
   709 F. Supp. 2d 1254 (S.D. Fla. 2009)................................................ 22

*Sierra Club v. Watkins,*
   808 F.Supp. 852 (D.D.C. 1991) ........................................................ 12

*Spiller v. White,*
   352 F.3d 235 (5th Cir. 2003)........................................... 6, 7, 8, 15, 18, 32

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
   255 F. Supp. 3d 101 (D.D.C. 2017) ............................................................ 12, 15, 23

*Stuttering Found. of Am. v. Springer,*
   498 F. Supp. 2d 203 (D.D.C. 2007) .................................................................. 6

*United States v. Pa. Indus. Chem. Corp.,*
   411 U.S. 655 (1973) ................................................................................ 10

*Universal Camera Corp. v. NLRB,*
   340 U.S. 474 (1951) ................................................................................. 5

## STATUTES

5 U.S.C. § 701 ......................................................................................... 5

5 U.S.C. § 706(2)(A) ................................................................................... 6

33 U.S.C. § 403 ........................................................................................ 3

33 U.S.C. § 408 .................................................................................... 10, 21

33 U.S.C. § 408(a) .................................................................................... 10

33 U.S.C. § 1251(a) .................................................................................... 9

33 U.S.C. § 1311(a) .................................................................................... 9

33 U.S.C. § 1342 ....................................................................................... 9

33 U.S.C. § 1344 ....................................................................................... 9

33 U.S.C. § 1362(6) .................................................................................... 9

33 U.S.C. § 1362(12) ................................................................................... 9

## CODE OF FEDERAL REGULATIONS

33 C.F.R. pt. 325 App. B(7) ......................................................................... 8, 9

33 C.F.R. pt. 325 App. B(8)(f) ........................................................................ 20

33 C.F.R. § 230.10 ..................................................................................... 8

33 C.F.R. § 320.4 ...................................................................................... 9

33 C.F.R. § 320.4(a)(1) ................................................................................ 25, 26

33 C.F.R. § 320.4(a)(4) ..................................................................................... 26

33 C.F.R. § 325.2(a)(6) ....................................................................................... 9

33 C.F.R. § 332.1 ................................................................................................ 9

33 C.F.R. § 332.3(a) ........................................................................................... 9

33 C.F.R. § 332.3(a)(1) ..................................................................................... 31

40 C.F.R. pt. 230 ........................................................................................ 10, 26

40 C.F.R. § 230.10(a) ....................................................................................... 22

40 C.F.R. § 230.11(h)(1) ................................................................................... 28

40 C.F.R. § 230.93(a)(1) ................................................................................... 31

40 C.F.R. § 1501.3 .............................................................................................. 8

40 C.F.R. § 1506.5(b) ....................................................................................... 20

40 C.F.R. § 1507.3 .............................................................................................. 8

40 C.F.R. § 1508.9 .............................................................................................. 8

40 C.F.R. § 1508.9(a) .......................................................................................... 8

49 C.F.R. § 194.7(a) ............................................................................................ 3

49 C.F.R. § 194.7(c) ............................................................................................ 3

49 C.F.R. pt. 194 ......................................................................................... 13, 26

49 C.F.R. § 194.119 ....................................................................................... 3, 24

49 C.F.R. § 194.119(e) ........................................................................................ 3

**OTHER AUTHORIES**

73 Fed. Reg. 19,594 (Apr. 10, 2008) ............................................................... 31

Executive Order 12898 ..................................................................................... 27

## INTRODUCTION

In pursuing their challenges to the Bayou Bridge Pipeline, Plaintiffs raise familiar arguments that were either rejected by this Court at the preliminary injunction stage or else by the Fifth Circuit on interlocutory review. Plaintiffs' claims fare no better at summary judgment.

This Court rightly rejected Plaintiffs' claims regarding the sufficiency of the United States Army Corps of Engineers' ("Corps") analysis of the possibility of an oil release in its earlier opinion, and should do so again here. First, the Corps did not simply defer to the pipeline proponent, but instead engaged in a lengthy and in-depth inquiry, requiring substantial revisions and updates to draft environmental analyses and requesting and obtaining additional data and information, as well as requesting comments and information from the public and other agencies. Second, the Corps' analysis satisfies the "hard look" standard of NEPA and the public interest analysis requirement of the Clean Water Act. The record shows that the Corps examined the nine major risk factors for an oil release and reasonably concluded the risk of a release in the Basin was low. Then, the Corps used a "worst case scenario" spill model to look at the potential scale of that unlikely event and its potential impacts on resources in the basin. At the end of that analysis, the Corps concluded that the risk of an oil release was not likely to have a significant impact on the environment. The Corps' conclusions are supported by the record and entitled to substantial deference.

The Corps also took a hard look at both direct and indirect construction impacts in the Basin, as well as at possible long-term changes to sediment accretion and Basin hydrology. Contrary to Plaintiffs' suggestion, there is no major new channel across the Basin; the Bayou Bridge pipeline is largely co-located alongside existing rights-of-way to minimize wetlands disturbance. Further, the Corps required the permittee to take both short- and long-term

measures following construction to ensure stabilization of disturbed areas and to mitigate against increased turbidity. The Corps likewise required the permittee to return the construction footprint to its pre-construction contours, preventing any changes to the Basin's hydrology. The Corps discussed these issues in the Environmental Assessments and reasonably concluded they were not significant. This satisfies both NEPA and the Clean Water Act.

Finally, Plaintiffs' challenge to the Corps' mitigation methodology was rejected by the Fifth Circuit and fails again here. The record shows that construction of the pipeline will not result in any permanent loss of wetlands, and that wetlands converted from scrub-shrub or forested habitat to herbaceous habitat will continue to function. The Corps' finding on this issue is reasonable and comports with the Corps' statutory and regulatory mandates. And similarly, the Corps disclosure of the conversion of those wetlands and finding that those impacts are not significant fulfilled the Corps' obligations under NEPA.

For these reasons, as explained more fully *infra*, each of Plaintiffs' claims fail and this Court should grant summary judgment to the Corps.

## STATEMENT OF FACTS[1]

The Bayou Bridge Pipeline Project ("Project") is an approximately 163-mile long, 24-inch diameter crude oil pipeline running from Lake Charles, Louisiana to St. James, Louisiana. BBP 337. The Project is capable of safely transporting 480,000 barrels of domestic crude oil per day to various crude oil terminals for eventual transportation by existing pipelines to refineries on the Gulf Coast. BBP 340. Pipelines are a safer, more environmentally responsible, and more

---

[1] The Corps incorporates by reference the statement of the case in our preliminary injunction brief, Rec. Doc. No. 46, as well as the Court's background section in its earlier opinion. Rec. Doc. No. 86 at 2.

economical method of delivering large quantities of crude than other delivery methods.  *See* BBP 343-45 (explaining lack of feasibility of truck and rail shipping of crude).

The Corps does not permit or regulate oil and gas pipelines.  In fact, no federal entity permits oil pipelines as there is no "general requirement of federal governmental evaluation and approval" for oil pipelines in the United States.  *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 50 n.8 (D.D.C. 2015).  The United States Department of Transportation, Pipeline and Hazardous Materials Safety Administration ("PHMSA") is the federal entity charged with establishing safety standards for pipelines.  PHMSA fulfills that responsibility, in part, by requiring pipeline operators to submit a spill response plan that meets PHMSA's requirements before the operator can "handle, store, or transport oil in th[e] pipeline."  49 C.F.R. § 194.7(a).  PHMSA's regulations allow a pipeline to operate for up to two years pending PHMSA's approval of a submitted plan where the operator certifies that it "has obtained, through contract or other approved means, the necessary personnel and equipment to respond, to the maximum extent practicable, to a worst case discharge or a substantial threat of such a discharge."  49 C.F.R. § 194.119(e); *see also* 49 C.F.R. § 194.7(c).  PHMSA determines whether a spill response plan meets its regulatory requirements.  49 C.F.R. § 194.119 (describing PHMSA's process for reviewing and approving pipeline spill response plans).

Because the pipeline crosses wetlands in the Basin that fall under the Corps' jurisdiction, as well as certain federal projects and easements, the Project required a permit to temporarily fill jurisdictional waters during construction under Section 404 of the Clean Water Act ("Section 404 Permit"), a permit to obstruct or alter navigable waters under Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, and permission to cross federal projects and easements

under Section 1 of the Rivers and Harbors Act ("Section 408 Permission").[2]  Before issuing the

Section 404 Permit and Section 408 Permission, the Corps completed environmental assessments

("EAs") analyzing the likely impacts of construction and pipeline operation, including in the

Basin.  BBP 1-92 (§ 404 Memorandum for Record, including the Section 404 EA); BBP 327-471

(§ 408 EA).

The environmental analyses for the Section 404 Permit and the Section 408 Permission

overlap in various ways, but each focuses on different agency actions required for the Project.

The Section 404 permit authorizes "dredge and fill" elements of the Project's construction, and

associated mitigation, and the Corps' environmental analysis focuses on those elements.  The

Section 408 permission authorizes the Project's crossings of federal projects (for example,

levees) and federal easements (for example, navigation through river channels).  Relevant to

Plaintiffs' claims, the Section 408 EA analyzed the risk of an oil spill along the entire length of

the pipeline and used a model from PHMSA to estimate the likely scope of a "worst case"

release through a guillotine cut of an above-ground pipeline.  BBP 354.  PHMSA data from real-

world pipeline spills shows that this worst case scenario is extraordinarily unlikely, and that most

pipeline spills are much smaller.  *Id.*

The Section 404 EA expressly incorporates—and properly relies upon—the Section 408

EA, including the spill risk analysis and potential impacts analysis.  In approving the Section 404

permit and issuing a FONSI, the District Commander "reviewed the information provided by the

applicant, the comments received from the public in writing and at the public hearing, *the

assessment prepared as part of the Section 408 review* and [the 404] assessment of the

_____

[2] There was no feasible route that would bypass the Atchafalaya basin or the federal projects.
See BBP 22-23; BBP 31-33; BBP 330; BBP 346-51.

environmental impacts."  BBP 91; *see also* Rec. Doc. 86 at 22 (finding that the Section 404 EA

"clearly and explicitly references and incorporates the finding of the Section 408 EA.").  In short,

the two EAs, while addressing separate agency actions, complemented each other and informed

the Corps about potential environmental impacts of the Project's construction, crossings, and

operations.  And on the basis of these EAs, the District Commander found that the issuance of

the Section 404 Permit and the Section 408 Permission would not result in a significant impact to

the physical environment.  BBP 91; BBP 131-36.

Pipeline construction is complete and the pipeline is now in service.  The Project

proponent represents that the only work left to do in the Basin is some clean up and revegetation

work.

## STATUTORY BACKGROUND

### I.      The Administrative Procedure Act (APA)

Plaintiffs bring their claims under the APA, 5 U.S.C. § 701.  The APA permits review of

"final agency action" based on the administrative record, which consists of the material that was

before the agency and considered directly or indirectly in its decisionmaking.  *Exxon Corp. v.*

*Dep't of Energy*, 91 F.R.D. 26, 33 (N.D. Tex. 1981) (citing *Universal Camera Corp. v. NLRB*,

340 U.S. 474, 487-88 (1951)).  In an APA case, the Federal District Court does not take evidence

or create a de novo record.  Rather, review is limited to the administrative record, much the way

review of a District Court's decision by the court of appeals is limited to the District Court's

record.  *See Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) ("[W]hen a

party seeks review of agency action under the APA, the district judge sits as an appellate

tribunal.")  "The entire case on review is a question of law."  *Id.*  Courts utilize summary

judgment "as the mechanism for deciding, as a matter of law, whether the agency action is

supported by the administrative record and otherwise consistent with the APA standard of

review." *Redeemed Christian Church of God v. U.S. Citizenship and Immigration Servs.*, 331 F. Supp. 3d 684, 694 (S.D. Tex. 2018) (quoting *Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007)).

The APA permits a court to set aside agency action that is "arbitrary, capricious, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  "Under this 'highly deferential' standard, a reviewing court has the 'least latitude in finding grounds for reversal' of an agency decision and may not substitute its judgment for that of the agency." *Spiller v. White*, 352 F.3d 235, 240 (5th Cir. 2003) (internal quotation marks and citation omitted); *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983); *Coastal Conservation Ass'n v. U.S. Dept. of Commerce*, 846 F.3d 99, 111 (5th Cir. 2017).

The deference owed to an agency is at its height when a court reviews the agency's technical judgments and predictions. *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc*., 462 U.S. 87, 103 (1983).  An agency is entitled to select the methodology that, in its judgment, it finds appropriate and to rely on the reasonable opinions of its own experts:

> Where conflicting evidence is before the agency, the agency and not the reviewing court has the discretion to accept or reject from the several sources of evidence. The agency may even rely on the opinions of its own experts, so long as the experts are qualified and express a reasonable opinion.  The reviewing court may be inclined to raise an eyebrow under such circumstances, but it must show the proper respect for an agency's reasoned conclusion even if the reviewing court finds the opinions of other experts equally or more persuasive.

*Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 678 (5th Cir. 1992) (citing *Marsh v. Or. Nat. Res.*, 490 U.S. 360, 377 (1989)).  A "battle of the experts" is inappropriate in a court's review under the APA.  *Marsh*, 490 U.S. at 376-77.

The APA's deferential standard of review applies equally to claims brought under NEPA and to claims brought under the CWA.  *Coliseum Square Ass'n v. Jackson*, 465 F.3d 215, 228

(5th Cir. 2006); *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 904 (5th Cir. 1983). Therefore, in reviewing the Corps' determinations under either statute, a court "must look at the decision not as a chemist, biologist, or statistician . . . , but as a reviewing court exercising [its] narrowly defined duty of holding agencies to certain minimal standards of rationality." *Gulf Restoration Network v. U.S. Dep't of Transp.*, 452 F.3d 362, 368 (5th Cir. 2006) (quoting *Avoyelles Sportsmen's League*, 715 F.2d at 905).

## II.     The National Environmental Policy Act (NEPA).

NEPA is a procedural statute requiring federal agencies to consider the potential environmental impacts of their proposed actions, while at the same time guaranteeing broad public dissemination of relevant information. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA does not mandate particular results or "require agencies to elevate environmental concerns over other appropriate considerations." *Balt. Gas & Elec. Co.*, 462 U.S. at 97. As the Supreme Court has explained, "[i]f the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson,* 490 U.S. at 350; s*ee also City of Dal. v. Hall*, 562 F.3d 712, 717 (5th Cir. 2009) ("NEPA does not require federal agencies to favor an environmentally preferable course of action, but rather requires that they take a 'hard look at environmental consequences.'") (quoting *Robertson*, 490 U.S. at 350); *Spiller*, 352 F.3d at 238 ("the NEPA statutory framework provides no substantive guarantees; it prescribes adherence to a particular process, not the production of a particular result." (citation omitted)).

NEPA requires that, for "major Federal actions significantly affecting the quality of the human environment," a federal agency must prepare a detailed statement on the potential environmental impact of the proposed action, including an analysis of alternatives to the

proposed action, known as an Environmental Impact Statement ("EIS").  Council on

Environmental Quality ("CEQ") regulations allow an agency to first prepare an EA to determine

whether a full EIS must be prepared for a proposed action.  40 C.F.R. § 1501.3; 40 C.F.R.

§ 1508.9(a).[3]  An EA is a concise document that briefly discusses the relevant issues and either

reaches a conclusion that preparation of a site-specific EIS is necessary or concludes with a

Finding of No Significant Impact ("FONSI"), in which case preparation of an EIS is

unnecessary.  *Sierra Club v. Espy*, 38 F.3d 792, 796 (5th Cir. 1994) (citing 40 C.F.R. § 1508.9).

Put differently, not all federal actions require the intense level of analysis found in an

EIS: "[a]n agency is not required to prepare a full EIS if it determines—based on a shorter

environmental assessment (EA)—that the proposed action will not have a significant impact on

the environment."  *In re Katrina Canal Breaches Litig.*, 696 F. 3d 436, 449 (5th Cir. 2012)

(internal quotation marks and citation omitted); s*ee also Spiller*, 352 F.3d at 237 ("The EA is a

rough-cut, low-budget environmental impact statement designed to show whether a full-fledged

environmental impact statement . . . is necessary." (internal quotation marks and citation

omitted)).  Additionally, because the CEQ regulations do not prescribe a particular format for an

EA, an agency has flexibility in the manner in which it documents its determination not to

prepare an EIS.  *See* 33 C.F.R. § 230.10; 33 C.F.R. pt. 325 App. B(7).

In issuing a Section 404 permit, the Corps documents its determination not to prepare an

EIS with a combined decision document, which includes an environmental assessment. A

---

[3] The Supreme Court has held that the CEQ regulations are entitled to substantial deference.  *See Robertson*, 490 U.S. at 355-56; *accord Andrus v. Sierra Club*, 442 U.S. 347, 358 (1979) ("CEQ's interpretation of NEPA is entitled to substantial deference").  The CEQ regulations require each federal agency to adopt implementing procedures to supplement the CEQ regulations. 40 C.F.R. § 1507.3.  The Corps' regulations described herein adopt and supplement the CEQ regulations. *See also* 33 C.F.R. pt. 325, App. B, further describing NEPA implementation procedures for the Corps' regulatory program.

404(b)(1) guidelines evaluation, a statement of findings, and a finding of no significant impact. *See* 33 C.F.R. pt. 325, App. B (7); *see also* 33 C.F.R. § 325.2(a)(6).  In granting a Section 408 permission, the Corps' practice has been to document a determination not to prepare an EIS in a standalone EA and FONSI.

### III.    The Clean Water Act

Congress enacted the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  To that end, the CWA prohibits the "discharge of any pollutant by any person" except as authorized, by the statute itself or by a permit granted by the Corps, the Environmental Protection Agency ("EPA"), or an authorized State.  *See id.* § 1344 (dredged or fill materials); *id.* § 1342 (other pollutants).  The term "Pollutant" is defined to include "dredged spoil . . . rock [and] sand . . . ," and "'discharge of a pollutant'" means "any addition of any pollutant to navigable waters from any point source." *Id*. § 1362(6), (12).

Section 404 of the Clean Water Act, *id.* § 1344, authorizes the Corps to issue permits for the discharge of dredged or fill material into waters of the United States when certain conditions are met.  *Id.* §§ 1311(a); 1344.  Where adverse impacts to aquatic resources cannot be avoided, the district engineer must determine the compensatory mitigation to be required in a Corps permit.  33 C.F.R. §§ 332.1 (definition of "Compensatory mitigation"), 332.3(a).

The Corps has promulgated regulations establishing general policies applicable to its review of all applications for Corps permits, including Section 404 permit applications. 33 C.F.R. § 320.4.  Pertinent to this case, the first of those policies requires that the Corps base its decision whether to issue a permit on a public interest review in which the agency evaluates the proposed activity's probable impacts by carefully weighing "all those factors which become relevant in each particular case" such that reasonably foreseeable benefits are balanced against

reasonably foreseeable detriments.  *Id*. § 320.4(a)(1).  Some of the numerous potential factors

that may be relevant include: conservation, economics, aesthetics, general environmental

concerns, wetlands, fish and wildlife values, navigation, recreation, energy needs, safety, and the

needs and welfare of the people.  *Id*.  The Corps must also consider the 404(b) Guidelines issued

by the United States Environmental Protection Agency.  40 C.F.R. pt. 230.

## IV.    The Rivers and Harbors Act [Section 408]

The Rivers and Harbors Act ("RHA") is a separate statute, designed to preserve and

protect the Nation's navigable waterways.  *United States v. Pa. Indus. Chem. Corp*., 411 U.S.

655, 663 (1973).  Section 14 of the RHA (codified at 33 U.S.C. § 408 and commonly referred to

as "Section 408") makes it unlawful for a person to "take possession of or make use of for any

purpose, or build upon, alter, deface, destroy, move, injure, . . .  or in any manner whatever

impair the usefulness of any . . . work built by the United States, . . . in whole or in part, for the

preservation and improvement of any of its navigable waters or to prevent floods." 33 U.S.C.

§ 408(a).  The Corps "may," however, permit the alteration, permanent occupation, or use of

such public works when, in its judgment, such activity (1) "will not impair the usefulness of such

work" and (2) "will not be injurious to the public interest."  *Id*.

## ARGUMENT

## I.    The Corps' Spill Analysis Fully Complied with NEPA

Plaintiffs argue that the Corps failed to adequately consider the risk of an oil spill in the

Atchafalaya Basin.  The record belies their arguments.  The Corps engaged in an in-depth study

of risk factors for an oil release and, after a thorough analysis, concluded the risk was small.

Then, the Corps employed a conservative spill model to consider potential impacts of that low-

risk event.  The Corps findings on the issue of oil spills involve technical decision making that is

entitled to substantial deference, and Plaintiffs difference of opinion on the matter cannot set

aside the reasoned decision of the Corps.  Further, Plaintiffs' contention that the Corps impermissibly delegated its NEPA responsibilities to the project proponent is factually inaccurate; the record demonstrates that the Corps undertook an exacting analysis of the materials provided by the proponent, requested changes, sought and obtained additional information, and consulted with other federal agencies.  Despite their protestations, Plaintiffs cannot legitimately dispute that the Corps fully satisfied its obligations under NEPA by taking a "hard look" at the proposed Project.

### A.  *The Corps thoroughly analyzed the risk of an oil release.*

The proposed action considered in the EAs is a temporary filling of wetlands and a crossing of federal projects in the basin—not whether to release oil from the pipeline into the basin.  *See Defs. of Wildlife v. Bureau of Ocean Energy Mgmt.*, 684 F.3d 1242, 1250 (11th Cir. 2012) ("This project concerns [drilling operations], not an expected oil spill from those operations.").  And the record shows that the risk of an oil spill affecting the basin is low.  In fact, far from being "unknown" as Plaintiffs claim, Rec. Doc. 205-1 at 22, impacts from construction and operation of oil and gas pipelines are well understood.  Oil and gas pipelines have been constructed for decades, and PHMSA has gathered data on these pipelines and their impacts.  Based on a review of this data, as well as on information about the specific pipeline project at issue here, the Corps reasonably concluded that the risk of spills was low.  Plaintiffs' arguments to the contrary are wrong.

While a rupture and resulting release are potential impacts of any pipeline, here, the Corps reasonably concluded that "the probability of a spill to any particular resource or community is low" and that BBP "has safeguards in place to mitigate the likelihood and severity of a spill."  BBP 443; *see also* BBP 420, 442 (discussing how the PHMSA database shows that the spill incidence for "onshore pipeline, including valve sites" is only 0.00079 incidents per

mile-year).[4]  Specifically, the Corps examined the "nine industry-recognized pipeline integrity threat categories" as endorsed by PHMSA and other industry experts.  BBP 443.  The Section 408 EA discusses how the risk of third party damage leading to a release is low because the portions crossing the federal projects and most federal easements are buried at depths that would preclude interference from any federal dredging activities and the portions that were laid via the open cut method are in remote locations and well-marked.  BBP 443-44.  The EA also discusses how the risk of external corrosion is low because "[a] conservative corrosion growth rate was determined to take 70 years" and thus would be detected by regular in-line maintenance well before the structural integrity of the pipeline is compromised.  *Id.*

Similarly, the risk of pipeline failure due to internal corrosion was deemed to be low because regular monitoring and maintenance would likely detect internal corrosion before a release.  *Id.*  The risk of a manufacturing or construction-related defect leading to a release was deemed low because the line was hydrostatically tested at 1.25 times the maximum operating pressure before being put into service.  BBP 445.  The risk of stress corrosion cracking leading to a release was deemed low because the relevant segments utilize a high grade pipe and would be installed and operated below twenty-five percent of the maximum tensile strength of the pipe.

---

[4] Plaintiffs quibble with the Corps here, arguing that the Corps should not have used the national average to calculate the risk of an oil spill, but should instead have used cherry picked data of "similarly sized pipelines" to conclude that the actual spill risk is somewhat greater.  Rec. Doc. 205-1 at 20-22.  Neither PHMSA nor Corps regulations required the Corps to employ the dataset Plaintiffs prefer, which Plaintiffs have never clearly articulated.  In any event, the Corps' decision to utilize the PHMSA compiled database—and to generally rely on PHMSA's expertise in this arena—is reasonable given that PHMSA is the regulatory agency with expertise in pipelines.  And that decision is entitled to substantial deference.  *See* Rec. Doc. 86 at 27-28 (citing *OVEC v. Army Corps of Eng'rs*, 883 F. Supp. 2d 627, 645 (S.D. W.Va. 2012); *see also Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 127 (D.D.C. 2017) ("courts should 'defer to an agency's decision to use a particular risk assessment methodology that is consistent with general principles of science'" (quoting *Sierra Club v. Watkins*, 808 F. Supp. 852, 868 (D.D.C. 1991)); *see also supra* at 5.

BBP 446.  The risk of a release due to natural forces was deemed low because hurricanes and floods—the natural forces relevant in the context of the basin—are not likely to impact a buried pipeline.  *Id.*  The risk of a release due to human error or due to an equipment failure was deemed low because the pipeline would employ state-of-the-art pipeline monitoring tools, including redundant communications and monitoring systems.  BBP 445.

In short, the Corps carefully studied the safety and pipeline integrity data and determined that the risk of a release from a modern steel pipe was low, recognizing—among other things— that the pipeline "would meet PHMSA specifications under 49 CFR Part 195, follow standards issued by the American Society of Mechanical Engineers, National Association for Corrosion Engineers and American Petroleum Industry."  BBP 447.

## B.  The Corps took a hard look at the possibility of an oil spill in the Basin.

As this Court has already recognized, the Corps gave "extensive and appropriate consideration to the risk of oil spills along the entire route of the pipeline, which includes the Basin."  Rec Doc. 86 at 27.  As the Court found in its earlier opinion, the Corps utilized a PHMSA model that evaluated the impacts of an oil spill through a "guillotine cut" to an above ground pipeline, evacuating all of the oil in a particular segment of the pipeline over the widest possible area.  Rec. Doc. 86 at 26 (citing BBP 354).  This type of pipeline event is extraordinarily unlikely and represents a worst-case scenario.  BBP 353.  The PHMSA model calculated release volumes including: (1) the amount of crude that would be released while the pumps were still operating (assumed for modeling purposes to be nine minutes); (2) the amount of crude that would be released after pump shutoff but before the valves are closed (assumed for modeling purposes to be three minutes); and (3) the amount able to drain between adjacent

valves once the valves have closed.  BBP 24803.[5]  The Corps chose to model using light crude oil "as it illustrates the worst case scenario"; light crude will more easily spread across the surface of the water and will more quickly transport downstream.  BBP 24804.  Release plumes were modeled every 200 feet along the entire pipeline length as well as at every stream crossing and federal project crossing.  BBP 24803-04; BBP 24806-08.

Importantly, the model produced a spill volume that was significantly greater than what would be expected to occur in the unlikely event of a release from the pipeline.  *See* BBP 354 (explaining the mitigating effects of pipeline burial in the event of a release).  PHMSA's spill data showed that actual pipeline spills are much smaller—in half of all spills, the volume released is less than one percent of the amount modeled and in three-quarters of all releases the actual release volume is less than five percent of what was modeled.  BBP 354.  While Plaintiffs repeatedly urge that a pipeline rupture or other large release could cause environmental harm to the Basin, they ignore the reality that the majority of releases are likely to be limited in duration and extent.  Further, the scale of any release from this Project is likely to be significantly mitigated by the modern design features of the pipeline, including remote oversight with redundant power and communications abilities, BBP 448, and state-of-the-art pipeline monitoring tools.  *Id.*  In short, the record confirms that the Corps employed a conservative model that considers potential impacts in the unlikely event of a release.

Plaintiffs invent speculative fact patterns that they argue could be worse than the PHMSA model, and thus argue that the Corps did not actually evaluate the "worst case scenario."  *See* Rec. Doc. 205-1 at 18-22.  This entirely misses the point.  NEPA does not require an agency to

---

[5] In fact, the state-of-the art pipeline monitoring tools used in the Bayou Bridge Pipeline can actually detect a rupture within one to three minutes, and valves take at most three minutes to close.  BBP 449.

divine and evaluate an absolute worst case under any conceivable scenario.  *See Defs. of Wildlife*, 684 F.3d at 1250 (citing *Robertson*, 490 U.S. at 354–55).  Rather, NEPA required the Corps to "examine[] the consequences of the harm in proportion to the likelihood of its occurrence." *Limerick Ecology Action, Inc. v. Nuclear Regulatory Comm'n*, 869 F.2d 719, 739 (3d Cir. 1989), *cited with approval* in *Standing Rock Sioux Tribe v. U.S. Army Corps of Engr's*, 255 F. Supp. 3d 101, 132 (D.D.C. 2017) (considering similar arguments regarding the possibility of a spill from the Dakota Access Pipeline).

Here, the Corps evaluated the low likelihood of an oil release through a model that represented an extremely unlikely release volume.  *See* BBP 354 (explaining that the PHMSA model employed did not take into account the mitigating effects of the anti-siphon effect or the limiting effect of backfill on a buried pipe).  The Corps' methodology is well-explained, and the Corps' finding of no significant impact is entitled to substantial deference on review.  *See Spiller*, 352 F.3d 235, 244 n.5 ("deference to the [agency's] fact-finding and conclusions includes deference to [its] judgment as to whether any particular environmental impact of the proposed pipeline rises to the level of significance"); *Standing Rock Sioux Tribe*, 255 F. Supp. 3d at 132 ("the finding that the probability of a given harm is nonzero does not, by itself, mandate an EIS: after the agency examines the consequences of the harm in proportion to the likelihood of its occurrence, the overall expected harm could still be insignificant and thus could support a FONSI." (quoting *Limerick Ecology Action, Inc.*, 869 F.2d at 739).

Courts have consistently deferred to expert agencies in the technical decisions that go in to making a simulation or model, and the Corps deserves that deference here.  *See Alaska Airlines, Inc. v. Transp. Sec. Admin.*, 588 F.3d 1116, 1120 (D.C. Cir. 2009) ("agency determinations receive an extreme degree of deference [when] they involve complex judgments

about sampling methodology and data analysis that are within the agency's technical expertise." (internal quotation marks and citation omitted)); *Colo. River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191, 205 (D.D.C. 2012) ("Although the plaintiffs raise plausible criticisms of the methodology chosen by the FWS, an agency's choice of methodology need only be reasonable to be upheld." (citation omitted)); *Conservation Law Found. v. Mineta*, 131 F. Supp. 2d 19, 30 (D.D.C. 2001). The Corps thoroughly analyzed the likely scale of an unlikely event and reasonably concluded no EIS was required. BBP 133; BBP 91. NEPA required no more.

### C. The Corps thoroughly analyzed the potential environmental impact of a release.

Even though the Corps reasonably concluded that an oil release was unlikely, the Corps still analyzed the potential environmental impacts of a release in the basin in detail. Section 4 of the Section 408 EA discusses the likely environmental impacts of an oil release on various resources. BBP 388-91, 397-99, 401-02, 404, 406-09, 411, 417-18, 425-32, 434, 439. The Corps took a hard look at these issues and reasonably concluded that none rose to the level of significance. Plaintiffs make no real attempt to grapple with this analysis beyond describing the Corps' analysis as "dismissive" and "absurd." Rec. Doc. 205-1 at 22-23. Plaintiffs' difference of opinion is insufficient to overturn the reasoned analysis of the Corps on APA review. *See La. Crawfish Prods. Ass'n-W. v. Mallard Basin, Inc.*, Nos. 6:10-cv-1085, 6:11-cv-0461, 2019 WL 171693, at *12 (W.D. La. Jan. 10, 2019) ("[Plaintiffs'] disagreement with the result achieved is insufficient to show a lack of NEPA adherence . . . .").

The only specific example of allegedly deficient analysis Plaintiffs could concoct is an alleged failure to analyze the market value of potentially contaminated crawfish caught in the limited geographic area of a theoretical oil release. Rec. Doc. 205-1 at 23-24. The record shows that the potential impacts of construction impacts on crawfish farms were considered, BBP 2216, and the record also shows that the Corps considered the likely results of an oil release on fish and

crawfish.  BBP 401-02.  The Section 408 EA explains that "acute and chronic impacts on crawfish as a result of a release would be limited due to BBP's containment and remediation efforts."  BBP 402.  The Corps discussed how the impacts of an oil release on crawfish and the crawfishing industry would be limited in size and duration, and thus not significant.  *Id.*  Nothing more is required from the "rough cut, low budget" analysis in an EA.  *La. Crawfish Prods. Ass'n-W. v. Rowan*, 463 F.3d 352, 356 (5th Cir. 2006) (quoting *Sabine River Auth.*, 951 F.2d at 677).

Plaintiffs argue that courts have ordered EISs for "smaller impacts."  Rec. Doc. 205-1 at 23 (citing *Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1087 (D.C. Cir. 2019). But the issues in *Semonite* have nothing to do with the case at bar.  That case involved allegations of aesthetic harm from energy transmission towers to "numerous highly unique historic and cultural sites," injuring the ability of visitors to enjoy the historic James River by disrupting their ability "to marvel at some of the same sites that Captain Smith and his crew beheld."  *Id.* at 1086.  Importantly, there was no dispute that the visual impact was certain; the transmission towers would be above ground and disrupt the historic vistas.  *See id.* at 1086-87 (explaining how transmission towers' visual impact would run contrary to Congress' stated purpose of "preserv[ing] 'an unencumbered view of an attractive scenic expanse.'" (quoting *Md-Nat'l Capital Park & Planning Comm'n v. U.S. Postal Serv.*, 487 F.2d 1029, 1038 n.5 (D.C. Cir. 1973))).  Here, in contrast, an oil release from the Bayou Bridge Pipeline is both unlikely and, if an oil release ever does occur, limited in scale and impact.  For those reasons, and as explained *supra*, it was not unreasonable for the Corps to find that the risk of an oil release did not require more analysis in an EIS.

Plaintiffs also misconstrue several other, mostly out-of-circuit cases as examples of Courts requiring an agency to prepare an EIS for "projects with far less impact than this one." Rec. Doc. 205-1 at 12.  The Fifth Circuit did not require an EIS in *O'Reilly*, but rather remanded back to the Corps "for further proceedings including the preparation of a new EA, a new FONSI, or an EIS, or other appropriate disposition . . . ."  *O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 255, 240-41 (5th Cir. 2007).  Nor did the D.C. Circuit require an EIS in *Grand Canyon Trust v. Federal Aviation Administration*, 290 F.3d 339, 347 (D.C. Cir. 2002), or in *Delaware Riverkeeper Network v. Federal Energy Regulatory Commission*, 753 F.3d 1304, 1320 (D.C. Cir. 2014).  The same is true of *Bluewater Network v. Salazar,* 721 F. Supp. 2d 7, 45 (D.D.C. 2010) (remanding back for further consideration of the uniqueness and safety factors, but not ordering an EIS.  Plaintiffs opine that those cases involved less impactful proposed actions, but nothing Plaintiffs cite suggests that pipelines require an EIS as a matter of law—a proposition that is plainly wrong in this circuit.  *See Spiller*, 352 F.3d at 238 (finding an EA sufficient for a pipeline that runs "across several rivers, streams and wetlands."); *see also id.* at 245 (rejecting challenge to sufficiency of an EA where plaintiffs "really don't want more process . . . . [w]hat they really desire is a substantive result . . . this pipeline project killed.").  Rather, the question is whether the agency took a "hard look" at the issue of an oil release in the EAs and reasonably found the risk was not significant.  *Id.* at 240 (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).  Here, the examination of oil spills in the Section 408 EA satisfies that standard.

Finally, Plaintiffs' speculate that the pipeline could at some point be used to transport diluted bitumen.  Rec. Doc. 205-1 at 24-26.  Plaintiffs' comments advancing this theory are included in the record and the Corps considered them.  BBP 1472-75.  But the articles Plaintiffs cite do not state that the Bayou Bridge Pipeline will be used to transport diluted bitumen or even

mention the Bayou Bridge Pipeline at all.  BBP 23768-69 (discussing the "Bakken Pipeline System" as consisting of two projects, the Dakota Access Pipeline and the Energy Transfer Crude Oil Pipeline); BBP 23770-72 (same).  The Bayou Bridge Pipeline is a separate project from the Dakota Access Pipeline.  The stated purpose and need of the Bayou Bridge Pipeline Project "is to safely transport of up to 480,000 barrels per day (bpd) of *domestic* crude oil" to refineries on the Gulf Coast.  BBP 340 (emphasis added).  Plaintiffs' bare speculation that the pipeline might someday be used to transport diluted bitumen did not require analysis; "'[r]easonable foreseeability' does not include 'highly speculative harms' that 'distort the decisionmaking process' by emphasizing consequences beyond those of 'greatest concern to the public and of greatest relevance to the agency's decision.'"  *City of Dal.*, 562 F.3d at 719 (quoting *Robertson*, 490 U.S. at 355-56).  And in any event, the Corps modeled spill risks using light crude because that represented what the Corps judged to be the worst case spill in terms of scale and impact.  BBP 24804.  Plaintiffs may disagree with the Corps' conclusion on that point, but disagreement with the Corps' technical judgments is not sufficient to overturn the Corps' reasoned decision.  *Sabine River Auth.*, 951 F.2d at 678.

The record shows that the Corps took a hard look at the likely environmental impacts of an oil release.  In light of the unlikely nature of a release, and given the relatively limited portion of the basin that would be impacted if that unlikely event occurred, the Corps concluded that the risk of an oil release was not significant and did not require additional analysis in an EIS.  Plaintiffs' arguments to the contrary lack merit.

### D.  The Corps did not delegate its NEPA responsibilities to the Project proponent or to another agency.

Corps' regulations allow for the permit applicant to provide information required for NEPA and other environmental reviews, but are clear that the Corps must conduct an

independent and impartial review of that information.  *See, e.g.*, 40 C.F.R. § 1506.5(b); 33

C.F.R. pt. 325, App. B(8)(f); *see also* BBP 18480-82 (Corps District 408 review procedures);

BBP 22121-23 (Corps 408 environmental compliance requirements).  When an applicant submits

environmental documentation for a project, the Corps' District convenes a team of engineers and

specialists to conduct a technical review under a District-specific review plan.  *See* BBP 22124-

25 (explaining the District-led Agency Technical Review process).  The record shows that the

Corps and the proponent engaged in an over one-year long back-and-forth about the information

in the EA, including the information about the risk of oil spills central to Plaintiffs' challenge.

     For example, the record contains multiple redline drafts of the Section 408 EA with

comments and questions from Corps officials.  BBP 1676-1819; BBP 1920-2057.  The record

also contains multiple examples of correspondence from the Corps requesting additional

information from the proponent and resisting requests from the proponent to speed up the review

process.  *See* BBP 2276-77 (email requesting, among other things, more information about

"potential oil spill effects on waterways, fisheries and wildlife" and more discussion about

"monitoring and operational practices that would minimize risk from a spill or petroleum

release"); BBP 3226-30 (email providing updated information and maps in response to Corps

requests); BBP 4084-89 (proposed drill plan from proponent in response to Corps concerns

regarding the risk of hydraulic fracture and inadvertent drilling fluid returns at the Calcasieu

river crossing); BBP 4191-4193 (Corps responding to proponent's frustration with the speed of

Corps review); BBP 4232-45 (letter from Corps' engineering review team requesting a

resubmitted project proposal with additional information in response to Corps comments); BBP

7224-66 (memorandum documenting review and comments from Corps' operations division).

The record also demonstrates that, as part of its review process, the Corps consulted with other agencies and governmental bodies and requested any concerns regarding the proposed action. BBP 12842-43 (comments from EPA regarding minimizing impacts, hydrology, sediment, and mitigation); BBP 14443 (NOAA providing no objections to the issuance of the permit); BBP 15831-49 (letters of no objection from non-federal sponsors). At the end of the process, the leaders of the various Corps review teams electronically signed documents confirming their independent Agency Technical Review of the information presented by the proponent. BBP 248; BBP 250. The Corps' independent review of the information provided by the proponent—as well as consultation with stake holders, other federal agencies, and non-federal governmental entities— satisfied the Corps' requirements under NEPA.

Contrary to Plaintiffs' argument, the record shows that the Corps did not "rubber stamp" the Project. Nor did the Corps simply "accept[] without question or oversight whatever BBP gave it." Rec. Doc. 205-1 at 14. The review process began with the proponent submitting a thirty-five page draft assessment. BBP 15850-85. What finally resulted was a 92-page Section 404 EA and a 145-page Section 408 EA thoroughly evaluating the impacts of the proposed temporary fill permit and Section 408 permission. BBP 1-92; BBP 327-471. This is not a case like *Sigler*, where the Corps had only two months to review a draft EIS prepared by the project proponent. *Sierra Club v. Sigler*, 695 F.2d 957, 962 n.3 (5th Cir. 1983); *see also id.* ("While the Corps ostensibly was supervising, we are concerned by the relatively brief time the Corps was given to review and comment on the documents, and the degree of thoroughness of the Corps' review and supervision."). Here, the Corps refused to be rushed, and instead sought and obtained more information and took the time necessary to make its own informed decision. The

Section 404 EA was written solely by the Corps and the Section 408 EA was substantially revised in response to comments and questions from the Corps.

Nor is this case anything like *Sierra Club v. Van Antwerp*, 709 F. Supp. 2d 1254 (S.D. Fla. 2009). First, that case involved an EIS for the permanent conversion of 5,400 acres of wetlands near Everglades National Park into limestone mining pits. *Id.* at 1257. In both scale and in the severity of the environmental impacts, the proposed project there dwarfed the temporary filling at issue here; there was no dispute that the *Sierra Club* proposal required the more robust analysis of an EIS. Second, that case involved a specific regulatory requirement that the Corps deny a Section 404 permit if there exists "a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant environmental consequences." *Id.* at 1263; *see also* 40 C.F.R. § 230.10(a). Plaintiffs do not argue that the Corps here violated this regulatory obligation by failing to consider a practicable alternative that would bypass the Basin, and the record shows that the Corps did consider alternative routes in both EAs. *See* BBP 31-33; BBP 345-52. Third, the deficient analysis confronting the Southern District of Florida involved "summary statements" that there were no alternatives to converting wetlands near the Everglades into mining pits. *Sierra Club*, 709 F. Supp. 2d at 1266. Here, as discussed *supra*, the Section 408 EA thoroughly considered the likelihood of an oil release and utilized a conservative spill model to evaluate the possible impacts of a release if it were to occur.

Rather, the Corps' independent review is similar to that in *Save Our Wetlands, Inc. v. Sands*, 711 F.2d 634, 642-44 (5th Cir. 1983). Here, as there, the Corps relied on materials presented by the proponent that were "prepared according to the instructions . . . [and] contained the information [the Corps] told them to have in it." *Id.* at 643. The Corps then "reviewed it . . .

[and] supplemented it as necessary." *Id.* And, although documents presented by project

proponents "may be somewhat biased," that ultimately was not much of a factor in either case

because where the Corps "disagree[s] with all or part of [the analysis], [the Corps] ha[s] it done

over or supplemented as necessary." *Id.* Further, as in *Save Our Wetlands*, the Corps did not

solely rely on information from the project proponent, but also received and considered

comments from interested organizations, other federal agencies, and non-federal governmental

entities. *Id.* As discussed *supra*, the Corps weighed all input and reasonably determined that the

risk of an oil release did not require additional analysis in an EIS. "The evidence that the Corps

reviewed, verified[,] and supplemented the [proponent's] report is sufficient to fulfill the Corps'

obligation under federal regulations." *Id.*

　　　Much of Plaintiffs' arguments on this point criticize the Corps' deference to PHMSA's

regulatory jurisdiction over pipeline risks and safety, including spill response plans and pipeline

construction and maintenance. Rec. Doc. 205-1 at 16-17; *see also* BBP 3 (explaining that the

Corps has limited jurisdiction over pipelines). But "courts . . . have favorably viewed similar

agency reliance on applicable regulatory standards when assessing impacts as part of a NEPA-

required analysis." *Standing Rock Sioux Tribe*, 255 F. Supp. 3d at 126 (citing *EarthReports, Inc.

v. FERC*, 828 F.3d 949, 957 (D.C. Cir. 2016) and *Club v. Clinton*, 746 F. Supp. 2d 1025, 1047

(D. Minn. 2010)). More fundamentally, Plaintiffs' arguments do not accurately portray the

record. Plaintiffs aver that the Corps could not have actually relied on and deferred to PHMSA's

expertise because the record does not document any correspondence between the two agencies.

Rec. Doc. 205-1 at 17. But Plaintiffs ignore record evidence that the Corps utilized the PHMSA

spill database to evaluate the risk of an oil release, BBP 420, 442, and that the Corps utilized a

PHMSA spill model. BBP 353-55. Plaintiffs also appear to fault the Corps for not requiring the

proponent to produce and obtain approval of a pipeline spill response plan prior to issuing the

Section 404 permit and Section 408 permission.  Rec. Doc. 205-1 at 17.  But spill response plans

and the timing of their approval are firmly in PHMSA's regulatory domain.  49 C.F.R.

§ 194.119; *see also EarthReports*, 828 F.3d at 957 (recognizing that, once an agency has

evaluated the environmental impacts of a proposed use, it may properly conclude that it has "'no

grounds' for requiring more stringent conditions than those required by the" agency with

regulatory jurisdiction over the use.).

    Finally, Plaintiffs also complain that the Corps failed to fully analyze the risk of a release

and instead left that issue for other agencies.  This Court has already correctly rejected that

proposition, *see* Rec. Doc. 86 at 27 (rejecting Plaintiffs' argument that "the Corps simply

dismissed the risk [of an oil spill] and referred the matter to PHMSA" as "meritless in light of the

substantial attention given to the issue as set forth in both EAs."), which, as described *supra*, is

also contradicted by the record.  Plainly, Plaintiffs are not satisfied with the regulatory regime

Congress has established for oil pipelines.  As Plaintiffs correctly point out, "[p]ipelines

transporting oil within the United States are not subject to any general requirement of federal

government evaluation and approval."  Rec. Doc. 205-1 at 17 (quoting *Sierra Club*, 803 F.3d at

50 n.8).  Plaintiffs are entitled to their point of view on the issue, but not to the relief they seek

here—a new regulatory regime for pipelines created through litigation.  Rather, Plaintiffs'

remedy is through the political process.  *See Metro Edison Co. v. People Against Nuclear

Energy*, 460 U.S. 766, 777 (1983) ("The political process, and not NEPA, provides the

appropriate forum in which to air policy disagreements.").

    Plaintiffs are wrong to argue that the Corps failed to independently assess information

provided by the project proponent or improperly kicked the oil release issue down the road to

another agency.  The Corps took a hard look at the issue, reasonably concluded that an oil release

is unlikely, and moreover that the low risk of any spill was not likely to have a significant impact

on the environment.  NEPA requires no more.  Plaintiffs' oil spill challenge to the Corps' NEPA

analysis fails and the Corps is entitled to summary judgment on that claim.

## II.    The Corps' Public Interest Analysis is Valid

Plaintiffs claim that the Corps failed to consider the potential risks and impacts of oil

spills that could have an adverse effect on wetlands in conducting the public interest review

required by 33 C.F.R. § 320.4(a)(1), which specifies that "a permit will be granted unless the

district engineer determines that it would be contrary to the public interest."  *See also id.* §

320.1(a)(1); Rec. Doc. 205-1 at 27.  The Corps is expressly required to evaluate that public

interest by conducting an even-handed analysis of the probable impacts—both beneficial and

detrimental—of a project for which a permit is requested.  Contrary to Plaintiffs' argument, the

impact on wetlands is not the "heart of [the public interest] inquiry," Rec. Doc. 205-1 at 27, but

only one of the seventeen factors that may be considered under 33 C.F.R. § 320.4(a)(1).  The

regulation provides:

> The decision whether to issue a permit will be based on an evaluation of the
> probable impacts, including cumulative impacts, of the proposed activity and its
> intended use on the public interest.  . . . The benefits which reasonably may be
> expected to accrue from the proposal must be balanced against its reasonably
> foreseeable detriments. . . . All factors which may be relevant to the proposal must
> be considered including the cumulative effects thereof:  among those are
> conservation, economics, aesthetics, general environmental concerns, wetlands,
> historic properties, fish and wildlife values, flood hazards, floodplain values, land
> use, navigation, shore erosion and accretion, recreation, water supply and
> conservation, water quality, energy needs, safety, food and fiber production,
> mineral needs, considerations of property ownership and, in general, the needs and
> welfare of the people.

33 C.F.R. § 320.4(a)(1); *see also id*. § 320.1(a)(4) ("The Corps is neither a proponent nor opponent of any permit proposal.").  The Corps must also address the factors under the 404(b)(1) Guidelines promulgated by EPA.  40 C.F.R. pt. 230; s*ee also* 33 C.F.R. § 320.4(a)(1) ("For activities involving 404 discharges, a permit will be denied if the discharge that would be authorized by such permit would not comply with the Environmental Protection Agency's 404(b)(1) guidelines.").

Plaintiffs' claim that the Corps failed to consider the potential for oil spills that could impact the wetlands is rebutted by the Corps' Section 404 EA, BBP 1-92, which "constitutes the Environmental Assessment, 404(b)(1) Guidelines Evaluation, Public Interest Review, and Statement of Findings."  This claim is based on the Corps' explanation that, because the potential for oil spills is not in the "defined purview of the Corps," the Corps would rely on PHMSA and LDEQ, which "have delegated authority and specific experience, to ensure the project conforms with applicable standards, and enforce compliance of those criteria."  BBP 30.  As the Court previously observed, the Corps' reliance on PHMSA's expertise with respect to oil spills "is appropriate."  Rec. Doc. 86 at 27-28 (citing *OVEC v. Army Corps of Eng'rs*, 883 F.Supp.2d 627 (S.D. W.V. 2012).  Moreover, Plaintiffs' suggestion that "the Corps did not give so much as a moment's thought to the risks and impacts of oil spills," Rec. Doc. 205-1 at 27, is rebutted by the fact that both EAs address the topic at several points.

The Corps specifically looked at the issue of oil spills in the context of analyzing "Water Supply & Conservation" as part of the "Public Interest Review."  BBP 1, 54-55.  The Corps also observed that, under PHMSA regulations, 49 C.F.R. pt. 194, BBP would have to prepare a Facility Response Plan to address the response to any oil spill and, in addition, would be installing "remote actuated shut-off valves" at periodic intervals along the pipeline.  BBP 24; *see*

*also* BBP 26-27 (BBP would be liable for remediation of any oil spill for which it was

responsible).  In addition, in evaluating the issue of environmental justice pursuant to Executive

Order 12898, the Corps determined "that risk of a large spill resulting in significant adverse

environmental impacts to any particular resource or community was determined to be minimal."

BBP 90.  The Corps also reviewed PHMSA's active 2004 to 2016 database and calculated that

the

> incident frequency for "onshore pipeline, including valve sites" is 0.00079
> incidents per mile-year. Additionally, if any release did occur, it is likely that the
> total release volume of a spill would be 4 barrels (bbls) or less based on historical
> spill volumes.

BBP 80 (quotation in original).

Finally, the Memorandum's NEPA findings expressly referred to the discussions of oil

spills in the EA for the 408 permit.  BBP 352.  While Plaintiffs argue that this reference should

be ignored because there was no specific reference to the section 408 EA in the CWA analysis,

Rec. Doc. 205-1 at 27, their argument is overly formalistic.  The record establishes that the Corps

did consider the potential for oil spills and found that there was a low risk of a significant spill.

Therefore, the Court should find that the Corps gave proper consideration to the issue.  *Bowman*

*Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) ("[W]e will uphold a

decision of less than ideal clarity if the agency's path may reasonably be discerned." (citation

omitted)).

### III.    The Corps Adequately Considered the Construction Impacts of the Bayou Bridge Pipeline

Plaintiffs also argue that the Corps failed to adequately consider the secondary or indirect

impacts of pipeline construction in the Basin and improperly classified impacts to forested

wetlands as temporary.  Plaintiffs are wrong on both counts.  First, the Corps properly considered

possible direct and indirect impacts from construction on sediment levels in the Basin and on the

Basin's hydrology.  And Second the Corps' determination that construction impacts on wetland function would be temporary is reasonable and comports with the relevant regulations.

### A. *The Corps properly considered the secondary impacts of the authorized discharge.*

The 404(b) Guidelines require that the Corps consider secondary effects of the proposed activity.

> Secondary effects are effects on an aquatic ecosystem that are associated with a discharge of dredged or fill materials, but do not result from the actual placement of the dredged or fill material.  Information about secondary effects on aquatic ecosystems shall be considered prior to the time final section 404 action is taken by permitting authorities.

40 C.F.R. § 230.11(h)(1).  Plaintiffs reject the Corps' conclusion that "significant secondary effects . . . are not anticipated" as conclusory because the Corps supposedly did not address changes to hydrology or any additional sediment accretion in the Basin.  Rec. Doc. 205-1 31 (quoting BBP 58).  The Corps, however, did examine these factors in setting out its conclusions under the 404(b) Guidelines.  The Corps considered the effect of digging the trench for placement of the pipe, but concluded that there would not be an adverse impact because the permit required that the natural, preexisting contours must be restored and the area allowed to revegetate.[6]  BBP 45.  While construction would have a temporary effect on water circulation, that circulation is anticipated to return to normal after the contours and elevation are restored to preexisting conditions.  *Id.*  With respect to sediment and turbidity, the Corps acknowledged that there will be increased amounts of sediment in the water column during construction, but that this would be minimized through specific construction techniques, such as the use of berms or coffer dams.  This effect should diminish over time and leave no adverse effect once the

---

[6]  Plaintiffs refer to the trenches to be dug for the pipes to be installed as pipeline canals.  *See, e.g.*, Rec. Doc. 205-1 at 5, 33.  Plaintiffs do not acknowledge that, after the pipes have been installed approximately four feet below the preexisting ground level, the original contours and elevation of the land must also be restored.

construction has finished.  BBP 46; *see also* BBP 50 ("Cumulative effects on the aquatic

ecosystem"); BBP 51 ("Secondary effects on the aquatic ecosystem").  It appears that these

discussions were in a different section of the EA than Plaintiffs expected, but the Corps plainly

considered the secondary effects of the Project.

The Corps' analysis on this point also satisfied NEPA.  Both EAs acknowledge the

possibility of indirect impacts to the basin, including "the introduction of sediments from the

cleared construction [right-of-way] to wetlands in or adjacent to the action areas" and

"modifications to the hydrology of the wetlands."  BBP 393; *accord* BBP 11-12; BBP 46; BBP

51; BBP 161.  To minimize the risk of suspended sediment or increased turbidity during

construction, the Corps required the permittee to implement sediment control measures during

construction. BBP 46; *see also* BBP 39; BBP 97; BBP 112; BBP 382; BBP 664-67 (construction

plan discussing temporary sediment control measures during construction).  To minimize the risk

of long-term increases in suspended sediment or turbidity, the Corps required the permittee to

take measures to stabilize disturbed areas after the Project was complete.  BBP 667-69

(construction plan discussing temporary and permanent stabilization procedures after

completion, as well as revegetation procedures).  With these conditions, the Corps concluded that

"[a]ny reduction in water quality resulting from the proposed construction activities is

anticipated to be of short duration, and localized to an area immediately surrounding the

construction site.  The proposed project should have little short-term and no long-term effect."

BBP 46; BBP 393.  These findings show that the Corps reasonably concluded that construction

would not have a significant impact on sediment or turbidity in the Basin.

In regards to hydrology, the EAs discuss how the "majority of the proposed activity is

adjacent to existing pipeline [rights-of-way]," BBP 51, and thus, contrary to Plaintiffs'

suggestion, Rec. Doc. 205-1 at 31, will not create a major new channel through the basin.  The EAs also discuss how the permittee will "return wetlands to pre-construction contours," BBP 393, which will minimize the possibility of any "long-term changes in drainage and flow patterns, flooding[,] and sediment distribution and accretion in environmentally sensitive areas such as the Atchafalaya Basin."  BBP 51; *see also* BBP 161 ("All excavated material placed in temporary spoil piles in the work space will be restored to preconstruction contours to minimize impacts on hydrology.").  In fact, early on Plaintiffs requested that the permittee change the hydrology of the basin by disturbing remnant spoil piles from pre-CWA pipeline construction. *See* BBP 4224.  This request was considered and rejected precisely because it would result in a new, permanent discharge of material into the Corps' jurisdictional waters and alter the status quo hydrology of the basin. *Id.*  The record and the EAs show that the Corps took a hard look at the issue of whether pipeline construction would alter the hydrology of the basin, and implemented permit conditions to minimize any impact.  BBP 1; BBP 39; BBP 96-98  The Corps reasonably concluded that pipeline construction would not significantly alter the Basin's hydrology, and Plaintiffs' difference of opinion on this technical determination is no basis to set aside the Corps' permitting decisions. *See Sabine River Auth.*, 951 F.2d at 678.

Plaintiffs' challenge to the Corps' analysis of the indirect impacts of pipeline construction on the Basin's sedimentation and hydrology fail.  The Corps is entitled to summary judgment on that claim.

### B. The Corps properly assessed the amount of mitigation necessary under the Clean Water Act.

The Fifth Circuit's decision in *Atchafalaya Basinkeeper v. United States Army Corps of Engineers*, 894 F.3d 692, 700 (5th Cir. 2018) established that the Corps properly relied upon the Louisiana Wetland Rapid Assessment Method ("LRAM") in calculating the amount of

mitigation credits to be required by the permit.  Plaintiffs are now claiming that the Corps misapplied LRAM by underestimating the amount of wetlands functions that would be permanently lost.  Rec. Doc. 205-1 at 33-34.  Plaintiffs contend that "the destruction of cypress forests will not be temporary because regenerating cypress forests is all but impossible."  *Id.* at 34.  However, "the Corps' responsibility under the CWA is to ensure the protection of aquatic functions and services, which does not include the protection of tree species as such." *Atchafalaya Basinkeeper*, 894 F.3d at 701.

In promulgating the regulation governing mitigation, 33 C.F.R. § 332.3(a)(1), the Corps explained that the appropriate time interval for differentiating between permanent and temporary impacts must be determined by the district engineer depending on the particular circumstances presented by the permit application.  Compensatory Mitigation for Losses of Aquatic Resources, 73 Fed. Reg. 19,594, 19,607 (Apr. 10, 2008).[7]  Here the Corps has clearly explained its assessment of the scale of temporary as opposed to permanent loss of functions as a result of the project.  More specifically, the Corps explained that, as a result of the project, 142.5 acres of wetlands will be "permanently converted from either a scrub-shrub habitat or forested habitat to an herbaceous habitat."  BBP 63.  There would also be a temporary loss of 455 acres of wetlands due to construction and to maintenance on the right of way.  Because the permit requires that the temporary work areas used during construction of the pipeline must be restored to their preexisting contours and allowed to revegetate, the loss of wetlands functions will be temporary. *Id.*  The maintenance activities on the permanent right of way would also cause only temporary losses.  *Id.*  The permanent right of way would naturally revegetate as scrub shrub, which can be

---

[7]  Because this final rule was jointly promulgated by the Corps and EPA, a corresponding provision was included in the 404(b) Guidelines.  *See* 40 C.F.R. § 230.93(a)(1).

"an important part of both wetland and upland woodland ecosystems." *Id.* at 49.  Maintenance

may result in the areas cycling between scrub shrub habitat and emergent/grassy habitat, which

"can provide a beneficial habitat diversity."

Because the Corps' assessment of the permanent and temporary loss of wetlands

functions is reasonable and supported by the administrative record, the argument that LRAM was

applied inaccurately must be rejected.

For these same reasons, the Corps did not "understate" the impacts to wetlands from

construction impacts.  Rec. Doc. 205-1 at 34.  The EAs clearly state the numbers of acres

impacted and explain the nature of those impacts.  BBP 63 (describing number of acres

temporary impacted by construction activities and number of acres that would be permanently

converted from either a scrub-shrub or forested habitat to an herbaceous habitat); BBP 395

(explaining that "a majority of the direct impacts would be temporary in nature, and all impacts

to forested wetlands would be mitigated for through the purchase of mitigation credits. . . .  [and]

there is no fill of wetlands as [a] result of this project.").  The Corps disclosed and discussed the

impacts of construction in the Basin.  And the Corps reasonably concluded those impacts would

not be significant, a finding that is entitled to substantial deference.  *Spiller*, 352 F.3d 235, 244

n.5

Plaintiffs' challenge to the Corps' mitigation calculation fails.  The Corps is entitled to

summary judgment on that claim.[8]

_____

[8] For all of the reasons stated above, Plaintiffs' claims fail and this Court should grant summary
judgment to the Corps.  However, if the Court were to find a legal violation, the Corps requests a
short, supplemental round of briefing on remedy.  Vacatur is an equitable remedy subject to the
Court's discretion. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 755-56 (D.C. Cir. 2002) (citing
*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150, 151 (D.C. Cir.
1993)).  "The decision whether to vacate depends on the seriousness of the . . . deficiencies [in
the agency action] and the disruptive consequences of an interim change that may itself be

## **CONCLUSION**

For the foregoing reasons, each of Plaintiffs' challenges to the Corps' analysis of the

Project fail.  The Corps took a hard look at the risk and likely impacts of an oil release in the

basin, and reasonably found they were not significant.  Likewise, the record shows that the Corps

considered the possibility of an oil spill in its public interest determination under the CWA.  And

finally, the Corps took a hard look at construction impacts and correctly applied LRAM in

calculating the amount of mitigation required.  This Court should deny summary judgment to

Plaintiffs and grant summary judgment on each of Plaintiffs' claims to the Corps.

Respectfully submitted this 16th day of August, 2019,

> BRANDON J. FREMIN
> UNITED STATES ATTORNEY
>
> Ellen Miletello Kinney (LBN 34679)
> Assistant United States Attorney
> 777 Florida Street, Suite 208
> Baton Rouge, Louisiana  70801
> (225) 389-0443
> ellen.kinney@usdoj.gov
>
> LAWRENCE VANDYKE
> Deputy Assistant Attorney General
> U.S. Department of Justice
> Environment & Natural Resources Division
>
> */s/ Tyler M. Alexander*
> TYLER M. ALEXANDER (CA 313188)
> Trial Attorney
> Natural Resources Section

---

changed." *Allied-Signal*, 988 F.2d at 150-51.  Plaintiffs' argument for vacatur is premature; the
question of remedy involves highly fact-bound determinations that can only—and should only—
be addressed if the Court finds a legal violation.  The parties would not be in a position to
adequately brief remedy issues without an order that sets forth the contours of any violation the
Court finds.  Further, the remaining remediation required under the Section 404 Permit will
shortly be completed, rendering the Section 404 Permit a legal nullity and, as a result, Plaintiffs'
challenge to the analysis in the Section 404 EA moot.  Accordingly, the Corps requests the
opportunity to address these issues, if necessary, after the Court issues an order.

P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20004-7611
Tel.: (205) 305-0238
Fax: (205) 305-0506
tyler.alexander@usdoj.gov

EILEEN T. MCDONOUGH (MD Bar)
Trial Attorney
Environmental Defense Section
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20004-7611
Tel.: (205) 514-4206
Fax: (205) 514-8865
Eileen.Mcdonough@usdoj.gov

*Attorneys for Defendant United States Army Corps of Engineers*

## CERTIFICATE OF SERVICE

I hereby certify that, on August 16, 2019, a copy of the foregoing was filed through the Court's CM/ECF management system and electronically served on counsel of record. All attorneys in this case are registered with this system.

*/s/ Tyler M. Alexander*
TYLER M. ALEXANDER