# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

ATCHAFALAYA BASINKEEPER,
LOUISIANA CRAWFISH PRODUCERS
ASSOCIATION-WEST, GULF RESTORATION        CIVIL ACTION
NETWORK, WATERKEEPER ALLIANCE, AND
SIERRA CLUB AND ITS DELTA CHAPTER


VERSUS                               18-23-SDD-EWD


U.S. ARMY CORPS OF ENGINEERS


## RULING

This matter is before the Court on the cross *Motions for Summary Judgment* filed by Plaintiffs, Atchafalaya Basinkeeper, Louisiana Crawfish Producers Association-West, Gulf Restoration Network, Waterkeeper Alliance, and Sierra Club and its Delta Chapter ("Plaintiffs");[1] Defendant, U.S. Army Corps of Engineers ("Corps");[2] Intervenor Bayou Bridge Pipeline, LLC ("Bayou Bridge");[3] and Intervenor Stupp Bros, Inc. d/b/a Stupp Corporation ("Stupp").[4] All Parties filed *Oppositions* and *Replies* to the respective motions.[5] The Court has carefully considered the Administrative Record,[6] the arguments

---

[1] Rec. Doc. No. 202.
[2] Rec. Doc. No. 220.
[3] Rec. Doc. No. 213.
[4] Rec. Doc. No. 214.
[5] Rec. Doc. Nos. 214, 220, 223, 224, 225, & 226. Due to the nature of this case, Parties were granted leave to incorporate motion memoranda and opposition memoranda in one document.
[6] The Parties reference the Administrative Record in this matter as "BBP," as will the Court.
Document Number: 59245

of all Parties, and the applicable laws and jurisprudence in this matter.  For the following reasons, the Court finds that Plaintiffs' motion should be DENIED, and the motions of the Corps, Bayou Bridge, and Stupp should be GRANTED.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

This matter arises out of the Corps' issuance of permits to Bayou Bridge to construct and maintain a pipeline across the Atchafalaya Basin capable of carrying nearly half a million barrels a day of crude oil.   The Corps performed two Environmental Assessments ("EAs"), one pursuant to Section 408 of the Rivers and Harbors Act ("RHA"),[7] and one pursuant to Section 404 of the Clean Water Act ("CWA")[8]

In October 2016, the Corps gave public notice inviting comment on Bayou Bridge's Section 404 permit application.[9] The Corps subsequently conducted a public hearing and extended the comment period.[10]   A few months later, the Corps gave notice also inviting public comment on Bayou Bridge's Section 408 application.[11] Numerous federal agencies, state agencies, and private parties provided comments in response.[12]  Plaintiffs submitted several letters during the comment periods[13] and additional comments thereafter.[14]  The record demonstrates that the Corps considered timely comments[15] and

---

[7] Rec. Doc. No. 37-7.
[8] Rec. Doc. No. 15-31.
[9] BBP 5.
[10] *Id.*
[11] BBP 4412-20.
[12] BBP 6-21.
[13] BBP 14-20,
[14] BBP 1631-75.
[15] BBP 459.
Document Number: 59245

conducted multiple meetings with Bayou Bridge and others during the review process.[16]

Following its year-long review of this project proposal, the Corps prepared a 135-page Section 408 EA, with nearly 200 pages of appendices.[17] In conjunction, the Corps also prepared a Section 404 EA that totaled 92 pages.[18] The Corps coordinated "between [its] Section 408 process and the . . . Section 404 process[ ]."[19]

Based on these EAs, the Corps ultimately concluded that no Environmental Impact Statement ("EIS") was necessary; however, Plaintiffs challenged this decision in this Court and moved for a temporary restraining order and preliminary injunction to stop the project from going forward without the completion of an EIS.[20] Plaintiffs claimed that the Corps' review failed to assess critical environmental impacts arising from project construction and operations and a long history of alleged noncompliance of prior Corps pipeline permits in violation of the National Environmental Policy Act ("NEPA")[21] and that the Corps' failed to consider oil spill risks in violation of the CWA. Plaintiffs also argued that the Corps violated both NEPA and the CWA by relying on inadequate mitigation.

The Court denied Plaintiffs' request for a temporary restraining order[22] but held a two-day hearing on Plaintiffs' request for a preliminary injunction and ultimately issued a *Ruling* granting a preliminary injunction and halting the project.[23] The Court disagreed

---

[16] BBP 34; BBP 462; BBP 4225-26.
[17] BBP 327-471.
[18] BBP 1-92.
[19] BBP 342.
[20] Rec. Doc. Nos. 15 & 16.
[21] 42 U.S.C. §§ 4321-4370f.
[22] Rec. Doc. No. 24.
[23] Rec. Doc. Nos. 81 & 86.
Document Number: 59245

with Plaintiffs' contention that the Corps failed to take a "hard look" at the likelihood and risks of oil spills in the EAs;[24] however, the Court granted the injunction finding a likelihood of success on the merits regarding the Corps' mitigation remedy for the loss of wetlands and the inadequacy of the Corps' consideration of the pipeline's cumulative impacts when considered with a history of past noncompliance.[25] Both the Corps and Bayou Bridge appealed this decision to the Fifth Circuit Court of Appeals.[26]

The Fifth Circuit stayed the injunction pending appeal and ultimately reversed the Court, concluding that that Corps' EA analysis under Section 404 and 408 satisfied the requirements of NEPA and the CWA.[27] Following the Fifth Circuit Court of Appeals' Ruling, the project construction continued, and the pipeline is now fully operational, subject to some cleanup and restoration. Plaintiffs subsequently moved to file an *Amended Complaint*, which the Court denied as futile.[28] The Corps completed the Administrative Record and filed a *Notice of Lodging of Certified Administrative Record.*[29] Bayou Bridge moved to complete the administrative record,[30] arguing the Corps failed to include materials it considered relating to oil spill risks, and Plaintiffs moved to supplement the record and/or have the Court consider extra-record evidence of purported expert analysis contradicting several conclusions the Corps reached.[31] The Corps opposed both

---

[24] Rec. Doc. No. 86, pp. 28-29.
[25] *Id.* at pp. 39-45; 49-51.
[26] Rec. Doc. Nos. 82 & 87.
[27] 894 F.3d 692 (5th Cir. 2018).
[28] Rec. Doc. Nos. 127, 192.
[29] Rec. Doc. No. 152.
[30] Rec. Doc. No. 157.
[31] Rec. Doc. No. 158.
Document Number: 59245

motions, and the Court denied both motions for reasons assigned in its May 14, 2019 *Ruling*.[32]  Now before the Court are the Parties' *Motions for Summary Judgment* as described above.

## II.    FEDERAL AGENCY REVIEW

Under § 706 of the Administrative Procedure Act ("APA"),[33] a reviewing court must uphold the agency's action unless it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[34]  The reviewing court must hold unlawful and set aside agency action that is contrary to constitutional right, in excess of statutory authority, or without observance of procedure required by law.[35]  The ultimate standard of review is a narrow one.[36] "The court is not empowered to substitute its judgment for that of the agency."[37]  In applying this standard, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."[38] Nevertheless, although the arbitrary and capricious standard of review is highly deferential, "it is by no means a rubber stamp."[39]  Alleged violations of both NEPA and the CWA are reviewed under the APA.

---

[32] Rec. Doc. No. 198.
[33] 5 U.S.C. § 706.
[34] 5 U.S.C. § 706(2)(A).
[35] *Id.* § 706(2)(B)-(D).
[36] *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).
[37] *Id.*
[38] *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).
[39] *U.S. v. Garner*, 767 F.2d 104, 116 (5th Cir. 1985).
Document Number: 59245

## A. NEPA

The National Environmental Policy Act of 1969 ("NEPA"),[40] mandates that federal agencies evaluate the environmental impacts of proposed agency action before taking action.[41] NEPA is a procedural statute intended "to ensure that federal agencies 'carefully consider detailed information concerning significant environmental impacts,' and at the same time 'guarantee that the relevant information will be made available to the larger audience that may also play a role in both the decision making process and the implementation of that decision.'"[42]

NEPA requires federal agencies to prepare a detailed EIS for all "major federal actions significantly [affecting] the quality of the human environment."[43] The threshold determination of whether the effect of the proposed action is sufficiently "significant" to necessitate the production of an EIS is made by the preparation of an Environmental Assessment ("EA").[44] The EA is a more "concise" environmental review that "briefly" discusses the relevant issues and either reaches a conclusion that preparation of an EIS is necessary or concludes with a "Finding of No Significant Impact" ("FONSI").[45]  An EA

---

[40] 42 U.S.C. §§ 4321-4370d.
[41] 42 U.S.C. § 4332(1*)*; *Baltimore Gas and Elec. Co. v. Natural Resources Defense Council*, 462 U.S. 87, 97 (1983).
[42] *Sabine River Authority v. U.S. Dept. of Interior*, 951 F.2d 669, 676 (5th Cir.1993) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989)).
[43] 42 U.S.C. § 4332(C).
[44] *Sabine River*, 951 F.2d at 677.
[45] *Id.*
Document Number: 59245

is conducted to "provide sufficient evidence and analysis for determining whether to prepare an [EIS]."[46]

In making this determination, agencies are to consider both direct and indirect effects of its decision "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."[47] An impact is reasonably foreseeable if a "person of ordinary prudence would take it into account in reaching a decision."[48] The Corps must consider even relatively unlikely events with significant impacts, like accidents.[49]

"The EA is a rough-cut, low-budget environmental impact statement designed to show whether a full-fledged environmental impact statement-which is very costly and time-consuming to prepare and has been the kiss of death to many a federal project-is necessary."[50] Thus, the ultimate purpose of the EA is to lead to one of two findings: "either that the project requires the preparation of an EIS to detail its environmental impact, or that the project will have no significant impact ... necessitating no further study of the environmental consequences which would ordinarily be explored through an EIS."[51] If the former is found, then the agency must proceed with a full blown EIS; if the latter is found, the agency issues a FONSI and has no further obligations under NEPA.[52]

---

[46] 40 C.F.R. § 1508.9(a)(1).
[47] 40 C.F.R. §1508.8(b); *O'Reilly v. U.S. Army Corps of Engineers*, 477 F.3d 225, 228 (5th Cir. 2007)
[48] *City of Shoreacres v. Waterworth*, 420 F.3d 440, 453 (5th Cir. 2005).
[49] 40 C.F.R. § 1502.22(b)(4).
[50] *Sabine River*, 951 F.2d at 677 (internal quotations and citations removed).
[51] *Id.*
[52] *Id.*
Document Number: 59245

Notably, the NEPA statutory framework provides no substantive guarantees; it prescribes adherence to a particular process, not the production of a particular result.[53] NEPA "is a procedural statute that demands that the decision to go forward with a federal project which significantly affects the environment be an environmentally conscious one."[54]  The statute "does not command the agency to favor an environmentally preferable course of action, only that it make its decision to proceed with the action after taking a 'hard look at environmental consequences.'"[55]  Indeed, "NEPA does not prohibit the undertaking of federal projects patently destructive of the environment; it simply mandates that the agency gather, study, and disseminate information concerning the projects' environmental consequences."[56]  Thus, while "[o]ther statutes may impose substantive environmental obligations on federal agencies . . . NEPA merely prohibits uninformed-rather than unwise-agency action."[57]  "Agency actions with adverse environmental effects can thus be NEPA compliant where 'the agency has considered those effects and determined that competing policy values outweigh those costs.'"[58]

Further, the Fifth Circuit has found that the fact that plaintiffs or their experts take great issue with the factual findings and ultimate conclusions of the agency does not render those findings and conclusions "arbitrary and capricious."[59] As the court noted,

---

[53] *Robertson*, 490 U.S. at 350, 109 S.Ct. 1835.
[54] *Sabine River*, 951 F.2d at 676 (quoting *Robertson*, 490 U.S. at 350).
[55] *Id.* (quoting *Robertson*, 490 U.S. at 350, 109 S.Ct. 1835).
[56] *Id.*
[57] *Robertson*, 490 U.S. at 351.
[58] *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 255 F.Supp.3d 101, 113 (D.D.C. 2017)(quoting *Ohio Valley Envtl. Coal v. Aracoma Coal Co.*, 556 F.3d 177, 191 (4th Cir. 2009)).
[59] *Spiller v. White*, 352 F.3d 235 (5th Cir. 2003).
Document Number: 59245

government agencies-and not the federal courts-are the entities NEPA entrusts with weighing evidence and reaching factual conclusions:

> Where conflicting evidence is before the agency, the agency and not the reviewing court has the discretion to accept or reject from the several sources of evidence. The agency may even rely on the opinions of its own experts, so long as the experts are qualified and express a reasonable opinion.[60]

Moreover, even if a court was convinced that the plaintiffs' experts were more persuasive than those relied upon by the agency, the court would still be compelled to uphold the agency's finding so long as their experts were qualified and their opinions reasonable.[61]

### B. CWA

The Clean Water Act is a pollution control statute that establishes a comprehensive program designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."[62] To achieve this goal, the CWA prohibits the discharge of pollutants, including dredged or fill material, into navigable waters unless authorized by a CWA permit.[63] The CWA defines "navigable waters" as "waters of the United States," which, in turn, is defined by regulation to include certain wetlands.[64]

---

[60] *Id.* at 243, quoting *Sabine River*, 951 F.2d at 678.
[61] *Id.* (citing *Sabine River*, 951 F.2d at 678; *Marsh*, 490 U.S. at 378, 109 S.Ct. 1851 ("[w]hen specialists express conflicting views, an agency must have the discretion to rely on the reasonable opinions of its own qualified experts, even if, as an original matter, a court might find contrary views more persuasive.")).
[62] 33 U.S.C. § 1251(a).
[63] 33 U.S.C. § 1311(a).
[64] 33 U.S.C. § 1362(7); 33 C.F.R. § 328.3(a)-(b).
Document Number: 59245

Section 404 of the CWA authorizes the Corps to regulate discharges of dredged and fill material into wetlands through permitting procedures.[65] In addition to passing a public interest review which balances reasonably expected benefits against reasonably foreseeable detriments, all CWA section 404 permits must meet guidelines issued by the Environmental Protection Agency and the Corps under CWA section 404(b)(1).[66] These "404(b)(1) Guidelines" specify that the Corps must ensure that the proposed fill will not cause significantly adverse effects on human health or welfare, aquatic life, and aquatic ecosystems.[67] To comply with this requirement, the Corps must make a written determination of the effects of a proposed activity "on the physical, chemical, and biological components of the aquatic environment ...."[68]

The 404(b)(1) Guidelines also provide that "no discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem."[69] Under the Guidelines, a project may generally not be permitted where there is "a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences."[70]

---

[65] 33 U.S.C. § 1344.
[66] See 33 U.S.C. § 1344(b)(1), 1344(e)(1); 33 C.F.R. § 320.4.
[67] 40 C.F.R. § 230.10(c)(1)-(3).
[68] *Id.* § 230.11.
[69] 40 C.F.R. § 230.10(d).
[70] 40 C.F.R. § 230.10(a); *see generally City of Shoreacres v. Waterworth*, 332 F.Supp.2d 992, 1015–16 (S.D.Tex. 2004).
Document Number: 59245

### C. RHA

The principal purpose in enacting the Rivers and Harbors Act[71] was to facilitate the federal government's ability to ensure that navigable waterways, like any other routes of commerce over which it has assumed control, remain free of obstruction.[72] "The coverage of the Rivers and Harbors Act is broad, and its principal beneficiary is the United States government."[73] Section 408 of the Rivers and Harbors Act makes it illegal for any person to damage or impair a public work built by the United States to prevent floods.[74] However, the Corps may "grant permission for the alteration or permanent occupation or use of any of the aforementioned public works when ... such occupation or use will not be injurious to the public interest and will not impair the usefulness of such work."[75]

## III. STANDARD FOR SUMMARY JUDGMENT

A court should grant a motion for summary judgment when the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[76] The party moving for summary judgment is initially responsible for identifying portions of pleadings and discovery that show the lack of a genuine issue of

---

[71] 33 U.S.C. § 408.

[72] *Board of Com'rs of Southeast Louisiana Flood Protection v. Tennessee Gas Pipeline Co., LLC*, 88 F.Supp.3d 615, 632 (E.D. La. 2015)(citing *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967)).

[73] *Id.* at 632-33 (citing *In re S. Scrap Material Co., L.L.C.,* 713 F.Supp.2d 568, 575 (E.D.La. 2010) (Feldman, J.) (citing *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967))).

[74] *Id.* at 633 (citing 33 U.S.C.A. § 408).

[75] *Id.*, n. 160 (quoting 33 U.S.C. § 408).

[76] Fed. R. Civ. P. 56.

Document Number: 59245

material fact.[77]  A court must deny the motion for summary judgment if the movant fails to meet this burden.[78]

If the movant makes this showing, however, the burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial."[79] This requires more than mere allegations or denials of the adverse party's pleadings. Instead, the nonmovant must submit "significant probative evidence" in support of his claim.[80] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[81]

A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment.[82] The court is also required to view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.[83]  Under this standard, a genuine issue of material fact exists if a reasonable trier of fact could render a verdict for the nonmoving party.[84]

## IV.    PARTIES' POSITIONS, GENERALLY

### A.    Plaintiffs

Plaintiffs maintain that the Corps issued the RHA 408 and CWA 404 permits based on the premise that the project— "a massive crude oil pipeline, operated by a company

---

[77] *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995).
[78] *Id.*
[79] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quotations omitted).
[80] *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990).
[81] *Anderson*, 477 U.S. at 249 (citations omitted).
[82] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).
[83] *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000).
[84] *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).
Document Number: 59245

with a terrible safety track record, in one of the nation's most sensitive and unique aquatic environments" —would not result in any significant environmental impacts warranting an EIS and was in the public interest.[85]   Plaintiffs argue that the Corps' conclusions are fundamentally flawed and contrary to law for two primary reasons.

First, Plaintiffs contend the Corps never took a "hard look" at the risk of oil spills in the remote and uniquely aquatic environment of the Atchafalaya Basin.  Rather, the Corps "rubber-stamped" a risk assessment provided by Bayou Bridge, without independent analysis, oversight, or input from other agencies with expertise.[86]  Plaintiffs also claim the Corps ignored extensive evidence that the "proponent-supplied oil spill assessment" was "hopelessly incomplete and one-sided."[87]   Plaintiffs maintain Bayou Bridge's analysis "gravely underestimates the risk of an incident, as well as its potential size"; "overstates the company's ability to detect a spill, as well as its ability to respond to one in the remote Atchafalaya Basin"; and "completely overlooks critical issues like the company's worst-in-the-industry safety record, and the special risks posed by tar sands crude."[88]   Further, Plaintiffs claim that, rather than address these important issues in its environmental review, which were repeatedly pointed out by Plaintiffs and others, the Corps simply ignored them.

Second, Plaintiffs maintain that the Corps' NEPA and CWA analysis ignored other

---

[85] Rec. Doc. No. 202-2, p. 10.
[86] *Id.*
[87] *Id.*
[88] *Id.*
Document Number: 59245

grave environmental impacts arising from the construction of the pipeline through the Atchafalaya Basin, arguing that the creation of a major new channel across the Basin will have serious and irreversible impacts to the Basin by changing water flows and encouraging deposition of sediment that is the death knell of swamps. Plaintiffs contend commenters repeatedly brought these concerns to the Corps' attention, but the Corps focused only on direct impacts and ignored serious indirect impacts of the project. Further, Plaintiffs claim the Corps failed to recognize or mitigate for the significant hydrologic and sediment impacts the project would cause. Plaintiffs also take issue with the Corps' designation of most construction impacts as temporary, which Plaintiffs claim is based on an assumption that the destroyed cypress-tupelo vegetation would grow back, an assumption they contend is belied by the record. Plaintiffs contend the Corps' failure to address these impacts is unlawful, and the Court should grant summary judgment in Plaintiffs' favor and vacate the underlying permits pending full compliance with NEPA and the CWA.

## B. The Corps

The Corps unsurprisingly disagrees with Plaintiffs' position and contends it did not "simply defer to the pipeline proponent" but did, indeed, engage in a lengthy and in-depth inquiry with Bayou Bridge, requiring substantial revisions and updates to draft environmental analyses and requesting and obtaining additional data and information, as well as requesting comments and information from the public and other agencies.[89]  Also,

---

[89] Rec. Doc. No. 220, p. 8.
Document Number: 59245

the Corps contends its analysis satisfies the "hard look" standard of NEPA and the public interest analysis requirement of the CWA. The record demonstrates that the Corps examined the nine major risk factors for an oil release and reasonably concluded such a risk of a release in the Basin was low. Further, the Corps used a "worst case scenario" spill model to look at the potential scale of that unlikely event and its potential impacts on resources in the basin. Following this analysis, the Corps concluded that the risk of an oil release was not likely to have a significant impact on the environment, and the Corps maintains that its conclusions are supported by the record and entitled to substantial deference under the law.

The Corps also claims the record demonstrates that it took a hard look at both direct and indirect construction impacts in the Basin, as well as possible long-term changes to sediment accretion and Basin hydrology. The Corps claims that, contrary to Plaintiffs' suggestion, there is no major new channel across the Basin; rather, the Bayou Bridge pipeline is largely co-located alongside existing rights-of-way to minimize wetlands disturbance. Moreover, the Corps notes that it required Bayou Bridge to take both short- and long-term measures following construction to ensure stabilization of disturbed areas and to mitigate against increased turbidity. The Corps likewise required Bayou Bridge to return the construction footprint to its pre-construction contours, preventing any changes to the Basin's hydrology. The Corps maintains these issues were addressed in the EAs, and it reasonably concluded they were not significant, satisfying both NEPA and the CWA.

Document Number: 59245

The Corps contends Plaintiffs' challenge to its mitigation methodology was rejected by the Fifth Circuit and should fail again here. The Corps maintains that the record establishes that construction of the pipeline will not result in any permanent loss of wetlands, and wetlands converted from scrub-shrub or forested habitat to herbaceous habitat will continue to function. The Corps argues that its finding on this issue is reasonable and comports with the Corps' statutory and regulatory mandates. Additionally, the Corps contends its disclosure of the conversion of those wetlands and finding that those impacts are not significant fulfilled the Corps' obligations under NEPA.

The Corps submits that the following facts are supported by the administrative record. The Bayou Bridge pipeline is an approximately 163-mile long, 24-inch diameter crude oil pipeline running from Lake Charles, Louisiana to St. James, Louisiana[90] that is capable of safely transporting 480,000 barrels of domestic crude oil per day to various crude oil terminals for eventual transportation by existing pipelines to refineries on the Gulf Coast.[91] The Corps maintains that pipelines "are a safer, more environmentally responsible, and more economical method of delivering large quantities of crude than other delivery methods."[92]

The Corps also notes that it does not permit or regulate oil and gas pipelines; rather, the United States Department of Transportation, Pipeline and Hazardous Materials

---

[90] BBP 337.
[91] BBP 340.
[92] Rec. Doc. No. 220, pp. 9-10 (citing BBP 343-45 (explaining lack of feasibility of truck and rail shipping of crude)).
Document Number: 59245

Safety Administration ("PHMSA") is the federal entity charged with establishing safety standards for pipelines. Pursuant to 49 C.F.R. § 194.7(a), PHMSA fulfills part of this responsibility by requiring pipeline operators to submit a spill response plan that meets PHMSA's requirements before the operator can "handle, store, or transport oil in th[e] pipeline." Further, PHMSA determines whether a spill response plan meets its regulatory requirements.[93]

As this project required permits under Section 404 and Section 408, the Corps completed EAs analyzing the likely impacts of construction and pipeline operation, including in the Basin.[94] While there is overlap in the analysis for the Section 404 and Section 408 permits, the Corps contends each focuses on the different agency actions required for the project. The Section 404 permit authorizes "dredge and fill" elements of the project's construction, associated mitigation, and the Corps' environmental analysis focuses on those elements. The Section 408 permission authorizes the project's crossings of federal projects and federal easements. Relevant to Plaintiffs' claims, the Section 408 EA analyzed the risk of an oil spill along the entire length of the pipeline and used a model from PHMSA to estimate the likely scope of a "worst case" release through a guillotine cut of an above-ground pipeline.[95] The Corps maintains that the PHMSA data

---

[93] 49 C.F.R. § 194.119 (describing PHMSA's process for reviewing and approving pipeline spill response plans).
[94] BBP 1-92 (§ 404 Memorandum for Record, including the Section 404 EA); BBP 327-471 (§ 408 EA).
[95] BBP 354.

Document Number: 59245

from real-world pipeline spills demonstrates that this worst case scenario is extraordinarily unlikely, and most pipeline spills are much smaller.[96]

The Corps notes that the Section 404 EA expressly incorporates, and properly relies upon, the Section 408 EA, including the spill risk analysis and potential impacts analysis. In approving the Section 404 permit and issuing a FONSI, the District Commander "reviewed the information provided by the applicant, the comments received from the public in writing and at the public hearing, the assessment prepared as part of the Section 408 review and [the 404] assessment of the environmental impacts."[97] Thus, the two EAs, while addressing separate agency actions, complemented each other and informed the Corps about potential environmental impacts of the project's construction, crossings, and operations. Based on these EAs, the District Commander found that the issuance of the Section 404 Permit and the Section 408 Permission would not result in a significant impact to the physical environment.[98]

### C. Bayou Bridge

Bayou Bridge claims that Plaintiffs' complaints about this project have already been rejected by the Fifth Circuit, so the Plaintiffs are "repackag[ing]" their same claims challenging the same agency actions.[99] However, now there exists a full administrative record which Bayou Bridge contends provides even greater support for the lawfulness of

---

[96] *Id.*
[97] BBP 91; *see also* Rec. Doc. 86 at 22 (finding that the Section 404 EA "clearly and explicitly references and incorporates the finding of the Section 408 EA.").
[98] BBP 91; BBP 131-36.
[99] Rec. Doc. No. 213-1, p. 10.
Document Number: 59245

the challenged agency actions.

Bayou Bridge states that the Corps "employed a rigorous and thorough yearlong review process" before issuing the two permits at issue to Bayou Bridge for construction of the pipeline.[100]  Bayou Bridge notes that, during this review process, the Corps sought public comment, held a public hearing, extended the comment period, reviewed input from Plaintiffs and others, considered a project-specific risk analysis, and oversaw the creation of a worst-case-scenario oil spill model to help assess the potential impacts if a leak were to occur. Further, the spill model, which was prepared in the manner that the relevant federal agency prescribes, was designed to greatly overstate the effects of a spill, and it assessed risks over the entire pipeline route.

At the end of the process, the Corps' comprehensive EAs demonstrated that a large spill could  have grave consequences, but the Corps concluded that, because the risk of such an event was low, granting the permits and allowing the project to proceed would have no significant impact on the environment.   Thus, no EIS was deemed necessary.

Bayou Bridge contends Plaintiffs are seeking relief regarding oil spills that the Court has already precluded in ruling on the preliminary injunction request.  Bayou Bridge quotes this Court's previous finding that the Corps gave "extensive and appropriate consideration" to the various environmental concerns and that the record was "replete

---

[100] *Id.*, p. 10.
Document Number: 59245

with evidence that the Corps did indeed take a 'hard look' at the risk of oil spills."[101]  Bayou Bridge contends Plaintiffs' arguments remain no more than disagreements with how the Corps evaluated this information, and, as the Court has already held, is no basis for holding an agency action to be arbitrary or capricious.

Bayou Bridge argues Plaintiffs' construction impact claims fare no better because the Corps considered and mitigated indirect impacts on the environment and supported its conclusion that such impacts would be temporary.  Further, the Fifth Circuit held that the Court "clearly erred" in agreeing with Plaintiffs and finding that any wetlands "will be . . . irretrievably lost."[102]  Thus, Bayou Bridge maintains Plaintiffs' motion should be denied, and the Court should grant summary judgment in favor of the Corps.

### D.      Stupp Bros. Inc.

Stupp offers essentially the same arguments as Bayou Bridge in favor of the Corps, and they will not be restated here.

## V.      ANALYSIS

### A.      Oil Spills

To the extent Plaintiffs re-urge the same oil spill arguments rejected by the Court in its *Ruling* on their motion for preliminary injunction,[103] the Court declines to reconsider these arguments.  Based on the Section 404 and 408 EAs, the Court found that it was not improper for the Corps to rely upon the Section 408 EA in reaching its conclusions in

---

[101] Rec. Doc. No. 86, pp. 27-28.
[102] *Atchafalaya Basinkeeper*, 894 F.3d at 699 n.3 (omission in original) (internal quotation marks omitted).
[103] Rec. Doc. No. 86.
Document Number: 59245

the Section 404 EA.[104]   The Court further found that:  "page 91 of the Section 404 EA clearly and explicitly references and incorporates the finding of the Section 408 EA. The Court is also satisfied that the Section 408 EA was not too narrow in scope to support the FONSI as the spill model utilized in both was the same, and the analysis was conducted every 200 feet along the entire length of the 162-mile pipeline."[105]

The Court also found that the Corps took the "hard look" required by the law at the risk and potential impacts of oil spills in the Basin, and the Court likewise found no error with the Corps' reliance on PHMSA's expertise in assessing this risk.[106]  The completed administrative record serves only to bolster the Court's previous findings, not undermine them as Plaintiffs suggest.

Plaintiffs argue that, considering the completed administrative record, it is apparent that the Section 408 EA is "grossly inadequate with respect to oil spills and leaks," and the Corps' conclusion of no significant impact of the risk and impact of oil spills fails to satisfy NEPA because the Corps failed to consider several critical issues that were brought to the Corps' attention during the administrative process.[107]  In conjunction with this argument, Plaintiffs request that the Court reconsider its denial of their motion to supplement the administrative record with oil spill risk/impact analysis from their experts.

---

[104] *Id.* at pp. 21-22.
[105] *Id.* at p. 22.
[106] *Id.* at pp. 26-27.
[107] Rec. Doc. No. 202-2, pp. 21-22.
Document Number: 59245

The Court declines this invitation for the reasons set forth in that *Ruling*.[108]

Nevertheless, the Court will address some new arguments raised by Plaintiffs and will expound on its prior findings in light of the completed administrative record.

### 1. Independent Review/ "Rubber Stamp" Review

Plaintiffs argue that the Corps failed to undertake any independent review of Bayou Bridge's analysis of spill risks and impacts and, rather, delegated this responsibility to Bayou Bridge and ultimately "rubber stamp[ed] [] a consultant-prepared NEPA document."[109] Plaintiffs maintain that the Corps never applied any expertise whatsoever to the question of oil spills and never conducted any independent analysis of the EA written by Bayou Bridge. Rather, Plaintiffs claim, "it accepted without question or oversight whatever BBP gave it, even though the company's self-interest in downplaying risks should have been self-evident … ."[110] Plaintiffs claim the Corps allowed Bayou Bridge to draft the Section 408 EA "with only the scantest input."[111] Plaintiffs cite to allegedly "preposterous" and "false" claims in the EA submitted by Bayou Bridge and allegedly adopted by the Corps without independent analysis or review.[112] Plaintiffs complain again about the "worst case spill" analysis (that the Court has previously held

---

[108] Rec. Doc. No. 198. Accordingly, the Court will not consider arguments by Plaintiffs that would require the Court to consider extra-record evidence or that would merely require the evaluation of competing expert evidence.

[109] Rec. Doc. No. 202-2, p. 22 (quoting *Sierra Club v. Sigler*, 695 F.2d 957, 962 n.3 (5th Cir. 1983)("[A]n agency may not delegate its public duties to private entities…particularly private entities whose objectivity may be questioned on grounds of conflict of interest.")).

[110] *Id.* at pp. 23-24.

[111] *Id.* at p. 24.

[112] *Id.*

Document Number: 59245

to be adequate under NEPA and the CWA) and argue: "This is a case where the Corps uncritically relied on complex technical information submitted by a self-interested proponent, and rubber-stamped it with no attempt whatsoever to verify its conclusions."[113]

Plaintiffs further contend that the Corps "does not appear to have any relevant expertise on staff, nor did it turn to outside agencies like PHMSA …to supply it."[114] Plaintiffs maintain the Corps' alleged deference and reliance upon PHMSA's expertise is undermined by the administrative record, which they contend reveals the Corps never sought or received any input from PHMSA, or any other agency, on the oil spill issue. Plaintiffs contend the Corps' representation that PHMSA has the primary responsibility for the issuance of special permits for the operation of crude oil pipelines is "simply wrong."[115] Plaintiffs claim no PHMSA permit or approval was ever required or obtained for this project, and Bayou Bridge operated the pipeline for months without a PHMSA-approved spill plan.

The Corps objects to Plaintiffs' characterization of its independent oil spill risk review and analysis and its reliance on PHMSA data in concluding that the risk of an oil spill in the Basin is low. The Corps maintains that Plaintiffs' contention that it delegated its NEPA responsibilities to Bayou Bridge is false and undermined by the administrative record, which demonstrates that the Corps "undertook an exacting analysis of the

---

[113] *Id.* at p. 25.
[114] *Id.*
[115] *Id.* at p. 26.  Plaintiffs cite *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31, 55 n.8 (D.C.C. 2015) ("Pipelines transporting oil within the United States are not subject to any general requirement of federal governmental evaluation and approval.").
Document Number: 59245

materials provided by the proponent, requested changes, sought and obtained additional information, and consulted with other federal agencies."[116]   Thus, the Corps argues it fulfilled its NEPA obligations and did, indeed, take a "hard look" at this project.

First, the Corps acknowledges that Corps' regulations allow for the permit applicant to provide information required for NEPA and other environmental reviews, but these regulations clearly require that the Corps conduct an independent and impartial review of that information.[117]   When an applicant submits environmental documentation for a project, the Corps' District convenes a team of engineers and specialists to conduct a technical review under a District-specific review plan.[118]   The Corps claims the record shows that the Corps and Bayou Bridge "engaged in an over one-year long back-and-forth about the information in the EA, including the information about the risk of oil spills central to Plaintiffs' challenge."[119]   The Corps cites the portions of the record which contain multiple redline drafts of the Section 408 EA with comments by Corps officials[120] and numerous examples of correspondence requiring specific additional information from Bayou Bridge:

> *See* BBP 2276-77 (email requesting, among other things, more information about "potential oil spill effects on waterways, fisheries and wildlife" and more discussion about "monitoring and operational practices that would minimize risk from a spill or petroleum release"); BBP 3226-30 (email providing updated information and maps in response to Corps requests);

---

[116] Rec. Doc. No. 220, p. 18.
[117] *Id.* at pp. 26-27 (citing 40 C.F.R. § 1506.5(b); 33 C.F.R. pt. 325, App. B(8)(f); see also BBP 18480-82 (Corps District 408 review procedures); BBP 22121-23 (Corps 408 environmental compliance requirements)).
[118] *See* BBP 22124-25 (explaining the District-led Agency Technical Review process).
[119] Rec. Doc. No. 220, p. 27.
[120] BBP 1676-1819; BBP 1920-2057.
Document Number: 59245

BBP 4084-89 (proposed drill plan from proponent in response to Corps concerns regarding the risk of hydraulic fracture and inadvertent drilling fluid returns at the Calcasieu river crossing); BBP 4191-4193 (Corps responding to proponent's frustration with the speed of Corps review); BBP 4232-45 (letter from Corps' engineering review team requesting a resubmitted project proposal with additional information in response to Corps comments); BBP 7224-66 (memorandum documenting review and comments from Corps' operations division).[121]

The Corps insists that the record demonstrates that the Corps consulted with other relevant agencies and governmental bodies during this review process and sought input regarding the project.[122] At the conclusion of this review process, the leaders of the Corps review teams signed documents confirming their independent Agency Technical Review of the information submitted by Bayou Bridge.[123] The Corps maintains this independent review, as well as consultation with stake-holders, other federal agencies, and non-federal governmental entities, satisfied the Corps' NEPA obligations.

Moreover, the Corps contends the record reveals that the Corps did not "rubber stamp" a project that began with Bayou Bridge's initial 35-page draft assessment[124] and ended over a year later with a 92-page Section 404 EA and a 145-page Section 408 EA.[125] The Corps stated: "This is not a case like *Sigler*, where the Corps only had two months to review a draft EIS prepared by the project proponent."[126] Rather, the Corps

---

[121] Rec. Doc. No. 220, p. 27.
[122] BBP 12842-43 (comments from EPA regarding minimizing impacts, hydrology, sediment, and mitigation); BBP 14443 (NOAA providing no objections to the issuance of the permit); BBP 15831-49 (letters of no objection from non-federal sponsors).
[123] BBP 248; BBP 250.
[124] BBP 15850-85.
[125] BBP 1-92; 327-471.
[126] Rec. Doc. No. 220, p. 28 (citing *Sierra Club v. Sigler*, 695 F.2d 957, 962 n. 3 (5th Cir. 1983).
Document Number: 59245

contends that, in reviewing this project, the Corps "refused to be rushed, and instead sought and obtained more information and took the time necessary to make its own informed decision."[127] The Corps notes that the Section 404 EA was written solely by the Corps, and the Section 408 EA went through substantial revisions and changes in response to comments and questions by the Corps.

The Corps also defends its deference to PHMSA's regulatory oversight over pipelines, including spill response plans and pipeline construction and maintenance. The Corps notes that "'courts . . . have favorably viewed similar agency reliance on applicable regulatory standards when assessing impacts as part of a NEPA required analysis.'"[128] Further, the Corps contends Plaintiffs' arguments do not accurately portray the record. While Plaintiffs claim the Corps could not have actually relied on and deferred to PHMSA's expertise because the record does not document any correspondence between the two agencies, Plaintiffs ignore record evidence that the Corps utilized the PHMSA spill database to evaluate the risk of an oil release[129] and that the Corps utilized a PHMSA spill model.[130] As to Plaintiffs' complaint that the Corps did not require Bayou Bridge to produce and obtain approval of a pipeline spill response plan prior to issuing the Section 404 permit and Section 408 permission, the Corps counters that spill response plans and

---

[127] *Id.*
[128] *Id.* at p. 30 (quoting *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 255 F. Supp. 3d 101, 126 (D.D.C.) (citing *EarthReports, Inc. v. FERC*, 828 F.3d 949, 957 (D.C. Cir. 2016) and *Sierra Club v. Clinton*, 746 F. Supp. 2d 1025, 1047 (D. Minn. 2010)).
[129] BBP 420, 442.
[130] BBP 353-55.
Document Number: 59245

the timing of their approval are firmly in PHMSA's regulatory domain.[131]

The Court finds that Plaintiffs have not carried their summary judgment burden on this issue. Indeed, the Court has already considered and rejected the proposition that the Corps failed to fully analyze the risk and impacts of an oil spill and that the Corps improperly delegated that responsibility to PHMSA.[132] The now fully developed administrative record further supports the Court's findings on this issue.

First, the Court finds that the Corps followed the governing regulations in allowing Bayou Bridge to prepare initial draft EA assessments from which to work.[133] Indeed, "[t]he Corps' regulations do not require the Corps to undertake an independent investigation or to gather its own information upon which to base an EA."[134] The administrative record in this case demonstrates that the Corps "independently evaluate[d] the information submitted" and "t[ook] responsibility for the scope and content of the" EAs and the underlying information's accuracy.[135] Plaintiffs' contention that the Corps simply dropped the issue of spills after Bayou Bridge promised to submit a spill response plan[136] is belied by the record. Plaintiffs complain that, when a Corps employee told Bayou Bridge its Facility Response Plan (FRP) should be "reviewed by Corps staff to ensure that it meets

---

[131] 49 C.F.R. § 194.119; see also *EarthReports*, 828 F.3d at 957 (recognizing that, once an agency has evaluated the environmental impacts of a proposed use, it may properly conclude that it has "'no grounds' for requiring more stringent conditions than those required by the" agency with regulatory jurisdiction over the use.).

[132] *See* Rec. Doc. 86 at p. 27 (rejecting Plaintiffs' argument that "the Corps simply dismissed the risk [of an oil spill] and referred the matter to PHMSA" as "meritless in light of the substantial attention given to the issue as set forth in both EAs.").

[133] 40 C.F.R. § 1506.5(a)-(b).

[134] *Friends of the Earth v. Hintz*, 800 F.2d 822, 834 (9th Cir. 1986).

[135] 40 C.F.R. § 1506.5(a)-(b).

[136] Rec. Doc. No. 202-2, p. 24 n. 6.

Document Number: 59245

requirements," Bayou Bridge responded that its "existing FRP" for "the region" would "be updated to include the [B]ayou [B]ridge [P]ipeline upon completion of construction per PHMSA requirements."[137]  However, Plaintiffs fail to note that Bayou Bridge also explained that the Corps staff member preparing the EA had already reviewed and provided "[e]dits to the FRP related information," and that other planning documents for spill responses—called Geographic Response Plans (GRPs)—"have been provided to the" Corps.[138] Moreover, Plaintiffs should be aware that the Corps considered the GRPs because they are identified on the administrative record index,[139] and Plaintiffs' counsel received them when the parties discussed a protective order.[140]  Thus, as Bayou Bridge notes, Plaintiffs are disingenuous in accusing the Corps of relying on a response plan that "did not even exist at the time the Corps made its final decision."[141]

Further, both EAs confirm that the Corps reviewed the data and analysis of oil spill risks in concluding that the risk of a large oil spill in the Basis was "minimal."[142]  Both EAs also confirm that the Corps comprehensively "assessed the environmental impacts" of a leak or spill under a variety of circumstances.[143]  Thus, Plaintiffs essentially ask the Court to find that the District Commander lied in his representations of independent review.  Not

---

[137] BBP1028.
[138] BBP1015 (referencing "Howard"); see also BBP465 (identifying "Howard" Ladner of the Corps).
[139] BBP23997-4532.
[140] Rec. Doc. No. 164, p. 3.
[141] Rec. Doc. No. 202-2, p. 15; *see also* BBP23997-4532 (emergency response prep, planning, and tactics at federal project crossings).
[142] BBP90; BBP443.
[143] BBP464.

Document Number: 59245

only are credibility determinations improper on summary judgment, the record simply does not support such a finding.

Regarding Plaintiffs' claim that the Corps' staff lacks relevant expertise for the oil spill risk analysis, the record fails to substantiate this claim as well. The District Commander who made the FONSI decision and public-interest findings for this project is a civil engineer with two Master of Science degrees.[144] The Corps' team on the Section 408 EA included experienced civil and geotechnical engineers, a facilities engineer, a biologist, and a marine biologist,[145] and the Corps employs scientists and engineers with relevant expertise in "Fuel Facilities (Petroleum, Oils and Lubricants)" and divisions that specialize in environmental engineering and geology, water resources, and water resources remote sensing/GIS technology.[146]

Ultimately, the Court finds, again, that the Corps properly deferred to PHMSA and relied on its expertise in evaluating the risks and impacts of oil spills for this project.[147] It

---

[144] Leadership: Colonel Michael Clancy, U.S. Army Corps of Eng'rs, https://web.archive.org/web/20171228015631/https://www.mvn.usace.army.mil/About/Leadership/Bio-Article-View/Article/474408/colonel-michael-clancy (archived Dec. 28, 2017) (last visited Aug. 16, 2019). Colonel Clancy's three-year term as District Commander ended on June 11, 2019. See Gov. Edwards Expresses Gratitude to New Orleans Corps of Engineers Commander Col. Clancy, Office of the Governor (June 11, 2019), http://gov.louisiana.gov/index.cfm/newsroom/detail/ 1988.

[145] BBP247.

[146] See Centers of Expertise, U.S. Army Corps of Eng'rs, https://www.usace.army.mil/About/Centers-of-Expertise (last visited Aug. 16, 2019). The Corps is also a congressionally designated member of the Interagency Coordinating Committee on Oil Pollution Research (ICCOPR). 33 U.S.C. § 2761(a)(3). In fiscal year 2016-2017 alone, the ICCOPR oversaw 316 member projects and generated over 250 publications "related to the prevention of, preparedness for, and response, to oil spills." Report to Congress: ICCOPR FY 2016-2017 Activities, U.S. Coast Guard 1 (2018), https://www.dco.uscg.mil/Portals/9/CG-5R/ICCOPR/Files/USCG_ICCOPR%20Oil%20Pollution% 20Research%20(FY%202016-2017)_Approved%20Version.pdf?ver=2018-11-28-154311-093.

[147] See Rec. Doc. No. 86, p. 22.

Document Number: 59245

was proper for the Corps to rely on the worst-case spill model prepared in accordance with PHMSA specifications[148] and on PHMSA's extensive database of pipeline incidents.[149] There is no basis upon which to find that the Corps neglected its legal obligation to perform an independent review of the oil spill risks from the project, that the Corps simply "rubber stamped" Bayou Bridge's submissions, or that the Corps improperly delegated its obligations to, and relied solely on information from, other federal agencies.

2. CWA Section 404 Public Interest Analysis

Plaintiffs argue that the Corps gave no consideration to the risks/impacts of oil spills for purposes of the Section 404 public interest analysis. Plaintiffs again claim that the Corps has "sidestepped" the consideration of spills by deferring to PHMSA, an argument the Court has rejected now three times, and further claims that the Corps' "lone sentence" in the Section 404 EA stating that it considered oil spill risks in the Section 408 EA fails to comply with the CWA because the Section 404 EA only complies with NEPA standards.[150] Plaintiffs argue that the Corps failed to incorporate any findings from the Section 408 EA into its CWA analysis. Plaintiffs urge that this failure to consider oil spills under CWA standards and regulations resulted in an arbitrary and capricious decision.

The Corps defends its public interest analysis under the CWA, arguing that it specifically addressed the issue of oil spills in the context of analyzing "Water Supply &

---

[148] BBP353-55.
[149] BBP422; BBP1362-63.
[150] Rec. Doc. No. 202-2, p. 36.
Document Number: 59245

Conservation" as part of the "Public Interest Review."[151] Further, pursuant to PHMSA regulations, the Corps stated that Bayou Bridge would be required to prepare a Facility Response Plan to address its response to any oil spill in addition to installing "remote actuated shut-off valves" at periodic intervals along the pipeline.[152]  Also, in evaluating the issue of environmental justice pursuant to Executive Order 12898, the Corps notes that it determined "that risk of a large spill resulting in significant adverse environmental impacts to any particular resource or community was determined to be minimal."[153] The Corps also reviewed PHMSA's active 2004 to 2016 database and calculated that the "incident frequency for 'onshore pipeline, including valve sites' is 0.00079 incidents per mile-year. Additionally, if any release did occur, it is likely that the total release volume of a spill would be 4 barrels (bbls) or less based on historical spill volumes."[154]  The Corps maintains Plaintiffs argument is "overly formalistic" as the record firmly establishes that the Corps considered the potential for oils spills and reasonably determined the low risk of a significant spill.

Pursuant to this analysis, the Corps concluded that an existing framework of requirements was in place to protect the public from the limited risk of a spill.  The Corps rejects Plaintiffs contention that it is the Corps' responsibility to police whether PHMSA and the Louisiana Department of Environmental Quality ("LDEQ") are functioning

---

[151] BBP 1, 54-55.
[152] BBP 24; *see also* BBP 26-27 (BBP would be liable for remediation of any oil spill for which it was responsible).
[153] BBP 90.
[154] Rec. Doc. No. 220, p. 34 (quoting BBP 80 (quotation in original)).
Document Number: 59245

properly; rather, the Corps maintains it reasonably and legally deferred to those agencies where appropriate.

The Court has already ruled that "it was not improper for the Corps to rely upon the Section 408 EA in reaching its FONSI determination in the Section 404 EA."[155] Plaintiffs claim that the Corps' oil spill analysis may have satisfied NEPA but failed to satisfy the CWA is without merit. The Court finds that the Corps reached substantively identical public interest determinations under both Section 404 and 408. Applying the relevant CWA regulations discussed above to the information found in the administrative record, the Court finds no merit to Plaintiffs' argument on this issue. As the Corps noted, "courts are encouraged to 'uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned.'"[156] At the very least, on this issue, the Corps' path is reasonably discerned as the oil spill analysis for both the Section 408 EA and 404 EA was rationally connected and closely tied together.

### 3. Diluted bitumen ("dilbit")

Plaintiffs claim that the Corps failed to consider information submitted during the administrative review process that the pipeline could be used to transport diluted bitumen ("dilbit") from Canadian tar sands. Plaintiffs cite documentation of the recent purchase of a significant interest in the pipeline system by Enbridge, the company that ships most

---

[155] Rec. Doc. No. 86, p. 22.
[156] *Handley v. Chapman*, 587 F.3d 273, 281 (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)).
Document Number: 59245

Canadian tar sands.[157] Plaintiff maintains that Enbridge has explicitly stated that the purpose of this purchase was to enable it to move dilbit to Gulf refineries and terminals via the Bayou Bridge pipeline.[158] Further, Plaintiffs claim Enbridge was previously involved in one of the worst pipeline spills in history, the Marshall, Michigan dilbit disaster that the NTSB attributed to both "pervasive organizational failures" at Enbridge as well as inadequate regulation by PHMSA.[159]

Plaintiffs posit that the distinction between conventional crude and tar sands bitumen is highly consequential in terms of both spill risks and impacts, and the transportation of tar sands increases the risks of pipeline ruptures. That the Corps did not address this possibility in its oil spill risk assessment, according to Plaintiffs, further renders the Corps' FONSI arbitrary and capricious.

The Corps responds to Plaintiffs' dilbit concerns, calling them speculative but nevertheless directing the Court to information in the administrative record demonstrating that the Corps did, indeed, consider this concern.[160] However, the Corps contends the articles cited by Plaintiff do not state that the Bayou Bridge pipeline will be used to transport dilbit, nor do they mention the Bayou Bridge pipeline at all.[161] The Corps maintains that the purpose of the Bayou Bridge pipeline is to transport domestic crude oil

---

[157] BBP 23768.
[158] BBP 23770 ("This week's deal by Enbridge, however, will allow more Canadian crude and oil sands barrels to flow to those Gulf Coast refineries.").
[159] BBP 23861.
[160] BBP 1472-75.
[161] BBP 23768-68.
Document Number: 59245

to refineries on the Gulf Coast.[162]  Additionally, the Corps contends it modeled spill risks using light crude oil because the Corps judged this to result in the worst case spill in both scale and impact.[163]

The Court finds that Plaintiffs have failed to demonstrate evidence to support the likelihood that the Bayou Bridge pipeline will carry dilbit such that the Corps' treatment of this possibility resulted in an arbitrary and capricious decision.  Notwithstanding the fact that Plaintiffs offered this information well beyond the comment period,[164] the documents cited by Plaintiffs do not support their assertion that Enbridge intends to move dilbit to Gulf refineries and terminals through the Bayou Bridge pipeline.  As Bayou Bridge notes: "the article that Plaintiffs cite (at 24) explains that Enbridge acquired its interest so it could redirect lighter crude oil from existing Enbridge pipelines to the DAPL and ETCO lines that connect to Bayou Bridge, thus allowing Enbridge to use its existing lines (i.e., not Bayou Bridge) for dilbit."[165]  This concern is highly speculative and is insufficient to find the Corps' conclusion arbitrary and capricious.

### B. Environmental Impacts of Construction

Plaintiffs also claim the Corps' EAs are insufficient as the Corps failed to analyze "other grave environmental impacts" resulting from the construction in the Basin.[166]

---

[162] BBP 340.
[163] BBP 24804.
[164] BBP1472-75 (September 28, 2017 letter); BBP7267 (404 comment period, as extended, closed January 31, 2017); BBP4412 (408 comment period closed March 9, 2017).
[165] Rec. Doc. No. 231-1, p. 36 (citing BBP23770 (explaining that by adding DAPL and ETCO to Enbridge's network, the company can "free up more space on its mainline system for additional volumes of Canadian oil to make its way south").
[166] Rec. Doc. No. 202-2, p. 10.
Document Number: 59245

Plaintiffs argue that no serious consideration was given to concerns that changing water flows and encouraging deposition of sediment in the Basin would result in significant hydrologic and sediment impacts. Plaintiffs contend the Corps' designation as environmental impacts as "temporary" – such as the loss of cypress-tupelo vegetation – is undermined by the record.

### 1. Alteration of sediment

Plaintiffs correctly note that NEPA requires consideration of the "indirect" effects of agency decisions.[167] Indirect effects are those "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."[168] An impact is "reasonably foreseeable" if a "person of ordinary prudence would take it into account in reaching a decision."[169] The CWA also recognizes that "secondary impacts" are a critical consideration when permitting the destruction of wetlands under Section 404.[170] Secondary effects are defined as "effects on an aquatic ecosystem that are associated with a discharge of dredged or fill materials, but do not result from the actual placement of the dredged or fill material."[171] Moreover, "[i]nformation about secondary effects on aquatic ecosystems shall be considered" prior to issuance of a Section 404 permit.[172]

---

[167] 40 C.F.R. § 1508.25.
[168] Id. § 1508.8; BBP 22880 (Corps' guidance) ("The district must consider the direct and indirect effects of the proposed project needing the Corps' permit authorization.")
[169] *City of Shoreacres v. Waterworth*, 420 F.3d 440, 453 (5th Cir. 2005).
[170] BBP 4446; 40 C.F.R. § 230.11; *Riverside Irr. Dist. v. Andrews*, 758 F.2d 508, 512 (10th Cir. 1985) ("To require [the Corps] to ignore the indirect effects that result from its actions would be to require it to wear blinders that Congress has not chosen to impose.").
[171] 40 C.F.R. § 230.11(h).
[172] *Id.*

Document Number: 59245

Plaintiffs claim that changes to the hydrology or sediment deposition in a waterway resulting from a project are precisely the kind of "indirect" or "secondary" impacts that require close scrutiny under these standards.[173]  Pursuant to the regulations, Plaintiffs maintain that changes to the flow and circulation of water must be considered as part of the public interest analysis and the significance of impacts from the proposed discharge.[174]  Further, the Corps acknowledged that sediment transport is a basic function of a stream system; thus, changes in sediment transport are a foreseeable consequence of altering channel morphology.[175]  Additionally, these types of changes are particularly significant in the context of cumulative effects from past changes to the Basin's hydrology and sediment.[176]

Plaintiffs contend that, not only was the Court correct to decide that these impacts on water flow and sediment deposition constituted irreparable harm to the Basin, the administrative record strongly supports this conclusion.[177]  Plaintiffs highlight the information in the record documenting the vast wetland loss in the Basis as a result of

---

[173] Rec. Doc. No. 202-2, p. 38 (citing e.g., *Idaho Rivers United v. Probert*, 2016 WL 2757690, at *11–12 (D. Idaho, May 12, 2016) (agency must consider sediment delivery into river system as indirect and cumulative impact); see also 40 C.F.R. § 230.11(a) ("Potential changes in substrate elevation and bottom contours shall be predicted[.]") (emphasis added); id. § 230.11(b) ("Consideration shall also be given to the potential diversion or obstruction of flow, alterations of bottom contours, or other significant changes in the hydrologic regime.").

[174] 40 C.F.R. §§ 230.23, 230.11.

[175] BBP 25467.

[176] BBP 1633 (past pipeline construction has "severely impacted the natural hydrology and circulation" of the basin); BBP 1640; BBP 4447; *supra* at 8–9 (NEPA requires adequate discussion of cumulative impacts).

[177] *See* Rec. Doc. No. 86, pp. 16-17; BBP 11670 (expressing concern over "large indirect hydrological impacts that cause siltation and vast changes to the forest canopy"); BBP 4446 ("direct, indirect, secondary, and cumulative impacts… remain overlooked"); BBP 11660 (mitigation "inadequate to address inevitable indirect and cumulative wetland effects" from project of this scale); BBP 4438 ("By altering north-south flow within the Atchafalaya, Bayou Bridge would even degrade fertile swamps vital to wildlife and harvest.").

Document Number: 59245

indirect impacts through changes in wetland hydrology.[178]  Issues of heaving flooding during times of high sediment loads were noted, along with accretion in the Basin resulting in the deprivation of sediment and ultimate loss of coastal land.[179]

Despite this information being presented to the Corps, Plaintiffs claim that neither the Corps' decisions or underlying analysis mention any of these impacts to the Basin's hydrology or sediment accretion.  Rather, Plaintiffs contend the Corps limited its analysis to only the direct impacts of wetlands loss and mitigation therefor.  Thus, Plaintiffs claim any secondary impacts have been ignored in the Corps' CWA analysis, finding simply in the Section 404 EA that "significant secondary effects…are not anticipated" from the pipeline.[180]  Plaintiffs acknowledge that the Corps refers to indirect impacts in the Section 408 EA but complains that this is only in the limited context of temporary turbidity resulting from construction.[181]

Plaintiffs further disagree with any argument by the Corps that it relied on mitigation via the Louisiana Wetland Rapid Assessment Method ("LRAM") to address these pipeline impacts.  Plaintiffs argue, while LRAM is used to calculate mitigation credits for direct losses of wetlands, there is nothing in LRAM to offset indirect impacts like increased sedimentation.[182]  Further, Plaintiffs complain that the Corps removed the requirement to mitigate for cumulative and indirect impacts, a requirement that had been part of previous

---

[178] BBP 1651.
[179] BBP 1659; 1635.
[180] Section 404 EA at 58.
[181] Section 408 EA at 60.
[182] BBP 24995; BBP 4464-67 ("LRAM does not include a direct method for evaluating cumulative, secondary, and indirect impacts").
Document Number: 59245

protocol.[183]  Because the EPA explicitly requires mitigation for both direct and indirect

impacts,[184] the Corps' failure to mitigate indirect impacts to wetlands was arbitrary and

capricious.

The Corps rejects Plaintiffs' contention that the Corps' conclusion that significant

secondary effects are not anticipated was conclusory because the Corps claims it did

specifically examine these factors in setting out its conclusions consistent with the 404(b)

guidelines.  The Corps acknowledges that it was required to consider secondary effects

for the project:

> Secondary effects are effects on an aquatic ecosystem that are associated
> with a discharge of dredged or fill materials, but do not result from the actual
> placement of the dredged or fill material. Information about secondary
> effects on aquatic ecosystems shall be considered prior to the time final
> section 404 action is taken by permitting authorities.[185]

Pursuant to these guidelines, the Corps notes that it considered the effect of

digging the trench for placement of the pipe, but it ultimately concluded that there would

not be an adverse impact because the permit required that the natural, preexisting

contours be restored and the area allowed to revegetate.[186]  The Corps notes that

Plaintiffs failed to acknowledge that, after the pipes have been installed approximately

four feet below the preexisting ground level, the original contours and elevation of the

---

[183] BBP 6533 ("unlike the Corps' previous mitigation method, the modified Charleston method, the LRAM apparently does not require mitigation for indirect, secondary, or cumulative impacts"); BBP 5088; BBP 4467 (predicting that more projects would require EISs because mitigation fails to account for indirect, secondary, and cumulative wetland impacts).
[184] BBP 12843.
[185] Rec. Doc. No. 220, p. 35 (quoting 40 C.F.R. § 230.11(h)(1)).
[186] BBP 45.
Document Number: 59245

land must also be restored.  Further, the Corps determined that, while construction would have a temporary effect on water circulation, that circulation is anticipated to return to normal after the contours and elevation are restored to preexisting conditions.[187] Regarding sediment and turbidity, the Corps acknowledged that there will be increased amounts of sediment in the water column during construction but likewise found that this impact would be minimized through specific construction techniques, such as the use of berms or coffer dams. Thus, the Corps concluded that this effect should diminish over time and leave no adverse effect once the construction has finished.[188]

The Corps also contends its analysis of this issue satisfied NEPA.  Notably, both EAs acknowledge the possibility of indirect impacts to the basin, including "the introduction of sediments from the cleared construction [right-of-way] to wetlands in or adjacent to the action areas" and "modifications to the hydrology of the wetlands."[189]  To minimize the risk of suspended sediment or increased turbidity during construction, the Corps points to the record demonstrating that it required Bayou Bridge to implement sediment control measures during construction.[190] Additionally, to minimize the risk of long-term increases in suspended sediment or turbidity, the Corps required Bayou Bridge to take measures to stabilize disturbed areas after the project was complete.[191]  The

---

[187] *Id.*
[188] BBP 46; *see also* BBP 50 ("Cumulative effects on the aquatic ecosystem"); BBP 51 ("Secondary effects on the aquatic ecosystem").
[189] BBP 393; accord BBP 11-12; BBP 46; BBP 51; BBP 161.
[190] BBP 46; see also BBP 39; BBP 97; BBP 112; BBP 382; BBP 664-67 (construction plan discussing temporary sediment control measures during construction).
[191] BBP 667-69 (construction plan discussing temporary and permanent stabilization procedures after completion, as well as revegetation procedures).
Document Number: 59245

Corps maintains that, considering these permit conditions, it reasonably concluded that "[a]ny reduction in water quality resulting from the proposed construction activities is anticipated to be of short duration, and localized to an area immediately surrounding the construction site. The proposed project should have little short-term and no long-term effect."[192] Hence, the Corps claims these findings show that it reasonably concluded that construction would not have a significant impact on sediment or turbidity in the Basin.

The Corps also argues that the record disputes Plaintiffs' claims that the pipeline creates a major new channel through the Basin because the EAs fully explain how the "majority of the proposed activity is adjacent to existing pipeline [rights-of-way]."[193] The EAs require Bayou Bridge to "return wetlands to pre-construction contours"[194] in order to minimize the possibility of any "long-term changes in drainage and flow patterns, flooding[,] and sediment distribution and accretion in environmentally sensitive areas such as the Atchafalaya Basin."[195] The Corps notes that it considered and rejected Plaintiffs' early request that Bayou Bridge change the hydrology of the basin by disturbing remnant spoil piles from pre-CWA pipeline construction[196] "precisely because it would result in a new, permanent discharge of material into the Corps' jurisdictional waters and alter the status quo hydrology of the basin."[197] The Corps asserts that the record and the EAs

---

[192] BBP 46; BBP 393.
[193] BBP 51.
[194] BBP 393.
[195] BBP 51; *see also* BBP 161 ("All excavated material placed in temporary spoil piles in the work space will be restored to preconstruction contours to minimize impacts on hydrology.").
[196] BBP 4224.
[197] Rec. Doc. No. 220, p. 37 (citing BBP 4224).
Document Number: 59245

show that the Corps took a hard look at the issue of whether pipeline construction would alter the hydrology of the Basin, and the Corps included permit conditions to minimize any impact.[198] Thus, the Corps reasonably concluded that pipeline construction would not significantly alter the Basin's hydrology, and the Corps maintains that Plaintiffs' difference of opinion on this technical determination is no basis to set aside the Corps' permitting decisions.[199]

Plaintiffs admit this issue was not raised at the preliminary injunction stage; thus, the Fifth Circuit has not spoken on this issue of indirect impacts. After reviewing the record, the Court finds that the Corps did not ignore the issue of indirect impacts in the Basin. The Court finds that the Section 408 EA clearly explains that the pipeline, which is co-located with existing pipelines, constructed in segments,[200] supports the conclusion that the Bayou Bridge pipeline would "not result in . . . the creation of a pipeline canal."[201] Further, the record demonstrates that the Corps expressly considered and analyzed indirect impacts on the Basin.[202] Under NEPA, the Corps explicitly considered "[i]ndirect impacts on wetland resources that could result from . . . the introduction of sediments from the cleared construction [right-of-way] . . . and modifications to the hydrology of the wetlands as the result of subsurface flow along the pipeline."[203] The Corps concluded

---

[198] BBP 1; BBP 39; BBP 96-98.
[199] Rec. Doc. No. 220, p. 37 (citing *Sabine River Auth. v. U.S. Dept. of Interior*, 951 F.2d 669, 678 (5th Cir. 1992)).
[200] BBP437.
[201] BBP458; BBP459 (Bayou Bridge's "preferred alternative is co-located with the existing pipelines and would not result in the creation of a new pipeline corridor through the area.").
[202] BBP51; BBP58; BBP393.
[203] BBP393.
Document Number: 59245

that the pipeline "would only result in minimal indirect impacts on wetlands,"[204] because Bayou Bridge would be required to implement measures both during and after construction to capture and remove sediment and "[t]o ensure that the hydrology of [the] wetlands is maintained."[205]

The record also demonstrates that the Corps considered secondary effects on the aquatic system for purposes of the CWA and concluded that construction would not result in an "expected loss of aquatic habitats, hydrology, or wetland contours."[206] The Corps made additional "[f]actual determinations" under the CWA about effects on "[w]ater circulation" and "[s]uspended particulate," which refers to hydrology and sediment deposits.[207] The Corps explained that permit conditions placed on Bayou Bridge would resolve Plaintiffs' concerns about the "potential [for] long-term changes in drainage and flow patterns, flooding and sediment distribution and accretion in environmentally sensitive areas such as the Atchafalaya Basin."[208] The Corps also required that Bayou Bridge "suitably maintain normal hydrologic flows" [] "to the greatest extent practicable[by] . . . maintain[ing] an approximate 50 foot gap for approximately every 500 feet of temporary side cast material."[209] The Corps further reserved the authority to order "additional compensatory mitigation" and "further remediation actions," including "[r]e-planting of desirable native tree species, erosion control, [and] regrading," if it deemed

---

[204] BBP394.
[205] BBP393; BBP664 (setting forth methods designed to capture and remove sediment).
[206] BBP45-46; BBP51.
[207] BBP45-46; *see* 40 C.F.R. § 230.11.
[208] BBP51; BBP50; BBP58.
[209] BBP97.

Document Number: 59245

such actions necessary.[210]   The administrative record simply does not support the contention that the Corps failed to mention or consider the secondary impacts regarding sediment as a result of the pipeline as the record is replete with instances that the Corps did just that.  The Court finds that the Corps complied with its NEPA and CWA obligations when considering secondary impacts of the pipeline, and Plaintiffs have not carried their burden of showing that the Corps' conclusions are not entitled to deference in this regard.

       2.  <u>Mitigation of Wetlands Loss</u>

Finally, Plaintiffs object to the Corps' allegedly arbitrary designation of the loss of forested wetlands as "temporary," because Plaintiffs maintain this loss is permanent as it is nearly impossible to regenerate cypress forests.  Plaintiffs claim that this "temporary" designation by the Corps allowed the Corps to unlawfully understate the significance of the environmental impacts, and escape the preparation of an EIS, and further freed the Corps from obtaining proper mitigation for such losses:   "The distinction between temporary and permanent loss of wetland function is a key factor under LRAM.[211]   But the Corps fumbled a critical fact when it determined that the project could proceed with mitigation that is far too low."[212]

The Court notes that, at the preliminary injunction stage, the Court agreed with Plaintiffs' arguments on this issue, and enjoined further construction in the Basis pending preparation of an EIS to address what the Court likewise perceived to be a permanent

---

[210] BBP97.
[211] Rec. Doc. No. 202-2, p. 44 (citing BBP 25030).
[212] *Id.* (citing *Ky. Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 413 (6th Cir. 2013)).
Document Number: 59245

loss of wetlands and a failure to appropriately mitigate same.[213]  However, Plaintiffs ignore

the Fifth Circuit's decision reversing this Court's finding and explicitly rejecting the

arguments[214] advanced herein by Plaintiffs on summary judgment.   The Fifth Circuit

pointedly noted that "the Corps' NEPA obligation was limited to discussing relevant

factors and explaining its decision, not to reaching conclusions that this court or the district

court approves."[215]   The Fifth Circuit held that: "after considering all the circumstances,

including—importantly—measures imposed on Bayou Bridge to comply with the CWA,

this project did not have a 'significant' environmental impact."[216]  The court continued:

> On their face, the 200+ pages in both EAs here acknowledged potential
> environmental impacts from the project, discussed third parties' concerns
> about those impacts, referenced in detail the hydrological, horticultural and
> wildlife environment in the affected acreage of the Basin, and explained how
> and where mitigation bank credits and construction protocols would be
> adopted to render the watershed impact not "significant." The court's
> misplaced view that the Corps issued a "mitigated FONSI" is an error of law
> that steered it in the wrong direction. Perhaps the Corps' discussion might
> have been improved with the addition of certain details, but the Corps' path
> could "reasonably be discerned" from the EAs and other publicly available
> documents and should have been upheld. *Nat'l Ass'n of Home Builders v.*
> *Defs. of Wildlife*, 551 US 644, 658, 127 S.Ct. 2518, 2530, 168 L.Ed.2d 467
> (2007) (internal quotation marks omitted).[217]

The Fifth Circuit also rejected the notion that the Corps had not required proper

mitigation for these impacts and upheld the Corps use of the LRAM methodology.   "In

---

[213] Rec. Doc. No. 86, pp. 34-44.
[214] The Fifth Circuit also rejected Plaintiffs' claim and this Court's finding that the Corps failed to adequately address the cumulative impacts of the history of noncompliance by relevant oil companies.
[215] *Atchafalaya Basinkeeper*  894 F.3d at 698.
[216] *Id.*
[217] *Id.* at 698-99.
Document Number: 59245

general, the Supreme Court has held that the use of scientific methodology like that contained in the LRAM is subject to particular judicial deference."[218]  The court found that,

> How the LRAM was utilized in the instant 404 EA is clearly referenced, if not fully explained in background, in twelve pages. Each of the eight watersheds crossed by this project is individually described, followed by a summary description of the mitigation bank credits required for each, followed by a summary chart for each watershed.[219]
>
> . . .
>
> That the LRAM analysis "rational[ly] connect[ed]" the out-of-kind mitigation bank purchases in the Basin to the "aquatic functions and services" lost by the project is all that was required either by the CWA regulation, by NEPA, or by the Supreme Court. *Motor Vehicle Mfrs.*, 463 U.S. at 43, 103 S.Ct. at 2866–67.[220]

Noting that Bayou Bridge was required to buy bottomland hardwood credits within the Basin watershed only because it had already purchased all available cypress/tupelo swamp credits, the court found that "[t]he Corps was entitled to make this decision rather than revert to the less-preferred alternatives prescribed in the regulations.[221]  The court continued:

> Second, the Corps' responsibility under the CWA is to ensure the protection of aquatic functions and services, which does not include the protection of tree species as such. The LRAM, properly read and understood, measures and scales precisely the aquatic functions and services characteristic of each type of Louisiana wetland and corresponding mitigation banks containing those wetlands. The scales differed for bottomland hardwoods and cypress/tupelo swamp on the basis of factors noted above. Appellees have not challenged the scientific validity of the LRAM-based analysis and calculations.

---

[218] *Id.* at 700 (citing *Marsh v. Oregon Nat. Res. Council,* 490 U.S. 360, 377-78, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989)).

[219] *Id.*

[220] *Id.*

[221] *Id.*

Document Number: 59245

Third, as the 404 EA clearly states, "[t]he Louisiana Wetland Rapid Assessment Method was utilized to determine the acquisition of a total of 714.5 acres of suitable habitat credits, from approved mitigation banks within the watershed of impact." It was on the basis of the LRAM that the Corps determined how many acres Bayou Bridge was required to purchase from mitigation banks within the Basin. Whether bottomland hardwoods or cypress/tupelo, both mitigation banks constitute wetlands, and the Corps concluded that the required purchases made up for the temporary or permanent conversion from one type of wetland (bottomland hardwood or cypress/tupelo swamp) to scrub shrub wetland. And as has been mentioned, Appellees did not contest the out-of-kind mitigation used in part to compensate for wetland conversion in the Terrebonne watershed.[222]

The court likewise found that the Section 404 EA noted that the Corps' conclusions were in line "with 'the preferred hierarchy as set forth by the USACE,' i.e. in-basin, in-kind mitigation first; in-basin, out-of-kind second; etc.[223] The court discussed the permit conditions set forth above that the Corps placed on Bayou Bridge to combat these environmental impacts and found that:

> In evaluating this project, the Corps conducted careful research; hewed to the governing regulations and the scientifically based LRAM tool; conditioned the permit in accordance with evolved best management practices; required purchases of acreage within mitigation banks that will provide the optimal replacement of lost aquatic functions and services; and produced two significantly reasoned EAs.[224]

> Finally, this explanation of the Corps' decision process is readily understood on the basis of the EAs, supplemented by the publicly available LRAM. That the district court's opinion did not express this understanding no doubt is partly attributable to its expedited judicial process, which pressed the parties' presentations and lacked the full administrative record. But regardless of these difficulties, the record suffices to supply a "rational connection" between the facts about the project and its CWA implications

---

[222] *Id.* at 701-702.
[223] *Id.* at 702.
[224] *Id.* at 702-703.
Document Number: 59245

and the ultimate decision rendered. The Corps' decision was thus not "arbitrary and capricious."[225]

The Fifth Circuit also found erroneous this Court's determination that 142 acres of wetlands would be "irretrievably lost," noting that

> [a]ccording to the 404 EA, 142 acres will be converted from forested wetlands to scrub shrub wetlands and 78 of these acres will have previously been cypress/tupelo swamp (designated PFO2 in the LRAM tables). "Herbaceous wetlands" also provide important aquatic functions. Because there will be no filling of wetlands in this project, converting them to dry land, the Corps found no permanent loss of wetlands.[226]

Nothing Plaintiffs have presented or argued on these issues upsets the holding of the Fifth Circuit on those same issues, and this Court is bound by that decision. Plaintiffs have failed to carry their summary judgment burden on these issues.

---

[225] *Id.* at 703.
[226] *Id.* at 699 n. 3.
Document Number: 59245

## VI.  CONCLUSION

For the reasons set forth above, Plaintiffs' *Motion for Summary Judgment*[227] is DENIED.  The *Motions for Summary Judgment* by the Corps,[228] Bayou Bridge,[229] and Stupp,[230] are GRANTED.

*Judgment* shall be entered accordingly.

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this 25th day of March, 2020.

_Shelly D. Dick_

**SHELLY D. DICK, CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

---

[227] Rec. Doc. No. 202.
[228] Rec. Doc. No. 220.
[229] Rec. Doc. No. 213.
[230] Rec. Doc. No. 214.
Document Number: 59245